BARRETT JOHNSTON MARTIN
  & GARRISON, PLLC
DAVID GARRISON (KY Bar No. 98258)
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
615/252-3798 (fax)
dgarrison@barrettjohnston.com

Local Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF KENTUCKY

AT BOWLING GREEN

| | | |
|---|---|---|
| CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | ) ) ) ) | Civil Action No. 1:23-cv-00148-GNS <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | JURY TRIAL DEMANDED |
| vs. | ) ) ) | |
| HOLLEY INC., f/k/a EMPOWER LTD., TOM TOMLINSON, DOMINIC BARDOS, and VINOD NIMMAGADDA, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND....................................................................................2

III.  ARGUMENT...........................................................................................................4

      A.   Plaintiff Properly Pleads Falsity ................................................................5

             1.   Defendants' Actionable Misstatements and Omissions.............................5

                  a.   Holley Damaged Its Reseller Relationships ...................................5

                  b.   Holley Failed to Integrate Acquired Companies .............................8

                  c.   Holley's Declining Financial Performance....................................11

             2.   Defendants' Misstatements and Omissions Were Material .......................12

             3.   The Safe Harbor Affords No Protection Here ..........................................15

      B.   Plaintiff Adequately Pleads Defendants' Scienter....................................17

             1.   The Complaint Collectively Alleges a Strong Inference of Scienter.........18

                   a.   The Individual Defendants Were Actively Involved in, Tracked, and Repeatedly Spoke About Holley's Central Business Operations.......................................................................19

                  b.   Suspiciously Timed Resignations Support Scienter ......................22

                  c.   Proximity Between Misstatements and Omissions and the Revelations of Truth Bolsters the Inference of Scienter ...............23

                  d.   Holley's Admissions Support Scienter .........................................23

              2.   Plaintiff's Inference of Scienter Is at Least as Compelling as Defendants' Inference of Non-Culpability ...............................................24

IV.  CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)..........................................................................................................12

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022).......................................................... *passim*

*Burges v. BancorpSouth, Inc.*,
2015 WL 4198795 (M.D. Tenn. July 10, 2015) ............................................................18

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)...........................................................................10

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) .......................................................................19

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*,
29 F.4th 802 (6th Cir. 2022) ...............................................................................5, 6, 25

*Doshi v. Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) ......................................................................................18

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ............................................................................15, 17, 19

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ........................................................................................17

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ............................................................................. *passim*

*Fryman v. Atlas Fin. Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ................................................................25

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) .............................................................9

*Gonzalez v. United States*,
2023 WL 6051458 (W.D. Ky. Sept. 15, 2023).................................................................5

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)............................................... *passim*

**Page**

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ..................................................................................... *passim*

*Heritage Glob. Network Los Angeles, Inc. v. Welch*,
   2024 WL 695772 (M.D. Tenn. Feb. 20, 2024) ........................................................18

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ...................................................23, 24

*In re Biogen Inc. Sec. Litig.*,
   857 F.3d 34 (1st Cir. 2017) .....................................................................................24

*In re Cardinal Health Inc. Sec. Litigs.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ..............................................................14, 21

*In re Envision Healthcare Corp. Sec. Litig.*,
   2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ...................................9, 11, 16, 21

*In re Ferro Corp. Sec. Litig.*,
   2007 WL 1691358 (N.D. Ohio June 11, 2007).......................................................17

*In re FirstEnergy Corp. Sec. Litig.*,
   2022 WL 681320 (S.D. Ohio Mar. 7, 2022)......................................................20, 21

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) ..................................................................................14

*In re Huntington Bancshares Inc. Sec. Litig.*,
   674 F. Supp. 2d 951 (S.D. Ohio 2009) ...................................................................22

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*,
   541 F. Supp. 2d 986 (S.D. Ohio 2007) ...................................................................16

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ..................................................................................18

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)........................................................16

*In re Upstart Holdings, Inc. Sec. Litig.*,
   2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ......................................................14

**Page**

*In re Yum! Brands, Inc. Sec. Litig.*,
   73 F. Supp. 3d 846 (W.D. Ky. 2014), *aff'd sub nom.*
   *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015)..............................................19

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
   2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021).........................................................................21

*Inst. Invs. Grp. v. Avaya, Inc.*
   564 F.3d 242 (3d Cir. 2009)............................................................................................7, 9, 22

*Kolominsky v. Root, Inc.*,
   667 F. Supp. 3d 685 (S.D. Ohio 2023), *aff'd*, 100 F.4th 675 (6th Cir. 2024).........................14

*Kyrstek v. Ruby Tuesday, Inc.*,
   2016 WL 1274447 (M.D. Tenn. Mar. 31, 2016) .......................................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011).............................................................................................................. *passim*

*McCoy v. Lake Cumberland Reg'l Hosp., LLC*,
   2019 WL 1960335 (E.D. Ky. May 2, 2019) ................................................................................5

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) .......................................................................................7

*Niederst v. Minuteman Cap., LLC*,
   2024 WL 3522413 (N.D. Ohio July 24, 2024) .........................................................................25

*Novak v. Kasaks*,
   216 F.3d 300 (2d. Cir. 2000).......................................................................................................7

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)........................................................................................................11, 14, 15

*Palazzolo v. Fiat Chrysler Autos. N.V.*,
   2017 WL 6389573 (E.D. Mich. Dec. 14, 2017) .......................................................................19

*Pittman v. Unum Grp.*,
   861 F. App'x 51 (6th Cir. 2021) ...............................................................................................22

*Plagens v. Deckard*,
   2023 WL 2711263 (N.D. Ohio Mar. 30, 2023) ........................................................................23

**Page**

*Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*,
556 F. Supp. 3d 772 (N.D. Ohio 2021), *aff'd*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022)......8

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) .......................................................................................19, 21

*Shupe v. Rocket Cos., Inc.*,
660 F. Supp. 3d 647 (E.D. Mich. 2023)............................................................. *passim*

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
2021 WL 195370 (M.D. Tenn. Jan. 20, 2021)......................................................23

*Strougo v. Tivity Health, Inc.*,
551 F. Supp. 3d 839 (M.D. Tenn. 2021)......................................................9, 12, 18

*Teamster's Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
83 F.4th 514 (6th Cir. 2023) .......................................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................... *passim*

*Weiner v. Tivity Health, Inc.*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019)..............................................................16

*Weston v. DocuSign, Inc.*,
669 F. Supp. 3d 849 (N.D. Cal. 2023) ..................................................................7

*Willis v. Big Lots, Inc.*,
2016 WL 8199124 (E.D. Ohio Jan. 21, 2016) ............................................6, 7, 23

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
426 F. Supp. 3d 864 (D. Kan. 2019)....................................................................24

*Zaller v. Fred's, Inc.*,
560 F. Supp. 3d 1146 (W.D. Tenn. 2021)......................................................18, 23

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b)...........................................................................................................................1
§78t(a) ...........................................................................................................................1
§78u-4(b)(1)(B)............................................................................................................5
§78u-5(c)(2)(B)(ii)......................................................................................................16

**Page**

Federal Rules of Civil Procedure
    Rule 9(b) ......................................................................................................................1, 5
    Rule 12(b)(6)...................................................................................................................4

Plaintiff respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Violations of the Federal Securities Laws [ECF 41-42] ("Motion" or "Mot.").[1]

## I.  INTRODUCTION

The Court should deny Defendants' Motion because the Complaint satisfies the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and sets forth actionable claims for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b), 78t(a). The Complaint details Defendants' misrepresentations and omissions, made with scienter, that concealed significant problems under Holley's hood during the Class Period. Unbeknownst to investors, Holley was experiencing a significant downturn in its financial performance due to its changed distribution strategy that materially damaged Holley's critical reseller relationships, Holley's failure to integrate myriad acquisitions, and Holley's shift away from customer service, which undermined Holley's outlook.

Defendants concealed these mounting problems through a temporary, unsustainable sales boost, as homebound auto enthusiasts spent COVID stimulus funds. However, when the stimulus-buying dried up, Defendants could no longer hide Holley's defects, and Holley's true operational and financial condition came to light in a series of partial disclosures, which caused Holley's stock price to plummet and resulted in significant investor losses. As the truth became known, Defendants Tomlinson (Holley's CEO) and Bardos (Holley's CFO) abruptly departed the

---

[1]  Citations to "¶__" refer to paragraphs of Plaintiff's Amended Complaint for Violations of the Federal Securities Laws [ECF 36] ("Complaint"). All capitalized terms herein shall have the same definitions as set forth in the Complaint. Unless otherwise noted, all emphasis is added and citations are omitted.

Company. Their replacements, Gloeckler and Weaver, who were left to pick up the pieces, revealed the full truth about the problems plaguing Holley during the Class Period.

Defendants' Motion challenges only two elements of Plaintiff's claims, falsity and scienter, conceding the rest. Among other fatal flaws, Defendants' arguments ignore binding precedent and are premised on an improper counter-narrative, which mischaracterizes Plaintiff's allegations and then seeks to draw inferences in Defendants' favor. But on a motion to dismiss, the Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiff's favor. Defendants' Motion should be denied and this case should proceed to discovery.

## II.    FACTUAL BACKGROUND

Holley designs, manufactures, and distributes performance automotive products. ¶¶4, 29-30. Historically, Holley sold 80% of its products through resellers who buy products from Holley and resell them to end users. ¶¶34-35. Leading up to and during the Class Period (July 21, 2021 to February 6, 2023, inclusive), Defendants shifted Holley's sales focus to a fledgling direct-to-consumer ("DTC") channel, whereby Holly sold its products through its own websites. ¶¶5, 37. At the same time, Holley rapidly expanded its business through mergers and acquisitions ("M&A") activity, including acquiring at least 15 companies between 2019 and 2022. ¶33.

Throughout the Class Period, Defendants misrepresented the impact of Holley's shift to the DTC channel and integration of acquired companies. *First*, Defendants assured investors that Holley's relationships with resellers remained intact and strong, notwithstanding DTC expansion, stating that Holley's unique brand importance and "strict" pricing discipline supported its reseller channel. ¶¶37-61. In reality, Holley's DTC shift, through which Holley abandoned its "strict" pricing discipline and removed bulk order discounts, hurt its reseller relationships. *Id.* As a result, resellers bought fewer Holley products, sold down their inventory of Holley products, returned products to Holley, and increased purchases from Holley's competitors. ¶¶43, 52-61. Holley's

- 2 -

sales suffered accordingly. *Id.*

*Second*, Defendants assured investors that Holley was successfully integrating the companies it acquired, touted Holley's scalable business platform and ability to capture synergies, and conditioned investors to believe Holley would continue rapidly growing through acquisitions. ¶¶62-78. In reality, Holley consistently failed to integrate and capture cost synergies from acquired companies. ¶63. Instead, Holley gutted the acquired companies through mass layoffs that hindered product development, robbed Holley of expertise and institutional knowledge, and decimated Holley's ability to provide critical customer service. ¶¶62-88. For at least one acquired company, Holley did not even bother attempting integration until *after* being prodded by analysts, and misrepresented the lack of progress. ¶¶65-75.

The truth was revealed through a series of three after-hours disclosures. *First*, on July 28, 2022, Holley announced that its preliminary results for 2Q22 badly missed expectations and slashed its 2022 outlook. ¶¶56-57, 92, 168-169. Tomlinson revealed that DTC sales growth was "more than offset by resellers that reduced their purchases below their out-the-door sales levels, indicating that some sell-down of reseller inventory also occurred in the quarter." ¶¶56, 92, 169. In response, Holley's stock price dropped more than *47%* over two days. ¶¶57, 234. Less than two weeks later, Holley abruptly announced CFO Bardos' resignation. ¶¶58, 93, 172.

*Then*, on November 14, 2022, the Company announced disappointing results for 3Q22 and disclosed that Holley's warranty costs suddenly skyrocketed as resellers – who were already cutting purchases from Holley and drawing down inventory – "caught up on" an unexplained "backlog of warranty returns[.]" ¶¶96, 185, 188. As the market digested the news over the next two days, the stock price fell *20%*, closing at a record low price on November 16, 2022. ¶¶97, 235.

*Finally*, on February 6, 2023, Holley announced that Tomlinson, its CEO and President,

- 3 -

was departing and resigning from the Board. ¶¶98, 198. New CFO Weaver also announced "disappointing" preliminary results for 4Q22 and FY22 due in part to a "normalization of consumer demand to pre-COVID levels" that "reduced sales in the second half of 2022." ¶¶100, 201. Moreover, new Interim CEO Gloeckler announced Holley was making "necessary changes to return Holley to profitable growth," including a slew of new initiatives to accelerate M&A synergy capture, improve cash flow, streamline operations, and manage costs and inventory. ¶¶200, 202. On this news, Holley stock fell *31%* on February 7, 2023, and *9.75%* on February 8, 2023, a total drop of nearly *38%* over the two-day period. ¶¶101, 203, 236.

On March 9, 2023, Gloeckler called 2022 a "challenging year" that "surfaced many areas of improvement" for Holley. ¶206. Weaver admitted that COVID stimulus had likely boosted Holley's demand "between 2020 and 2022," including "a ton of . . . stimulus" that "distorted" financial results in 1Q22. ¶¶207, 211-212. Weaver disclosed Holley would stop all M&A activity and admitted that with regard to "a lot" of the acquisitions "over the past several years[,]" Holley was "still working through those to find and realize synergies." ¶¶208-209.

## III.    ARGUMENT

Under Rule 12(b)(6), the Court considers the Complaint in its entirety, "accept[s] all factual allegations . . . as true," and construes all reasonable inferences in Plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10, 322 (2007). Defendants challenge only falsity and scienter, conceding that the remaining elements were adequately pled and waiving any challenges to them.[2]

---

[2]    The elements are: "(1) a material misrepresentation or omission by the defendant [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

## A.        Plaintiff Properly Pleads Falsity

Rule 9(b) and the PSLRA require that allegations of fraud "state with particularity the circumstances constituting fraud or mistake" and "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading[.]" Fed. R. Civ. P. 9(b); 15 U.S.C. §78u-4(b)(1)(B). Together, "Rule 9(b) and the PSLRA require a complaint to allege the 'who, what, where, when, and why' of the fraudulent statements." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*, 29 F.4th 802, 810 (6th Cir. 2022). The Complaint satisfies these standards, detailing the time, place, content, and speaker of each false statement (¶¶106-115, 117-126, 128-137, 139-144, 146-152, 154-166, 168-183, 185-196) and the reasons why each was false and misleading when made (¶¶116, 127, 138, 145, 153, 167, 184, 197). Nothing more is required.

Defendants argue the Complaint is deficient because "it is unclear" which statements are challenged or why they are misleading. Mot. at 7-9. Yet, the detailed arguments in Defendants' Motion demonstrate that they clearly understand, but just disagree with, the Complaint's allegations. *Id.* at 9-21. Accordingly, Defendants' objections to the form of the Complaint should be rejected. *See Astec*, 29 F. 4th at 810-12 (rejecting a similar challenge).[3]

### 1.        Defendants' Actionable Misstatements and Omissions

#### a.        Holley Damaged Its Reseller Relationships

Throughout the Class Period, Defendants misrepresented Holley's relationships with and demand from resellers, who made up 80% of Holley's sales. For example, Defendants repeatedly

---

[3]    The Court should also reject Defendants' improper "reserv[ation of] the right to identify additional grounds for dismissal on all statements" and any new arguments raised in their reply brief. Mot. at 9 n.4; *see McCoy v. Lake Cumberland Reg'l Hosp., LLC*, 2019 WL 1960335, at *2 n.2 (E.D. Ky. May 2, 2019) ("the Sixth Circuit has repeatedly refused to recognize arguments raised initially in a reply brief") (collecting cases); *Gonzalez v. United States*, 2023 WL 6051458, at *2 (W.D. Ky. Sept. 15, 2023) (Stivers, J.).

stated they had "established mutually beneficial and long-term relationships with [] resellers" supported by "strong pricing discipline across [Holley's] channels with strict conformance to minimum advertised pricing." ¶¶36, 38, 52, 109, 111, 113, 115, 141, 152. When asked whether resellers were giving "pushback" or "frustrated with the shift towards DTC," Bardos denied any problem, stating Holley's "relationships" with resellers were "strong and solid." ¶¶53, 122. Defendants also assured investors that reseller demand remained strong; there was "far more demand there than is visible in our numbers"; top resellers were "growing very nicely and growing with us"; and Holley's brands were "must-carry brands." ¶¶37, 59, 137, 183.

In reality, Holley seriously damaged its reseller relationships through discounting, "flash sales," a lack of pricing discipline in the DTC channel (*i.e.*, selling *via* DTC below Holley's minimum advertised pricing), and eliminating bulk order discounts. ¶¶37-55. As a result, Holley's resellers decreased purchases of Holley products, returned products *en masse*, and turned to Holley's competitors. ¶¶43, 52-61. Holley's DTC channel, meanwhile, was not big enough to offset these effects, which caused a severe reduction in organic growth obscured by a temporary sales boost from COVID stimulus. ¶¶56-61, 76-78, 92-96, 100, 103, 211-212. Defendants' failure to fully disclose these material facts rendered their statements misleading. *See Matrixx*, 563 U.S. at 44 (omissions actionable when disclosure is "necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading") (cleaned up); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001) (*en banc*) ("[A] company may choose silence . . . but it may not choose half-truths.").[4]

---

[4]   *See Astec*, 29 F.4th at 812 (falsity adequately pled where "Defendants painted a rosy picture of Astec's performance without disclosing [the alleged] problems and without providing a fair disclosure of the financial consequences"); *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *18 (M.D. Tenn. Dec. 18, 2017) (statements about strong client relationships were false because company's poor quality led "important client relationships to the brink of collapse"); *Willis v. Big*

Defendants' misstatements and omissions regarding Holley's problems with resellers are supported by Holley's admissions. At the end of the Class Period, new CFO Weaver revealed that demand dropped sharply to "pre-COVID levels" during the second half of 2022. ¶¶100, 199-201, 236; §II, *supra*; *Inst. Invs. Grp. v. Avaya, Inc.* 564 F.3d 242, 263-64 (3d Cir. 2009) (falsity allegations supported by admissions); *Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d. Cir. 2000) (same); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1024 (N.D. Cal. 2020) (same).[5]

The falsity of Defendants' reseller statements is also supported by the corroborating accounts of several Holley FEs. The Complaint pleads particularized facts demonstrating that the information provided by the FEs is reliable, including detailed descriptions of their titles, employment dates, supervisors, and relevant experiences and interactions. ¶¶42-55, 61, 76-78. Thus, the FE allegations are sufficiently pled. *See Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 667 (M.D. Tenn. 2022) ("plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged") (collecting cases); *Shupe v. Rocket Cos., Inc.*, 660 F. Supp. 3d 647, 680 n.15 (E.D. Mich. 2023) (rejecting challenges to FEs because they were "described with sufficient particularity to support the basis of their allegations").

Defendants' disputes over the weight of the FE statements (Mot. at 10-11) are premature at the pleading stage, where all allegations are accepted as true and all reasonable inferences are

---

*Lots, Inc.*, 2016 WL 8199124, at *17-29 (E.D. Ohio Jan. 21, 2016) (positive statements about a shift away from company's traditional business model were misleading because sales growth declined from the shift); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 873-81 (N.D. Cal. 2023) (statements about customer demand failed to disclose it was unsustainably fueled by COVID-19).

[5]    Defendants fail to address these admissions aside from quibbling that they never used the word "suffered" when referring to Holley's reseller relationships and instead maintained the relationships were "great." Mot. at 9-10. This factual dispute is premature (*Tellabs*, 551 U.S. at 309-10, 322), unsupported, and contradicted by the Complaint, which pleads with particularity that Holley's reseller relationships were seriously damaged, as discussed herein.

construed in Plaintiff's favor. *Tellabs*, 551 U.S. at 309-10, 322. For example, Defendants challenge the weight of FE descriptions of Holley's minimum advertised pricing agreements. Mot. at 10.[6] But the corroborating accounts of FE1-4 detail Holley's undercutting of resellers by selling products to DTC customers below minimum advertised prices, reducing and eliminating resellers' bulk buying discounts, and broadening promotions to DTC customers. ¶¶42-52.[7] The FE accounts corroborate each other, provide sufficient detail (¶¶42-45, 50, 52), and support the falsity of Defendants' statements such as Holley maintaining "pricing discipline" and "strict conformance to minimum advertised pricing." ¶¶38, 40, 109, 111, 113, 115, 141, 152. Defendants' efforts to undermine the FE accounts should be rejected. *See Clover*, 587 F. Supp. 3d at 666-68 (rejecting defendants' challenges to FE accounts that "call on the court to weigh the value of evidence" because "[t]he PSLRA's heightened pleading standards are still ***pleading*** standards – not evidentiary ones") (emphasis in original).[8]

### b.       Holley Failed to Integrate Acquired Companies

The Complaint also pleads that Defendants made material misrepresentations and omissions about the success of Holley's M&A strategy, creating a false narrative. For example,

---

[6]   *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772 (N.D. Ohio 2021), *aff'd*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022), is inapposite. There, the court found that the confidential witnesses provided no facts whatsoever supporting the allegations (*id.* at 788), whereas the FEs here provide detailed factual support (¶¶42-55, 61, 63-68, 70, 72-83, 85-86).

[7]   Defendants' suggestion that FE3 could not have known about Holley's DTC sales (Mot. at 11) is contradicted by the facts. While Holley initially operated FE3's company, AEM, as a standalone business, it ultimately forced AEM to shift to DTC sales at the expense of reseller sales. ¶¶43, 53, 65-75. Things were so bad that Nimmagadda even asked FE3 to rewrite Holley's business model to improve relations with resellers. ¶¶53-55.

[8]   Defendants' attempt to distort DTC allegations also fails. Plaintiff does not allege that DTC was not a priority or a source of growth. Mot. at 11, 15-16. Rather, as discussed herein, Plaintiff alleges that DTC growth came at the expense of reseller relationships and sales, which hurt Holley's financial performance because DTC was not large enough to offset reseller losses.

Defendants stated Holley was realizing "cost synergies" from acquisitions, "meaningfully accelerating" integration "to realize value within the year[,]" positioned to "continue to acquire and integrate value-enhancing acquisitions[,]" and had a "track record of recent acquisitions" indicating its ability to complete further "transformational acquisitions[.]" *See, e.g.*, ¶¶63, 108, 112, 140, 150, 179, 187. But Defendants did not disclose that, in reality, Holley failed to successfully integrate and capture synergies from acquired companies due to a host of problems: inefficient operations, excess costs, disparate systems, inventory management issues, and terminations of key personnel. ¶¶62-90. As such, Defendants violated their duty to fully disclose relevant, material facts. *See Matrixx*, 563 U.S. at 44; *Helwig*, 251 F.3d at 563.[9]

The falsity of these statements is evident from the Company's sharply contrasting admissions. *See Avaya*, 564 F.3d at 263-64 (defendants' admissions supported the falsity of prior statements). In February 2023, at the same time Holley announced Tomlinson's abrupt departure from the Company, it announced "necessary changes to return Holley to profitable growth," including a slew of much needed initiatives to accelerate M&A synergy capture. ¶¶100, 200, 202. A month later, Holley announced that it would stop all M&A activity, a dramatic reversal. ¶¶104, 208. Interim CEO Gloeckler admitted that, with regard to "a lot" of Holley's acquisitions "***over the past several years***," Holley was "still working through those to find and realize synergies" and CFO Weaver stated the M&A pause was to "finaliz[e] successful integrations and synergy capture" and "to restore Holley's profitability, improve[] free cash flow, optimize working capital and de[-

---

9     *See also Strougo v. Tivity Health, Inc.*, 551 F. Supp. 3d 839, 844-45, 847-48 (M.D. Tenn. 2021) (statements painting a "deceitfully rosy picture" of acquisition were actionable); *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *10-12 (M.D. Tenn. Nov. 19, 2019) (statements regarding company's "track record of delivering strong growth" through "selective acquisitions" were materially misleading); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *3-7, *17-23, *48-50 (M.D. Tenn. Mar. 31, 2011) (statements about "[d]emonstrated ability to identify and integrate acquisitions" were actionable).

]lever the balance sheet." ¶¶104-105, 208.

In addition to these admissions, falsity is supported by sufficiently detailed and corroborated FE accounts. ¶¶62-90. Defendants attempt to undermine these accounts by downplaying them as "anecdotes" and "colorful . . . criticisms" and drawing inferences in Defendants' favor. Mot. at 13-15. But such challenges are premature, improper on a motion to dismiss, and otherwise groundless. *Tellabs*, 551 U.S. at 309-10, 322; *Clover*, 587 F. Supp. 3d at 666-67; *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 410-11 (S.D.N.Y. 2020) (rejecting challenges to FEs supporting falsity allegations about problems integrating acquired companies).

The FE accounts are not anecdotal or lacking particularity, as Defendants contend, but rather multiple FEs (FE1, FE2, FE3, and FE5) describe with detail that the integration problems caused dysfunction, brand deterioration, product development issues, and margin compression. ¶¶63-75, 79-86. These accounts expose Defendants' false claims that the FEs "support Defendants' statements" and that Holley was successfully integrating its M&A targets and capturing cost "synergies." Mot. at 14; ¶¶62-63, 108, 112, 124, 132, 140, 159, 176, 186-187.

Defendants' other challenges to the FEs are unavailing. For example, Defendants mischaracterize FE2, who did not simply observe that Holley "fired staff after each merger" (Mot. at 14), but rather detailed that the firings were detrimental to Holley, causing lost expertise and institutional knowledge. ¶¶63, 79. Defendants also ignore the observations of FE1, FE3, and FE6 that Holley upset consumers and hurt sales by gutting critical technical support, contrary to Defendants' statements that Holley's "knowledgeable phone technical sales advisors" "deepen[ed]" engagement with "enthusiast consumers" to "[e]xpand DTC [s]ales[.]" ¶¶79-86, 106, 110, 114, 150. Likewise, Defendants misconstrue FE3's account of the AEM integration. Mot. at

- 10 -

13-14. FE3 stated that, before Holley's 2Q21 earnings call, Holley had not taken *any* action to integrate AEM (¶¶68-69) and was not "working diligently to integrate" AEM or pushing DTC at AEM (¶123). FE3 further stated that Defendants began taking *some* steps to start integrating AEM shortly after analysts began asking about Holley's integration efforts during the 2Q21 call, but AEM still functioned as a standalone company. ¶¶70-71. It was not until after the 4Q21 call that Defendants launched a disastrous integration of AEM that caused brand and reputational damage, pushed away many customers, and compressed margins. ¶¶65, 72-75. Thus, Defendants' statements about AEM were false and misleading. ¶¶71, 112, 117, 123, 140, 149, 166.[10]

### c.       Holley's Declining Financial Performance

Defendants argue they accurately reported Holley's financial performance. Mot. at 16-17. But Plaintiff does not challenge the literal accuracy of Holley's financial statements. Rather, Plaintiff alleges that Defendants' misstatements and omissions painted a rosy picture of sustainable, strong financial results and failed to disclose mounting problems with Holley's reseller network and M&A that hurt demand, growth, and profits, or that such problems were temporarily obscured by an unsustainable sales boost from COVID. *See* §III.A.1.a.-b., *supra*; *Envision*, 2019 WL 6168254, at *12 (statements misrepresenting the source of a company's financial success are actionable); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187-90 (2015) (literally true statements can be misleading when viewed in context).[11]

---

[10]   Defendants' arguments that Holley focused on M&A, had an M&A pipeline, made acquisitions, and used M&A to increase its market position (Mot. at 13) are irrelevant. The Complaint does not allege otherwise. Rather, the M&A allegations concern Defendants' undisclosed failure to integrate the companies Holley acquired, as discussed herein.

[11]   Analysts following Holley were also misled, as evidenced by their strong reactions to Defendants' disclosures. *See, e.g.*, ¶171(a) ("these results are drastically different from our takeaways from the 1Q call and conversations with the company"); ¶171(b) (calling poor results "jarring" compared to "much better tone" from competitors); ¶205 (noting "clouded internal visibility" and stating, "It was also news, to us, that consumer demand softened during the quarter,

**2.      Defendants' Misstatements and Omissions Were Material**

Materiality is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38 (cleaned up). Materiality is an objective, fact-specific determination rarely appropriate for a motion to dismiss. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 467 (2013); *Strougo*, 551 F. Supp. 3d at 852 (courts "must tread lightly" when assessing materiality).

Here, Defendants' misstatements were material because they involved matters critical to Holley's operational and financial condition: Holley's relationship with resellers and two of its core business objectives, DTC expansion and M&A growth. *See* §III.A.1.a.-b., *supra*. Reasonable investors would have found it important to know that Holley's DTC expansion came at the expense of far more important reseller relationships, and that Holley was failing to integrate its acquisitions. Disclosure of those omitted facts would have "significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38 (cleaned up).

Defendants' materiality arguments fail. ***First***, Defendants disingenuously suggest that they disclosed Holley's problems to investors. Mot. at 11-12, 14-15, 17-18. But this "truth-on-the-market" defense requires a fact-specific analysis, reserved for the trier of fact and not appropriately adjudicated at this stage of the proceedings. *See Tellabs*, 551 U.S. at 309-10, 322; *Shupe*, 660 F. Supp. 3d at 671 ("The Sixth Circuit has not applied the truth-on-the-market defense" and "even if it had, truth on the market is an issue for the trier of fact.") (cleaned up).

Moreover, Defendants provide no evidence that their supposed "disclosures" actually

---

particularly given HLLY's Nov. commentary that sell through had actually strengthened throughout the Fall as it made headway in improving retailer/distributor stocking levels.").

- 12 -

counteracted the alleged false statements. *See Shupe*, 660 F. Supp. 3d at 671 (rejecting truth-on-the-market defense where "Defendants have not provided any evidence that could cure the effect of the false . . . statements"). While Defendants vaguely warned in their SEC filings that, if Holley "loses any of the Company's key retail partners or any key retail partner reduces its purchase of the Company's existing or new products," then sales "***would be*** harmed" and Holley ***could*** experience "fluctuations in demand as a result of the pandemic" (Mot. at 11-12, 18), Defendants led investors to believe that the warned-of events were not happening, stating, for example, that Holley's "[s]trong organic growth" was "driven by growth to our resale channel's quarter" (¶120); Holley's demand "across the channels remain strong" (¶136); and Holley's brands were "must-carry brands" for resellers (¶137). Defendants also touted Holley's "mutually beneficial and long-term relationships with our resellers" due to "strong pricing discipline across [its] channels with strict conformance to minimum advertised prices," conveying that Holley was not losing resellers, or sales to resellers, despite its shift to DTC. ¶¶36, 38, 52, 109, 111, 113, 115, 141, 152. Moreover, in response to an analyst's question, Bardos denied that retail partners were frustrated by Holley's DTC shift and maintained that Holley's reseller relationships were "strong and solid." ¶¶53, 122.

Likewise, Defendants' boilerplate disclosures that Holley "may not achieve the anticipated benefits from future acquisitions for several reasons" and "cannot assure that any acquisition, once successfully integrated, will perform as planned, be accretive to earnings, or prove to be beneficial to the Company's results of operations or cash flow" (Mot. at 15), were not meaningful because Defendants repeatedly assured investors the opposite was true: that the integrations were succeeding and the warned-of events were not happening. For example, Defendants maintained that Holley "continue[d] to make solid progress integrating acquired businesses to drive further synergies." ¶186; *see also* ¶190; §III.A.1.b., *supra*. Thompson's vague remark that there was "still

- 13 -

a lot of work to do" on the AEM integration (Mot. at 14) was not meaningful because, in the same statement, Tomlinson falsely stated that Holley was making progress when, in fact, AEM effectively operated as a standalone company. ¶¶68-71, 149; §III.A.1.b., *supra*.

***Second***, Defendants' statements were not, in context, "puffery." Mot. at 12, 15-16, 18; *see Matrixx*, 563 U.S. at 38 (mandating contextual review of materiality). The statements were not puffery because they were not vague affirmations; rather, they communicated specific, critical information on matters at the heart of Holley's operations and financial performance – its reseller relationships, M&A, and demand. *See In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *14 (S.D. Ohio Sept. 29, 2023) (rejecting puffery argument where the statements at issue "would likely be considered essential to a reasonable investor"); *In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 749 (S.D. Ohio 2006) (alleged statements regarding the company's transition to a new distribution model were materially false statements rather than puffery).[12]

***Third***, this case does not deal in inactionable opinions. Mot. at 20-21. Statements starting with "believe" or "think" "remain perfectly capable of misleading investors." *Omnicare*, 575 U.S. at 175, 193. Plaintiff alleges factual statements, not opinions, "express[ing] certainty" about present and historical facts related to Holley's reseller relationships, troubled M&A, and the resulting negative financial impacts. *Id.* at 183. For example, Tomlinson's false statement, in response to an analyst's question on reseller destocking, that "we do think that there is far more

---

[12] Defendants' puffery cases (Mot. at 12, 15-16, 18) are inapposite because they involve statements that, unlike those here, were vague, ambiguous, or generic when viewed in context. *See, e.g.*, *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004) (statements about Ford's commitment to quality, safety, and corporate citizenship were commonly heard from corporate managers and thus "numbingly familiar" and unimportant to reasonable investors); *Kolominsky v. Root, Inc.*, 667 F. Supp. 3d 685, 706-07 (S.D. Ohio 2023) (loose statement about defendants' "long term" belief in the company's ability to keep customer acquisition costs much lower than competitors' costs), *aff'd*, 100 F.4th 675 (6th Cir. 2024).

- 14 -

demand there than is visible in our numbers, hence my comment that we believe the demand for our products is solid" is actionable because it falsely assured investors that Holley's demand was above verifiable thresholds ("our numbers"), even as problems began to leak out publicly about Holley's reseller network. ¶183. Additionally, even if certain statements are opinions, they remain actionable because Plaintiff identified material omissions concerning the problems surrounding Holley's resellers, M&A, and demand (§III.A.1.-2., *supra*) that "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189.

### 3.      The Safe Harbor Affords No Protection Here

Defendants next argue that some alleged false statements are forward-looking and thus immunized by the PSLRA safe harbor. Mot. at 18-20. The safe harbor is inapplicable for four reasons. ***First***, the safe harbor does not apply to statements of present or historical fact. *See Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018). This includes the many alleged statements concerning past and present facts about Holley's resellers, M&A, demand, and growth. For example, Defendants misleadingly stated "[w]e . . . are able to maintain strong pricing discipline across [our] channels with strict conformance to minimum advertised pricing[,]" Holley's "historical[]" acquisition "track record" was "indicative of [its] ability to make . . . transformational acquisitions," and "we're continuing to make progress integrating acquired businesses in order to drive further synergies." *See, e.g.*, ¶¶108-109, 112-113, 141, 152. 190.

***Second***, the safe harbor does not apply to omissions. *See Helwig*, 251 F.3d at 547-48, 562. Therefore, the safe harbor does not apply to Defendants' failure to disclose that Holley suffered from reduced demand, lost sales from resellers cannibalized by the shift to the DTC, or that its acquisitions were beset by integration problems. *See* §III.A.1., *supra*.

***Third***, the safe harbor does not apply to forward-looking statements when, as here, they

- 15 -

were made with actual knowledge of their falsity. *See* §III.B., *infra*; *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 541 F. Supp. 2d 986, 1005 (S.D. Ohio 2007) ("no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made") (cleaned up).

*Fourth*, Defendants' purported cautionary language (Mot. at 19) was insufficient. To qualify for safe harbor protection, cautionary language must be "meaningful" in the sense that it "must be substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge." *Helwig*, 251 F.3d at 559. The adequacy of cautionary language is a fact-intensive inquiry that is not appropriately resolved on a motion to dismiss. *See Envision*, 2019 WL 6168254, at *16. The cautionary language cited by Defendants was not substantive or tailored to any supposed forward-looking statements at issue. Mot. at 19. Indeed, Defendants point to vague and generic risk factors that could apply to virtually *any* company in the automotive products industry. *Id*. The fact that these warnings were substantially unchanged during and after the Class Period illustrates that they were not meaningful. *See* Mot. Ex. 1 at 7-9, 17-18, 20, 22, 28, 55; Ex. 2 at 5-6, 15, 17-18, 21, 23-24, 43; Ex. 3 at 3-4, 10-11, 13, 15, 21, 35; Holley's Form 10-K for the year ended December 31, 2022, at 3, 13, 15, 20; *Helwig*, 251 F.3d at 559. Moreover, the warnings themselves were inadequate and misleading because the future warned-of events were *already* occurring. §III.A.1.-2., *supra*; *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 911 (M.D. Tenn. 2019) ("Cautionary language cannot be meaningful if it is misleading in light of historical facts . . . established at the time the statement was made.") (cleaned up).[13]

---

[13] The safe harbor similarly does not apply to Defendants' oral statements on conference calls (*see, e.g.*, ¶¶119-123, 133-137, 149, 160-166, 177-183, 188-194) because "[t]he cautionary statements included at the beginning of each conference call were brief and generic" and failed to identify even a "single important factor that could lead to different results." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (cleaned up); 15 U.S.C. §78u-

### B. Plaintiff Adequately Pleads Defendants' Scienter

"[A]n inference of recklessness is sufficient to satisfy a plaintiff's pleading burden on the scienter element." *Dougherty*, 905 F.3d at 980 (reversing dismissal). In *Tellabs*, the Supreme Court articulated the standards for evaluating a "strong inference" of scienter under the PSLRA, holding that "courts must . . . ***accept all factual allegations*** in the complaint as true[,]" "assess all the allegations ***holistically***[,]" determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," and decide whether "a reasonable person would deem the inference of scienter cogent and ***at least as compelling*** as any plausible opposing inference one could draw from the facts alleged." 551 U.S. at 309-10. Following *Tellabs* and *Matrixx*, which provided a "post-*Tellabs* example of how to consider scienter pleadings 'holistically,'" the Sixth Circuit made clear that the "***only*** appropriate approach" is to "review scienter pleadings based on the collective view of the facts, ***not*** the facts individually" and that its "former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees." *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011).

Ignoring binding precedent, Defendants wrongly argue the Court "must" credit Plaintiff's scienter inferences "***only if***" they are the "***most*** plausible." Mot. at 21. The "most plausible" inference standard Defendants cite, relying on *In re Ferro Corp. Sec. Litig.*, 2007 WL 1691358, at *11 (N.D. Ohio June 11, 2007), derived from *Helwig*, was ***expressly rejected*** by the Supreme Court 17 years ago. *See Tellabs*, 551 U.S. at 324 ("The inference that the defendant acted with scienter ***need not be*** irrefutable, *i.e.*, of the 'smoking-gun' genre, ***or even the*** '***most plausible*** of competing inferences.'"); *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008) ("After *Tellabs*, however,

---

5(c)(2)(B)(ii) (requiring an "accompanying oral statement" to identify "the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement").

the standard adopted in *Helwig* is no longer good law.").[14]

Defendants also argue that the Complaint's purported failure to address various *Helwig* factors "indicates the absence of scienter." Mot. at 22. Not so. *Helwig* itself explained that while the factors it enumerated were "***usually*** relevant to scienter[,]" they were "***not*** exhaustive" but meant to be helpful in "guiding securities fraud pleading." 251 F.3d at 552. For this reason, courts in this Circuit have rejected Defendants' argument that the *Helwig* factors are a pleading necessity. *See Clover*, 587 F. Supp. 3d at 676 (treating the *Helwig* factors as a "pleading requirement" would be "unsupported by the caselaw"); *Heritage Glob. Network Los Angeles, Inc. v. Welch*, 2024 WL 695772, at *13 (M.D. Tenn. Feb. 20, 2024) (*Helwig* factors are "neither elements of any cause of action nor a checklist . . . more than half of the *Helwig* factors involve situational circumstances with little bearing on many types of fraud.").[15]

### 1. The Complaint Collectively Alleges a Strong Inference of Scienter

The Complaint alleges numerous particularized facts that collectively give rise to a strong inference of scienter. ¶¶213-231.[16] Defendants ignore some facts and launch piecemeal attacks on

---

[14] *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016), did not impose the "most plausible" standard, but rather cited *Tellabs*' "at least as compelling" standard. And, while the *Doshi* defendant knew of one segment's "accounting errors," this was insufficient for scienter because the segment's data "composed only a part" of the company's "***firm-wide*** financial data" that was misstated. *Id.* at 1042 (emphasis in original). The *Doshi* plaintiff also failed to identify any "public misstatement" to impute scienter to the company. *Id.* at 1041.

[15] Courts have found scienter without referencing the *Helwig* factors **at all** (*see, e.g.*, *Burges v. BancorpSouth, Inc.*, 2015 WL 4198795, at *6 (M.D. Tenn. July 10, 2015); *Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at *9 (M.D. Tenn. Mar. 31, 2016)), or where only certain factors were present (*see Dana*, 646 F.3d at 959; *Strougo*, 551 F. Supp. 3d at 851; *Welch*, 2024 WL 695772, at *14; *Zaller v. Fred's, Inc.*, 560 F. Supp. 3d 1146, 1172 (W.D. Tenn. 2021)). While unnecessary, among the many compelling indicia of scienter alleged, the Complaint alleges *Helwig* factors 3 (proximity between misstatements and disclosure of inconsistent information) and 6 (disregard of the most current factual information before making statements). *See* §§III.B.1.a., III.B.1.c, *infra*.

[16] The Complaint's particularized indicia of scienter discussed herein is easily distinguished from the allegations found deficient in *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 482 (6th Cir.

others, contravening *Tellabs*' mandate for a holistic analysis. But, none of their challenges undermine the strong inference of scienter here.[17]

### a. The Individual Defendants Were Actively Involved in, Tracked, and Repeatedly Spoke About Holley's Central Business Operations

During the Class Period, Tomlinson, Bardos, and Nimmagadda were Holley's highest-ranking executives. ¶¶214-216. As confirmed by several FEs, they were hands-on executives who actively monitored, had full access to, and were made aware of the Company's performance throughout the Class Period. ¶¶222-225; *see also Palazzolo v. Fiat Chrysler Autos. N.V.*, 2017 WL 6389573, at *5, *9-10 (E.D. Mich. Dec. 14, 2017) (FEs' statements confirming executives were hands on with vehicle sales and thus were aware of, or directed, the alleged fraud supported scienter).[18] And, Holley's own 10-K described Tomlinson as the Company's "chief operating

---

2014) (offering no concrete details or specific facts to show individual defendants received audit reports); *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 867 (W.D. Ky. 2014) (failing to plead that defendants, senior officers of a global restaurant chain with 39,000 franchises, had knowledge of or obligation to discover Chinese suppliers' failed test results), *aff'd sub nom. Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015); and *Teamster's Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525-34 (6th Cir. 2023) (more plausible opposing inference that defendants promptly disclosed termite-damage claims when they learned of their seriousness).

[17] Defendants wrongly argue that a lack of stock sales "undermines an inference of scienter." Mot. at 22. "[T]he absence of a motive allegation is not fatal[,]" and courts regularly find scienter without insider trading allegations. *Dougherty*, 905 F.3d at 982; *see also Grae*, 2017 WL 6442145, at *20; *Clover*, 587 F. Supp. 3d at 680 (same). Defendants' authorities fail to establish otherwise. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004) (emphasizing that the Sixth Circuit has "***never held that the absence of insider trading defeats an inference of scienter***") (abrogated by *Dana*, 646 F.3d at 961); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 834-35 (W.D. Mich. 2012) (noting "lack of motive is not critical").

[18] Defendants' assertion that FEs who did not interact with the Individual Defendants "cannot support scienter" (Mot. at 24) is wrong. *See Grae*, 2017 WL 6442145, at *20 n.8 ("[Defendant] makes much of the fact that FE1 has not claimed to have spoken directly to any of the Individual Defendants. [Plaintiff], however, has explained the basis of FE1's claims: as a . . . manager, he was . . . knowledgeable of the company's practices.").

decision maker." ¶214. FEs confirm he was active with day-to-day processes, micromanaged operations, and made decisions on every single new project from the Company's engineers. ¶¶89, 225. Bardos, as Holley's "principal financial and accounting officer" (Mot. Ex. 3 at 89), knowledgably reported on in-depth financial matters on earnings calls (*e.g.*, Mot. Ex. 4 at 5-6) and signed and certified Holley's financial filings (*e.g.*, ¶¶132, 150, 159, 176, 187, 217). As EVP of Corporate Development & New Ventures, Nimmagadda was deeply involved with Holley's M&A and integration efforts, including the efficiency of post-acquisition processes. ¶¶67, 73, 224. For example, he was the point person on the AEM acquisition, touring the AEM facilities multiple times, relaying Holley's due diligence requests to AEM, and representing Holley when mass layoffs were announced at AEM. ¶¶73, 224. Because of Holley's deteriorating reseller relationships, he also "asked FE3 to rewrite the business model" for the reseller channel. ¶55.

The Individual Defendants' scienter is further supported by their access to reports generated by Sightline – the program Holley used to track company-wide performance. *See Shupe*, 660 F. Supp. at 679 (scienter supported by FE allegations that defendants had access to dashboard reports demonstrating key performance indicators); *Grae*, 2017 WL 6442145, at *20 (finding scienter where there was a divergence between public and non-public assessments and statements were made without regard for recent contradictory facts). Tomlinson received monthly Sightline reports, and reports available to Defendants showed real-time sales data and red flags of cancellations and decreasing sales from repeat customers such as resellers. ¶¶48, 223.

Defendants nitpick these allegations, contending scienter is undermined because Plaintiff does not provide evidence, such as exactly when the Individual Defendants accessed Sightline and what data they analyzed. Mot. at 23. But Defendants' demand for this type of evidence is misplaced. *See In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at *20 (S.D. Ohio Mar. 7,

2022) (a plaintiff is not required "[t]o have knowledge of internal documents at this pre-discovery stage").[19] Tomlinson received monthly reports, and Defendants' access to key reports about Holley's central business operations shows they were aware of Holley's true condition (as later admitted by Holley's new executives) or were reckless in not being aware of it.

Moreover, the Individual Defendants, as Holley's highest level executives, are presumed to be aware of matters central to Holley's business. *See Shupe*, 660 F. Supp. 3d at 683. Here, reseller relationships made up 80% of Holley's sales, and were at the core of Holley's operations. ¶¶218-221; *see Envision*, 2019 WL 6168254, at *22 (because "out-of-network billing" constituted "upwards of 35%" of revenues for Envision's largest division, "it [was] reasonable to presume" that the CEO and CFO had scienter for omitting out-of-network billing when discussing Envision's "drivers of growth"). And, Defendants described Holley's M&A activity as "a pivotal piece of the Company's growth strategy" and "a key strategic pillar to drive growth." ¶220; *see Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *19 (M.D. Tenn. Apr. 8, 2021) (finding scienter for misstatements about sales and marketing practices that executives held out as core operations).

Defendants' repeated statements about central aspects of Holley's business further bolster the inference of scienter. ¶216; *Cardinal Health*, 426 F. Supp. 2d at 744 (finding scienter for "high-level executives, responsible for day-to-day operations and issues relating to Cardinal's financial

---

[19] Defendants' reliance on *PR Diamonds*, which relied on pre-*Tellabs* piecemeal scienter calculus, is misplaced. *Compare* 364 F.3d at 684-93, *with Dana*, 646 F.3d at 961 (citing and declining to follow the approach in *PR Diamonds*). *PR Diamonds* found access to financial information was insufficient to establish scienter because, in that case, unlike here, the false statements turned on arcane accounting issues concerning a subsidiary. 364 F.3d at 688. But *PR Diamonds* "included the important corollary that 'high-level executives **can be presumed to be aware** of matters **central to their business's operation**.'" *Grae*, 2017 WL 6442145, at *21 (quoting *PR Diamonds*, 364 F.3d at 688). Here, the Sightline reports contained data pertinent to the Company's central operations (*i.e.*, order cancellations and sales decreases impacting the channel responsible for **80%** of overall sales) and support a holistic finding of scienter. *See id.* (relationship providing 11-13% of annual revenue was "central" to operations).

- 21 -

performance . . . [who] signed off on Cardinal's corporate disclosure statements or participated in conference calls with analysts and investors"). Indeed, Defendants responded in detail to analysts' questions about resellers and M&A, including denying and deflecting problems when "specifically asked, directly and repeatedly" about them. *See Avaya*, 564 F.3d at 269 (denials of problems "in response to repeated questions" by analysts supported scienter). For example, when asked about the intersection between DTC and Holley's reseller relationships, Bardos falsely denied any problems and instead called the relationships "strong and solid." ¶¶53, 122. When asked about AEM, Tomlinson said Holley was "working diligently" on the integration, despite taking no action to do so. ¶¶68-69, 123, 221. Further, Tomlinson and Bardos blamed reseller drawdowns on factors such as "the Russian invasion of Ukraine" rather than damaged reseller relationships (¶¶162-163) and Tomlinson said AEM teams were "folded in" even though AEM had been largely left alone to that point (¶¶71, 149, 221).[20] These statements support scienter.

### b.   Suspiciously Timed Resignations Support Scienter

The abrupt departures of Holley's two highest-ranking officers, Tomlinson and Bardos support scienter. Tomlinson, a 20-year Holley veteran (¶23), and Bardos, whose Holley tenure lasted a little over one year (¶24), both left Holley within two years of it going public. Their departures coincided with the fraud being revealed and, combined with the totality of allegations

---

[20]   Far from finding defendants were not aware of matters central to insurer's long-term care business, *Pittman v. Unum Grp.*, 861 F. App'x 51, 53, 55, 57 (6th Cir. 2021), turned on the fact that the company made numerous, robust disclosures of losses in that business line, as well as the potential for additional losses and the need to increase reserves, which required significant accounting judgment and complex forecasting. That is not the case here, where Defendants denied problems with reseller relationships and falsely touted Holley's successful M&A integrations, misleading investors as to Holley's true condition. *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 971 (S.D. Ohio 2009), rejected plaintiff's argument that because Defendants monitored cash flow and were "aware of the nature of [Defendants' subsidiary's client's] business" "Defendants had to be aware of the ***acute*** problems facing [Defendants' subsidiary's client]") (emphasis omitted).

herein, support scienter. ¶¶58, 92-93, 98-100, 172; §III.B.1.a., *supra*; §III.B.1.c.-d., *infra*; *see Frank*, 646 F.3d at 961 (scienter allegations included CFO retirement within months after the fraud was revealed); *Plagens v. Deckard*, 2023 WL 2711263, at *29 (N.D. Ohio Mar. 30, 2023) (CEO departure a "few weeks" after revelation of fraud helped tilt in favor of strong inference of scienter); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2021 WL 195370, at *7 (M.D. Tenn. Jan. 20, 2021) (abrupt resignation "with no notice" supported scienter); *Willis*, 2016 WL 8199124, at *34 (resignation on last day of class period supported scienter).

### c. Proximity Between Misstatements and Omissions and the Revelations of Truth Bolsters the Inference of Scienter

The temporal proximity between Defendants' false statements and the disclosures supports scienter. *See Helwig*, 251 F.3d at 553; *Zaller*, 560 F. Supp. 3d at 1155-56, 1172 (disclosure made "less than three months after" statement it corrected had "a relative closeness in time" supporting scienter). For example, on May 12, 2022, Defendants reaffirmed FY22 guidance and said that DTC "remains strong." ¶¶154-167. Then, on July 28, 2022, Defendants cut FY22 guidance and admitted that DTC growth was "more than offset by resellers" reducing purchases. ¶¶168-171. And on November 14, 2022 – close to year-end – Defendants touted the "solid demand we've seen for our products" and "progress" on M&A synergies (¶¶185-197), while on February 6, 2023, Defendants' new replacements (Weaver and Gloeckler) disclosed a "normalization of consumer demand to pre-COVID levels" that "reduced sales in the second half of 2022" and that Holley needed to quickly implement several measures to accelerate M&A "deal synergy capture" and "return to profitable growth" (¶¶198-202).

### d. Holley's Admissions Support Scienter

In addition to Holley's admissions on February 6, 2023 detailed above, Holley's post-Class Period admissions further support scienter. ¶¶226-231; *see In re Avon Sec. Litig.*, 2019 WL

- 23 -

6115349, at *11 (S.D.N.Y. Nov. 18, 2019) (new CEO's post-class period disclosures demonstrated scienter for ex-CEO's class period statements); *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 868, 874 (D. Kan. 2019) ("post-class-period admissions" supported scienter for failure to disclose the near-term negative impact of the "transition away from Curo's most profitable line of business"). A month after the Class Period, Tomlinson's and Bardos' replacements admitted that yearly and quarterly growth ***during 2020-2022*** was unsustainably elevated due to COVID stimulus, including "a ton of [COVID] stimulus" that "distorted" financial results in 1Q22, and that Holley had struggled for "***several years***" to "realize synergies" from M&A. ¶¶206-212, 226-231. These specific admissions about the true state of Holley's business – on the heels of Tomlinson's and Bardos' departures – provide strong circumstantial evidence of Defendants' knowledge of these issues. If the new Holley executives could readily identify these issues, it strains credulity that Defendants were not aware of them, or were recklessly indifferent to them, when they spoke to investors. That the new executives did not specifically "mention" Bardos or Tomlinson or discuss their state of mind does not undercut the strong inference of their scienter. Mot. at 25; *see Avon*, 2019 WL 6115349, at *20.[21]

### 2. Plaintiff's Inference of Scienter Is at Least as Compelling as Defendants' Inference of Non-Culpability

As detailed above, "[t]he PSLRA does not require a plaintiff to definitively rule out non-fraudulent explanations of a defendant's behavior or even to establish, at the complaint stage, that the scales tip decidedly in favor of a finding of scienter." *Grae*, 2017 WL 6442145, at *21 (citing *Tellabs*, 551 U.S. at 326). In other words, "where two contrary inferences of scienter are equally

---

[21]   The timing and specificity of the admissions here distinguish them from those in *In re Biogen Inc. Sec. Litig.*, which were made "well after the end of the Class Period" and did "not provide particularized insight into the defendants' knowledge at the time of the alleged misstatements." 857 F.3d 34, 44 (1st Cir. 2017).

probable, the tie goes to the plaintiff." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *21 (N.D. Ill. Apr. 18, 2022). Here, the Complaint's well-pleaded allegations, supported by the multiple compelling indicia above, give rise to a strong inference that Defendants were aware of, or at a minimum, reckless in not being aware of, Holley's problems with resellers, M&A integrations, demand, and growth when Defendants spoke about these matters during the Class Period. §III.B.1., *supra*. And, because the particularized facts collectively give rise to a strong inference of the Individuals Defendants' scienter, the "individual scienter is sufficient to establish" Holley's scienter. *Clover*, 587 F. Supp. 3d at 675-76; *see also Astec*, 29 F.4th at 813-14 (CEO's scienter imputed to corporate defendant).

Defendants' competing inference of non-culpability fails to collectively consider *all* of the scienter facts alleged, as required by *Tellabs*, and is *not* more compelling than the inferences offered by Plaintiff. Defendants' suggestion that they acted in good faith[22] and with transparency during an uncertain post-COVID landscape (Mot. at 25) is belied by the specific information they received during the Class Period, Tomlinson's and Bardos' abrupt departures as the truth was revealed, and the other indicia of scienter detailed above. As such, Defendants have failed to defeat the strong inference of scienter here.

## IV.   CONCLUSION[23]

For the reasons described herein, Defendants' Motion should be denied in its entirety.

---

[22]   As an "affirmative defense" (*Dana*, 646 F. 3d at 963), "good faith" must be rejected at this stage. *See Niederst v. Minuteman Cap., LLC*, 2024 WL 3522413, at *16 (N.D. Ohio July 24, 2024) (motion to dismiss was an "inappropriate vehicle for testing an affirmative defense").

[23]   Defendants' sole challenge to the Section 20(a) claim is a purported failure to allege a primary violation of Section 10(b). Mot. at 25. Because Plaintiff alleged primary violations under Section 10 (b), the Court should sustain Plaintiff's Section 20(a) claim. ¶¶263-266; *Dana*, 646 F.3d at 962-63.

DATED:  August 16, 2024

BARRETT JOHNSTON MARTIN
  & GARRISON, PLLC
DAVID GARRISON (KY Bar No. 98258)


                    /s/ David Garrison
                   DAVID GARRISON

200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
615/252-3798 (fax)
dgarrison@barrettjohnston.com

*Local Counsel*

ROBBINS GELLER RUDMAN &
  DOWD LLP
ROBERT J. ROBBINS (admitted *pro hac vice*)
ELIZABETH A. SHONSON (admitted *pro hac vice*)
ANDREW T. REES (admitted *pro hac vice*)
MASON G. ROTH (admitted *pro hac vice*)
ALEX KAPLAN (admitted *pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33423
Telephone:  561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com
eshonson@rgrdlaw.com
arees@rgrdlaw.com
mroth@rgrdlaw.com
akaplan@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of *Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Complaint for Violations of the Federal Securities Laws* was filed electronically with the Clerk's office and served upon Defendant using the Court's CM/ECF system on August 16, 2024 through their counsel of record as indicated below:

LATHAM & WATKINS LLP
Sean M. Berkowitz
Eric R. Swibel
Nicholas J. Siciliano
330 North Wabash Street, Suite 2800
Chicago, IL 60611
Telephone: 312/876-7700

LATHAM & WATKINS LLP
Michele D. Johnson
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: 714/540-1235

KAPLAN JOHNSON ABATE
& BIRD LLP
Michael P. Abate
710 West Main Street, 4th Floor
Louisville, KY 40202
Telephone: 502/540-8280

*Counsel for Defendants Holley, Inc., Tom Tomlinson, and Dominic Bardos*

/s/ David Garrison
DAVID GARRISON