BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
DAVID GARRISON (KY Bar No. 98258)
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
615/252-3798 (fax)
dgarrison@barrettjohnston.com

Local Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF KENTUCKY

AT BOWLING GREEN

| | | |
|---|---|---|
| CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | ) ) ) ) | Civil Action No. 1:23-cv-00148-GNS |
| | ) | CLASS ACTION |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HOLLEY INC., f/k/a EMPOWER LTD., TOM TOMLINSON, DOMINIC BARDOS, and VINOD NIMMAGADDA, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SUPPLEMENTED AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   DEFENDANTS' REHASHED ARGUMENTS SHOULD BE REJECTED ......................2

III.  THE SAC ADEQUATELY PLEADS FALSITY ........................................................3

      A.    The SAC Pleads Falsity with Particularity .........................................3

      B.    Defendants' Actionable Misstatements and Omissions...........................3

            1.    Defendants Misrepresented Holley's Reseller Relationships ......................3

            2.    Defendants Failed to Disclose Holley's Failure to Integrate
                  Acquired Companies...........................................................................9

            3.    Defendants Obfuscated Holley's Declining Financial Performance .........11

      C.    Defendants' Misstatements and Omissions Were Material ...................12

      D.    The Safe Harbor Affords No Protection Here .......................................15

IV.   THE SAC PLEADS A STRONG INFERENCE OF SCIENTER...................................17

      A.    The Individual Defendants Were Actively Involved in, Tracked, and
            Repeatedly Spoke About Holley's Central Business Operations .........19

      B.    Suspiciously Timed Resignations Support Scienter .............................22

      C.    Proximity Between Misstatements and Disclosures Supports Scienter.................23

      D.    Holley's Admissions Support Scienter .................................................23

V.    CONCLUSION....................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)................................................................................................12

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022)........................................................... *passim*

*Burges v. BancorpSouth, Inc.*,
2015 WL 4198795 (M.D. Tenn. July 10, 2015) ...................................................18

*City of Charleston v. Hotels.com, LP*,
520 F. Supp. 2d 757 (D.S.C. Nov. 5, 2007)............................................................3

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020).................................................................10

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) .............................................................19

*City of Taylor Gen. Emps. Ret. Syst. v. Astec Indus., Inc.*,
29 F.4th 802 (6th Cir. 2022) .......................................................................3, 4, 25

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)....................................................................6

*City Pension Fund for Firefighters & Police Officers in
City of Tampa Bay v. Generac Holdings, Inc.*,
2025 WL 435928 (E.D. Wis. Feb. 7, 2025)............................................................6

*Dixie Fuel Co. v. Dir., Off. of Workers' Comp. Programs*,
820 F.3d 833 (6th Cir. 2016) ..................................................................................2

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ...................................................................15, 17, 19

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ............................................................................ *passim*

*Fryman v. Atlas Fin. Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) .......................................................25

*Garber-Cislo v. State Farm Auto. Ins. Co.*,
2012 WL 13005826 (E.D. Mich. Apr. 18, 2012)....................................................2

**Page**

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
  2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) .......................................................9

*Grae v. Corr. Corp. of Am.*,
  2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)............................................. *passim*

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) .................................................................... *passim*

*Heritage Glob. Network Los Angeles, Inc. v. Welch*,
  2024 WL 695772 (M.D. Tenn. Feb. 20, 2024) ........................................................18

*In re Accredo Health, Inc. Sec. Litig.*,
  2005 WL 8152649 (W.D. Tenn. Apr. 11, 2005)........................................................5

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)........................................................24

*In re Biogen Inc. Sec. Litig.*,
  857 F.3d 34 (1st Cir. 2017)....................................................................................24

*In re Cardinal Health Inc. Sec. Litig.*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) .............................................................14, 21

*In re Envision Healthcare Corp. Sec. Litig.*,
  2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) .................................9, 12, 16, 21

*In re FirstEnergy Corp. Sec. Litig.*,
  2022 WL 681320 (S.D. Ohio Mar. 7, 2022)........................................................20

*In re Ford Motor Co. Sec. Litig.*,
  381 F.3d 563 (6th Cir. 2004) .................................................................................15

*In re GM Co. Sec. Litig.*,
  2025 WL 952479 (E.D. Mich. Mar. 28, 2025) .......................................................6

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*,
  541 F. Supp. 2d 986 (S.D. Ohio 2007) ..................................................................16

*In re Omnicare, Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) .................................................................................18

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)........................................................17

**Page**

*In re Sotera Health Co. Sec. Litig.*,
2025 WL 860897 (N.D. Ohio Mar. 19, 2025) ........................................................................5

*In re Upstart Holdings, Inc. Sec. Litig.*,
2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ....................................................................14

*In re Yum! Brands, Inc. Sec. Litig.*,
73 F. Supp. 3d 846 (W.D. Ky. 2014) ....................................................................................18

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021) ....................................................................21

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ...........................................................................................10, 21

*Kyrstek v. Ruby Tuesday, Inc.*,
2016 WL 1274447 (M.D. Tenn. Mar. 31, 2016) ..................................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .......................................................................................................... *passim*

*Niederst v. Minuteman Cap., LLC*,
2024 WL 3522413 (N.D. Ohio July 24, 2024) ....................................................................25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ......................................................................................................12, 15

*Padilla v. Cmty. Health Sys., Inc.*,
2022 WL 3452318 (M.D. Tenn. Aug. 17 2022) ....................................................................8

*Palazzolo v. Fiat Chrysler Autos. N.V.*,
2017 WL 6389573 (E.D. Mich. Dec. 14, 2017) ..................................................................19

*Pittman v. Unum Grp.*,
861 F. App'x 51 (6th Cir. 2021) ..........................................................................................22

*Plagens v. Deckard*,
2023 WL 2711263 (N.D. Ohio Mar. 30, 2023) ..................................................................22

*Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*,
556 F. Supp. 3d 772 (N.D. Ohio 2021),
*aff'd*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022) ................................................................8

**Page**

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ......................................................................19, 20, 21

*Rensin, Tr. of Rensin Joint Tr. v. U.S. Cellular Corp.*,
755 F. Supp. 3d 1048 (N.D. Ill. 2024) .................................................................6

*Rose v. Hartford Underwriters Ins. Co.*,
203 F.3d 417 (6th Cir. 2000) ................................................................................2

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*,
2021 WL 195370 (M.D. Tenn. Jan. 20, 2021)....................................................22

*Saddle Rock Partners, Ltd v. Hiatt*,
1996 WL 859986 (W.D. Tenn. Mar. 26, 1996) .....................................................5

*Shupe v. Rocket Cos.*,
660 F. Supp. 3d 647 (E.D. Mich. 2023).............................................7, 13, 20, 21

*Strougo v. Tivity Health, Inc.*,
551 F. Supp. 3d 839 (M.D. Tenn. 2021)......................................................9, 12, 18

*Teamster's Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
83 F.4th 514 (6th Cir. 2023) ...............................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................. *passim*

*Weiner v. Trivity Health, Inc.*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019).............................................................17

*Willis v. Big Lots, Inc.*,
2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) .................................................4, 22

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
426 F. Supp. 3d 864 (D. Kan. 2019)...................................................................24

*Zaller v. Fred's, Inc.*,
560 F. Supp. 3d 1146 (W.D. Tenn. 2021).......................................................18, 23

**Page**

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b) .......................................................................................................................25
§78t(a) .......................................................................................................................25
§78u-5(c)(2)(B)(ii) ....................................................................................................17

Federal Rules of Civil Procedure
Rule 9(b) ......................................................................................................................3
Rule 12(b)(6) ...........................................................................................................2, 3
Rule 15 .........................................................................................................................3

## I.    INTRODUCTION[1]

During the Class Period, while Holley changed its distribution strategy, damaged critical reseller relationships, and failed to adhere to MAP and integrate acquisitions, Defendants misled investors to believe Holley's engines were roaring. A temporary sales boost from COVID stimulus funds allowed Defendants to maintain the façade, but when that dried up, partial disclosures exposed Holley's true condition, causing Holley stock to plummet, resulting in significant investor losses. As the truth was revealed, CEO Tomlinson and CFO Bardos abruptly departed Holley.

In the wake of this fall out, new Company CEO Stevenson revealed in a series of disclosures beginning in February 2024 that, contrary to Defendants' Class Period statements, Holley's distribution partners were not included in the Company's promotional efforts and Holley had virtually no MAP enforcement on its SKUs. Plaintiff moved for leave to file the SAC to include these critical admissions. Defendants opposed on futility grounds, insisting that Stevenson's admissions were irrelevant and did not establish falsity or scienter. The Court disagreed, finding Stevenson's statements "provide factual support for the allegations that Holley acted unlawfully" and that the SAC states a "prima facie case" of the alleged securities law claims. March 20, 2025 Memorandum Opinion and Order (ECF 67) ("Order") at 7.

Defendants now seek dismissal based on the same arguments the Court already rejected. Defendants' rehashed arguments do not provide a basis for the Court to revisit its findings, the Motion should be denied, and this case should proceed to discovery.[2]

---

[1]    Defendants' motion to dismiss (ECF 70) is referred to as "Motion" or "Mot." Citations to "¶__" refer to paragraphs of Lead Plaintiff's Supplemented Amended Complaint (ECF 68) ("SAC"). All capitalized terms herein have the same definitions as in the SAC. Unless otherwise noted, all emphasis is added and citations are omitted.

[2]    Defendants again only challenge falsity and scienter, conceding the remaining elements of Plaintiff's claims.

## II.    DEFENDANTS' REHASHED ARGUMENTS SHOULD BE REJECTED[3]

When the Court rejected Defendants' effort to prevent filing of the SAC, it employed a Rule 12(b)(6) standard in analyzing the futility of the SAC's allegations. Order at 5 ("Allowing an amendment or supplementation is futile when the pleading as amended or supplemented could not withstand a motion to dismiss."); *see also Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) ("A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss."). The Court found: (1) the supplemented allegations are "plead[ed] with an enhanced level of particularity by attributing the time and substance of the representations, and the basis for claims of falsity"; (2) "the additions support the allegations of falsity and scienter, as required to make a prima facie case of [Plaintiff's] securities law claims"; and (3) Defendants' scienter counterarguments were "not well-taken." Order at 7.

In seeking dismissal again, Defendants ***ignore*** the Court's Order and rehash ***identical*** arguments (many for the ***third*** time). To be sure, Defendants neither raise new arguments nor attempt to narrow the issues, despite the Order constituting law of the case. *See Dixie Fuel Co. v. Dir., Off. of Workers' Comp. Programs*, 820 F.3d 833, 843 (6th Cir. 2016) ("Under the law of the case doctrine, findings made at one stage in the litigation should not be reconsidered at subsequent stages of that same litigation."); *Garber-Cislo v. State Farm Auto. Ins. Co.*, 2012 WL 13005826, at *2 (E.D. Mich. Apr. 18, 2012) ("[T]here is no question that the undersigned clearly and expressly determined that plaintiffs' bad faith breach of contract claim was not futile, utilizing the very same legal standard that applies to this motion to dismiss. . . . The ruling set forth in that order

---

[3]    The parties extensively detailed the factual background of this case in lengthy briefing on the previous motion to dismiss (ECF 42-44) and on Plaintiff's motion for leave to supplement the complaint (ECF 55-57). The Court further summarized these facts in its Order. In an effort to proceed efficiently, Plaintiff incorporates its prior summaries of the factual allegations in its briefs (ECF 43 at 2-4; 55 at 2-7).

- 2 -

is now the law of the case."); *City of Charleston v. Hotels.com, LP*, 520 F. Supp. 2d 757, 775 (D.S.C. Nov. 5, 2007) (invoking the law of the case doctrine to preclude review of the "same issues" raised in a motion to dismiss, which the Court decided "mere months [prior] under an identical standard of review" in connection with a Rule 15 motion). Nevertheless, for the reasons stated below, Defendants' rehashed arguments are meritless.

## III.   THE SAC ADEQUATELY PLEADS FALSITY

### A.   The SAC Pleads Falsity with Particularity

The SAC amply satisfies the pleading requirements of Rule 9(b) and the PSLRA.[4] The supplemented allegations "are plead[ed] with an enhanced level of particularity by attributing the time and substance of the representations and the basis for claims of falsity." Order at 7. As such, Defendants' rehashed argument that the false statements are not clearly identified is meritless. Mot. at 7; *see City of Taylor Gen. Emps. Ret. Syst. v. Astec Indus., Inc.*, 29 F.4th 802, 810-12 (6th Cir. 2022) (rejecting a similar challenge).

### B.   Defendants' Actionable Misstatements and Omissions

#### 1.   Defendants Misrepresented Holley's Reseller Relationships

During the Class Period, Defendants misrepresented Holley's relationships with and demand from resellers, who made up 80% of Holley's sales. Defendants repeatedly stated they had "established mutually beneficial and long-term relationships with . . . resellers" supported by "strong pricing discipline" across channels with "*strict* conformance to [MAP]," and denied that Holley's focus on DTC was harming reseller relationships. ¶¶37-39, 54, 116, 118, 120, 122, 129, 148, 159. Defendants stated that: reseller demand remained strong; there was "far more demand

---

[4]   Under Rule 12(b)(6), the court considers the complaint in its entirety, "accept[s] all factual allegations . . . as true[,]" and construes all reasonable inferences in plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

there than is visible in [our] numbers"; resellers were "growing very nicely and growing with us" with "no effects" from DTC; and Holley's brands were "must-carry brands." ¶¶38, 61, 144, 190.

In reality, Holley seriously damaged its reseller relationships through discounting, "flash sales," a complete lack of "strict" adherence to MAP (*i.e.*, selling *via* DTC below Holley's MAP), and eliminating bulk order discounts. ¶¶38-57. As a result, unbeknownst to investors, Holley's resellers cut purchases of Holley products, returned products *en masse*, and turned to competitors. ¶¶45, 54-58, 61-63. Holley's growing DTC channel sales, meanwhile, were not nearly enough to offset these effects, which caused a severe reduction in organic growth that Defendants obscured by a temporary sales boost from COVID stimulus. ¶¶58-63, 78-80, 94-98, 102, 105, 218-219. Defendants' failure to fully disclose these material facts rendered their statements misleading. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (en banc) ("[A] company may choose silence . . . but it may not choose half-truths."); *see also Astec*, 29 F.4th at 812 (falsity adequately pled where "Defendants painted a rosy picture of Astec's performance without disclosing [the alleged] problems and without providing a fair disclosure of the financial consequences"); *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *18 (M.D. Tenn. Dec. 18, 2017) (statements about strong client relationships were false because company's poor service quality led "important client relationships to the brink of collapse"); *Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *17-29 (S.D. Ohio Jan. 21, 2016) (positive statements about a shift away from company's traditional business model were misleading because sales growth declined from the shift).

The falsity of Defendants' statements regarding Holley's resellers and MAP adherence is supported by new CEO Stevenson's admissions. Stevenson revealed that Holley previously excluded distribution partners from sales promotions and that, as a result, those distribution partners refused to promote Holley products and even promoted competitors' products. ¶¶221-

- 4 -

225. Stevenson also admitted that "the number of SKUs we were monitoring and enforcing was *very low*, compared to what we're doing now." ¶228; *see also* ¶227 (Stevenson stating that "MAP enforcement is now in place for 20,000 SKUs, which is *12 times more* than it was just a short time ago. This is key to earning trust with distributors and keeping everyone on a level playing field."). These admissions prove Holley lacked MAP enforcement on the vast majority of its SKUs during the Class Period. ¶¶227-232 (based on Defendants' statements, the SAC alleges Holley lacked MAP enforcement on approximately 97% of its entire product line). Stevenson's admissions, in context with the SAC's other particular allegations, demonstrate that Defendants' statements that Holley had "mutually beneficial" relationships with resellers supported by "strong pricing discipline with strict conformance to [MAP]" were misleading when made. ¶¶112, 232-233.

Defendants wrongly claim Stevenson's admissions "are irrelevant" and "reveal nothing[.]" Mot. at 15-17; ECF 56 at 11-13 (same). But, Stevenson's statements are Company admissions that are probative of securities fraud. *See* Order at 7 (finding supplemented allegations "provide factual support for the allegations that Holley acted unlawfully"); *In re Accredo Health, Inc. Sec. Litig.*, 2005 WL 8152649, at \*11 (W.D. Tenn. Apr. 11, 2005) (recognizing plaintiffs may rely on post-class period statements to substantiate falsity); *Saddle Rock Partners, Ltd v. Hiatt*, 1996 WL 859986, at \*16 (W.D. Tenn. Mar. 26, 1996) (recognizing post-class period statements may be used to establish the misleading nature of statements made within the class period).[5]

---

[5] Defendants cite *In re Sotera Health Co. Sec. Litig.*, 2025 WL 860897, at \*27 (N.D. Ohio Mar. 19, 2025), to argue Stevenson's admissions are "irrelevant" because they came too long after the Class Period. Mot. at 15. *Sotera* is inapt because that case involved an FE's public statements long after the class period that could not have put the defendants on notice during the class period. Here, Stevenson spoke for Holley and described how Holley's new practices with resellers and MAP differed from past practices. Unlike *Sotera*, the SAC links the two time periods based on the content of the Company's own statements. *See* ¶¶221-233; Order at 7 ("Defendants' counterarguments that these additions fail to show intent or additional support for the allegations are not well-taken" and recognizing "Stevenson's leadership position within the company").

To undercut these admissions, Defendants launch a number of fact-based challenges and wrongly seek falsity inferences in their favor. For example, Defendants argue Stevenson's admissions cannot support falsity because Defendants "never explained what they meant by 'mutually beneficial relationships[.]'" Mot. at 15. But, any reasonable investor could infer from Defendants' description of Holley's reseller relationships as "mutually beneficial" and its supposed adherence to "strict" pricing discipline that Holley was not secretly undercutting those resellers by excluding them from promotions and failing to enforce MAP. At this stage of the proceedings, Defendants' favored interpretation is not accepted as true. *See In re GM Co. Sec. Litig.*, 2025 WL 952479, at *5-6 (E.D. Mich. Mar. 28, 2025) (crediting plaintiffs' interpretation of defendants' statement that its new vehicles operated with "the human out of the loop" because it was "clear enough that a reasonable investor could interpret them to mean" that the vehicles "operated without human input"); *Rensin, Tr. of Rensin Joint Tr. v. U.S. Cellular Corp.*, 755 F. Supp. 3d 1048, 1063-64 (N.D. Ill. 2024) (crediting plaintiff's "competing plausible interpretation" of defendants' statements about the company's "regional approach"); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (crediting plaintiffs' interpretation of the word "renewal" and holding that context showing a possible alternative meaning raised a "factual dispute").[6]

---

[6] Defendants cite *City Pension Fund for Firefighters & Police Officers in City of Tampa Bay v. Generac Holdings, Inc.*, 2025 WL 435928 (E.D. Wis. Feb. 7, 2025), to distance themselves from Stevenson's (aka, Holley's) statements. Mot. at 15-16. There, the court found that post-class period statements indicating that "one of many" demand metrics bottomed out did not render false prior statements that demand remained "incredibly robust" in light of plaintiffs' concession that defendants' relied on other "accurate" metrics to support their belief. *Id.* at *11-12. Here, Stevenson's statements support that Holley actively undermined its own reseller relationships by excluding them from promotions (which were available DTC) and not enforcing MAP. ¶¶221-233. Thus, the relationships ceased to be "mutually beneficial" and resellers even turned to promoting competitors' products. *Id.*; Order at 7 ("These additions provide factual support for the allegations that Holley acted unlawfully.").

Defendants again argue that Stevenson's MAP-enforcement admissions do not support falsity because the Company never explained how it enforced its MAP policy or whether MAP applied to all SKUs. Mot. at 16; ECF 56 at 12. But as the SAC details, Defendants repeatedly stated that Holley maintained "strong pricing discipline *across [Holley's] channels* with *strict* conformance to [MAP]," leading reasonable investors to believe it applied to all business segments and products. ¶¶5, 16, 37, 116, 120, 122, 148, 159. That Holley tracked and penalized resellers who advertised below MAP does not undercut these well-pleaded allegations. Mot. at 16. To the contrary, Holley's one-way enforcement of MAP shows that Holley lacked "strong pricing discipline" and did not have "strict" conformance to MAP.

And, Defendants wrongly contend that enhancements in MAP oversight strategy after the Class Period do not bear on falsity. Mot. at 16. But, of course, Stevenson's admissions implicated the Company's past practices – the state of the Company's MAP enforcement *during* the Class Period. As Stevenson acknowledged when discussing the Company's 3Q24 results, there was virtually no MAP enforcement on any of the Company's SKUs previously. ¶¶227-228.

The falsity of Defendants' reseller statements is also supported by the corroborating accounts of several Holley FEs. The SAC pleads particularized facts demonstrating that the information provided by the FEs is reliable, including detailed descriptions of their titles, employment dates, supervisors, and relevant experiences and interactions. ¶¶44-57, 63, 78-80. Thus, the FE allegations are sufficiently pled. *See Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 667 (M.D. Tenn. 2022) ("plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged") (collecting cases); *Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 680 n.15 (E.D. Mich. 2023) (rejecting challenges to FEs because they were

- 7 -

"described with sufficient particularity to support the basis of their allegations").

Defendants' disputes over the weight of the FE statements (Mot. at 8-9, 14-15) are premature at the pleading stage, where all allegations are accepted as true and all reasonable inferences are construed in Plaintiff's favor. *Tellabs*, 551 U.S. at 322. For example, Defendants challenge the weight of FE descriptions of Holley's MAP agreements. Mot. at 14-15.[7] But the corroborating accounts of FE1-4 detail Holley's undercutting of resellers by selling products to DTC customers below MAP, reducing and eliminating resellers' bulk buying discounts, and broadening promotions to DTC customers. ¶¶44-54.[8] And Stevenson corroborated the FE accounts by admitting that Holley excluded resellers from promotions and that Holley failed to enforce MAP. ¶¶221, 223, 227-232; *see Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *36 & n.45 (M.D. Tenn. Aug. 17 2022) (refusing to "discount" statements from confidential witnesses because they were corroborated by other information alleged in the operative complaint).

The FE accounts corroborate each other, align with Stevenson's post-Class Period admissions, provide sufficient detail (¶¶44-47, 52, 54), and support the falsity of Defendants' statements that Holley maintained "pricing discipline" and "strict" conformance to MAP (¶¶37, 39, 54, 116, 118, 120, 122, 148, 159). Defendants' efforts to undermine the FE accounts should be rejected. *See Clover*, 587 F. Supp. 3d at 666-68 (rejecting defendants' challenges to FE accounts that "call on the court to weigh the value of evidence" because "[t]he PSLRA's heightened

---

[7]    *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772 (N.D. Ohio 2021), *aff'd*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022), is inapposite. There, the court found that the confidential witnesses provided no facts whatsoever supporting the allegations (*id.* at 788), whereas the FEs here provide detailed factual support (¶¶44-57, 63, 65-70, 72, 74-85, 87-88).

[8]    Defendants' suggestion that FE3 could not have known about Holley's DTC sales (Mot. at 15) is contradicted by the facts. While Holley initially operated FE3's company, AEM, as a standalone business, it ultimately forced AEM to shift to DTC sales at the expense of reseller sales. ¶¶45, 55, 67-77. Things were so bad that Nimmagadda even asked FE3 to rewrite Holley's business model to improve relations with resellers. ¶¶55-57.

pleading standards are still ***pleading*** standards – not evidentiary ones") (emphasis in original).[9]

### 2. Defendants Failed to Disclose Holley's Failure to Integrate Acquired Companies

The SAC also pleads that Defendants made material misrepresentations and omissions about the success of Holley's M&A strategy, creating a false narrative. For example, throughout the Class Period, Defendants represented that Holley's acquisitions produced "cost synergies," that Holley was "meaningfully accelerating" integration of the acquisitions "to realize value within the year[,]" and that Holley's "track record of recent acquisitions" demonstrated its ability to complete further "transformational acquisitions[.]" *See, e.g.*, ¶¶64, 115, 119, 147, 157, 183, 194. In reality, however, Holley failed to successfully integrate and capture synergies from acquired companies due to a host of problems: inefficient operations, excess costs, disparate systems, inventory management issues, and terminations of key personnel. ¶¶64-92. By failing to disclose these realities, Defendants violated their duty to fully disclose relevant, material facts. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *Helwig*, 251 F.3d at 563.[10]

Defendants claim that the SAC "alleges no specific facts" to suggest Defendants' statements regarding Holley's acquisitions were false or misleading. Mot. at 8. But Defendants ignore the SAC's well-pleaded allegations, including the Company's sharply contrasting

---

[9]   Defendants' attempt to distort the DTC allegations also fails. Plaintiff does not allege that DTC was not a priority or a source of growth. Mot. at 10-11. Rather, as discussed herein, Plaintiff alleges that DTC growth came at the expense of reseller relationships and sales, which hurt Holley's financial performance because DTC was not large enough to offset reseller losses. ¶¶61-63, 123, 134, 145, 152, 160, 174, 176, 180-182, 191, 204.

[10]   *See also Strougo v. Tivity Health, Inc.*, 551 F. Supp. 3d 839, 844-45, 847-48 (M.D. Tenn. 2021) (statements painting a "deceitfully rosy picture" of acquisition were actionable); *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *10-12 (M.D. Tenn. Nov. 19, 2019) (statements regarding company's "track record of delivering strong growth" through "selective acquisitions" were materially misleading); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *3-7, *17-23, *48-50 (M.D. Tenn. Mar. 31, 2011) (statements about "[d]emonstrated ability to identify and integrate acquisitions" were actionable).

admissions, which support the falsity of Defendants' statements. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 263-64 (3d Cir. 2009) (defendants' admissions supported the falsity of prior statements). In February 2023, at the same time Holley announced Tomlinson's abrupt departure from the Company, it announced "necessary changes to return Holley to profitable growth," including a slew of much needed initiatives to accelerate M&A synergy capture. ¶¶107, 207, 209. A month later, Holley announced that it would stop all M&A activity, a dramatic reversal. ¶¶106, 215. Interim CEO Gloeckler admitted that, with regard to "a lot" of Holley's acquisitions "*over the past several years*," Holley was "still working through those to find and realize synergies" and CFO Weaver stated the M&A pause was to "finaliz[e] successful integrations and synergy capture" and "to restore Holley's profitability, improve[] free cash flow, optimize working capital and de[-]lever the balance sheet." ¶¶106-107, 215.

In addition to these admissions, the falsity of Defendants' statements regarding its M&A strategy and integration of its acquisitions is supported by sufficiently detailed and corroborated FE accounts. ¶¶64-92. Defendants attempt to undermine these accounts by downplaying them as "anecdotes" and "colorful . . . criticisms" and drawing inferences in Defendants' favor. Mot. at 8-10. But such challenges are premature, improper on a motion to dismiss, and otherwise groundless. *Tellabs*, 551 U.S. at 322; *Clover*, 587 F. Supp. 3d at 666-67; *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 410-11 (S.D.N.Y. 2020) (rejecting challenges to FEs supporting falsity allegations about problems integrating acquired companies).

The FE accounts are not anecdotal or lacking particularity, as Defendants contend. To the contrary, multiple FEs (FE1, FE2, FE3, and FE5) describe with detail that the integration problems caused dysfunction, brand deterioration, product development issues, and margin compression. ¶¶65-77, 81-88. These accounts undermine Defendants' arguments that the FEs "support

Defendants' statements" and that Holley was successfully integrating its M&A targets and capturing cost "synergies." Mot. at 9; ¶¶64-65, 115, 119, 131, 139, 147, 166-167, 183, 193-194.

Defendants' other challenges to the FEs are unavailing. For example, Defendants mischaracterize FE2, who did not simply observe that Holley "fired staff after each merger" (Mot. at 9), but rather detailed that the firings were detrimental to Holley, causing lost expertise and institutional knowledge. ¶¶65, 81. Defendants also ignore the observations of FE1, FE3, and FE6 that Holley upset consumers and hurt sales by gutting critical technical support, contrary to Defendants' statements that Holley's "knowledgeable phone technical sales advisors" "deepen[ed]" engagement with "enthusiast consumers" to "[e]xpand DTC [s]ales[.]" ¶¶81-88, 113, 117, 121, 157. Likewise, Defendants misconstrue FE3's account of the AEM integration. Mot. at 9-10. FE3 stated that, before Holley's 2Q21 earnings call, Holley had not taken *any* action to integrate AEM (¶¶70-71) and was not "working diligently to integrate" AEM or pushing DTC at AEM (¶130). FE3 further stated that Defendants began taking *some* steps to start integrating AEM shortly after analysts began asking about Holley's integration efforts during the 2Q21 call, but AEM still functioned as a standalone company. ¶¶72-73. It was not until after the 4Q21 call that Defendants launched a disastrous integration of AEM that caused brand and reputational damage, pushed away many customers, and compressed margins. ¶¶67, 74-77. Thus, Defendants' statements about AEM were false and misleading. ¶¶73, 119, 124, 130, 147, 156, 173.[11]

### 3. Defendants Obfuscated Holley's Declining Financial Performance

Defendants argue they accurately reported Holley's financial performance. Mot. at 11-13.

---

[11] Defendants' arguments that Holley focused on M&A, had an M&A pipeline, made acquisitions, and used M&A to increase its market position (Mot. at 8) are irrelevant. The SAC does not allege otherwise. Rather, the M&A allegations concern Defendants' undisclosed failure to integrate the companies Holley acquired, as discussed herein.

But Plaintiff does not challenge the literal accuracy of Holley's financial statements. Rather, Plaintiff alleges Defendants' misstatements and half-truths painted a rosy picture of sustainable, strong financial results, and failed to disclose mounting problems with Holley's reseller network and M&A activity that hurt demand, growth, and profits, or that such problems were temporarily obscured by an unsustainable sales boost from COVID. *See* §III.B.1.-2., *supra*; *Envision*, 2019 WL 6168254, at *12 (statements misrepresenting the source of a company's financial success are actionable); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187-90 (2015) (literally true statements can be misleading when viewed in context).[12]

## C.    Defendants' Misstatements and Omissions Were Material

Materiality is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38 (cleaned up). Materiality is an objective, fact-specific determination rarely appropriate for a motion to dismiss. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013); *Strougo*, 551 F. Supp. 3d at 852 (courts "must tread lightly" when assessing materiality).

Here, Defendants' misstatements were material because they involved matters critical to Holley's operational and financial condition: Holley's relationship with resellers and two of its core business objectives, DTC expansion and M&A growth. *See* §III.B.1.-2., *supra*. Reasonable investors would have found it important to know that Holley's DTC expansion came at the expense

---

[12]    Analysts following Holley were also misled, as evidenced by their strong reactions to Defendants' disclosures. *See, e.g.*, ¶178(a) ("these results are drastically different from our takeaways from the 1Q call and conversations with the company"); ¶178(b) (calling poor results "jarring" compared to "much better tone" from competitors); ¶212 (noting "clouded internal visibility" and stating, "It was also news, to us, that consumer demand softened during the quarter, particularly given HLLY's Nov. commentary that sell through had actually strengthened throughout the Fall as it made headway in improving retailer/distributor stocking levels.").

of reseller relationships, which were far more important to Holley's financial performance, and that Holley was failing to integrate its acquisitions. Disclosure of those omitted facts would have "significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38 (cleaned up).

Defendants' materiality arguments fail. ***First***, Defendants disingenuously suggest that they disclosed Holley's problems to investors. Mot. at 10, 12-13, 17-18. But this "truth-on-the-market" defense requires a fact-specific analysis, reserved for the trier of fact and not appropriately adjudicated at this stage of the proceedings. *See Tellabs*, 551 U.S. at 322; *Shupe*, 660 F. Supp. 3d at 671 ("The Sixth Circuit has not applied the truth-on-the-market defense" and "even if it had, truth on the market is an issue for the trier of fact.") (cleaned up).

Moreover, Defendants provide no evidence that their supposed "disclosures" actually counteracted the alleged false statements. *See Shupe*, 660 F. Supp. 3d at 671 (rejecting truth-on-the-market defense where "Defendants have not provided any evidence that could cure the effect of the false . . . statements"). While Defendants vaguely warned in their SEC filings that, if Holley "loses any of the Company's key retail partners or any key retail partner reduces its purchases of the Company's existing or new products," then sales "***would be*** harmed" and Holley ***could*** experience "fluctuations in demand as a result of the pandemic" (Mot. at 13, 17-18), Defendants led investors to believe that the warned-of events were not happening, stating, for example, that Holley's "[s]trong organic growth" was "driven by growth to our resale channel's quarter" (¶127); Holley's demand "across the channels remain strong" (¶143); and Holley's brands were "must-carry brands" for resellers (¶144). Defendants also touted Holley's "mutually beneficial and long-term relationships with our resellers" due to "strong pricing discipline across [its] channels with strict conformance to [MAP]," conveying that Holley was not losing resellers, or sales to resellers,

despite DTC growth. ¶¶37, 39, 55, 116, 118, 120, 122, 148, 159. Moreover, in response to an analyst's direct question, Bardos denied that retail partners were frustrated by Holley's DTC shift and maintained that Holley's reseller relationships were "strong and solid." ¶¶55, 129.

Likewise, Defendants' boilerplate disclosures that Holley "may not achieve the anticipated benefits from future acquisitions for several reasons" and "cannot assure that any acquisition, once successfully integrated, will perform as planned, be accretive to earnings, or prove to be beneficial to the Company's results of operations or cash flow" (Mot. at 10), were not meaningful because Defendants repeatedly assured investors the opposite was true: that the integrations were succeeding and the warned-of events were not happening. For example, Defendants maintained that Holley "continue[d] to make solid progress integrating acquired businesses to drive further synergies." ¶193; *see also* ¶197; §III.B.2., *supra*. Thompson's vague remark that there was "still a lot of work to do" on the AEM integration (Mot. at 9) was not meaningful because, in the same statement, Tomlinson falsely stated that Holley was making progress when, in fact, AEM effectively operated as a standalone company. ¶¶70-73, 156; §III.B.2., *supra*.

***Second***, Defendants' statements were not, in context, "puffery." Mot. at 10, 17; *see Matrixx*, 563 U.S. at 38 (mandating contextual review of materiality). The statements were not puffery because they were not vague affirmations; rather, they communicated specific, critical information on matters at the heart of Holley's operations and financial performance – its reseller relationships, M&A, and demand. *See In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *14 (S.D. Ohio Sept. 29, 2023) (rejecting puffery argument where the statements at issue "would likely be considered essential to a reasonable investor"); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 749 (S.D. Ohio 2006) (alleged statements regarding the company's transition to

- 14 -

a new distribution model were materially false statements rather than puffery).[13]

*Third*, this case does not deal in inactionable opinions. Mot. at 19-20. Statements starting with "believe" or "think" "remain perfectly capable of misleading investors." *Omnicare*, 575 U.S. at 175, 193. Plaintiff alleges factual statements, not opinions, "express[ing] certainty" about present and historical facts related to Holley's reseller relationships, troubled M&A, and the resulting negative financial impacts. *Id.* at 183. For example, Tomlinson's false statement, in response to an analyst's question on reseller destocking, that "we do think that there is far more demand there than is visible in our numbers, hence my comment that we believe the demand for our products is solid" is actionable because it falsely assured investors that Holley's demand was above verifiable thresholds ("our numbers"), even as problems began to leak out publicly about Holley's reseller network. ¶190. Additionally, even if certain statements are opinions, they remain actionable because Plaintiff identified material omissions concerning the problems surrounding Holley's resellers, M&A, and demand (§III.B.1.-2., *supra*) that "conflict with what a reasonable investor would take from the statement itself[.]" *Omnicare*, 575 U.S. at 189.

## D.    The Safe Harbor Affords No Protection Here

Defendants vaguely argue that some alleged false statements are forward-looking and immunized by the PSLRA safe harbor, while conceding the rest are not. Mot. at 18-19. Defendants fail to specifically identify the forward-looking statements in the paragraphs they challenge. *Id.* at 18 n.8. Nevertheless, the safe harbor is inapplicable for four reasons. *First*, it does not apply to statements of present or historical fact. *See Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d

---

[13] Defendants' puffery cases (Mot. at 10, 17, 19-20) are inapposite because they involve statements that, unlike those here, were vague, ambiguous, or generic when viewed in context. *See, e.g.*, *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004) (statements about Ford's commitment to quality, safety, and corporate citizenship were commonly heard from corporate managers and thus "numbingly familiar" and unimportant to reasonable investors).

971, 983 (6th Cir. 2018). This includes the many alleged statements concerning past and present facts about Holley's resellers, M&A, demand, and growth. For example, Defendants described DTC as Holley's "fastest-growing sales channel" but misleadingly omitted it came at the expense of reseller sales, falsely touted the integration status of "value-enhancing acquisitions," misrepresented "everything we see at this point," and misled investors as to why resellers had destocked. *See, e.g.*, ¶¶117, 119, 130, 141, 151, 154, 180-182, 193.

*Second*, the safe harbor does not apply to omissions. *See Helwig*, 251 F.3d at 547-48, 562. Therefore, the safe harbor does not apply to Defendants' failure to disclose that Holley suffered from reduced demand, lost sales from resellers cannibalized by the shift to the DTC, or that its acquisitions were beset by integration problems. *See* §III.B., *supra*.

*Third*, the safe harbor does not apply to forward-looking statements when, as here, they were made with actual knowledge of their falsity. *See* §IV., *infra*; *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 541 F. Supp. 2d 986, 1005 (S.D. Ohio 2007) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made.").

*Fourth*, Defendants' purported cautionary language (Mot. at 18-19) was insufficient. To qualify for safe harbor protection, cautionary language must be "meaningful" in the sense that it "must be substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge." *Helwig*, 251 F.3d at 559. As in this case, the adequacy of cautionary language is often a fact-intensive inquiry not appropriately resolved on a motion to dismiss. *See Envision*, 2019 WL 6168254, at *16. The cautionary language cited by Defendants was not substantive or tailored to any supposed forward-looking statements at issue. Mot. at 18-19. Indeed, Defendants point to vague, generic risk factors that could apply to *any* company in the

- 16 -

automotive products industry. *Id*. The fact that these warnings were substantially unchanged during and after the Class Period illustrates that they were not meaningful.[14] *Helwig*, 251 F.3d at 559. Moreover, the warnings themselves were inadequate and misleading because the future warned-of events were ***already*** occurring. §III.B.1.-2., *supra*; *Weiner v. Trivity Health, Inc.*, 365 F. Supp. 3d 900, 911 (M.D. Tenn. 2019) ("Cautionary language cannot be meaningful if it is misleading in light of historical facts . . . established at the time the statement was made.") (cleaned up).[15]

## IV.    THE SAC PLEADS A STRONG INFERENCE OF SCIENTER

"[A]n inference of recklessness is sufficient to satisfy a plaintiff's pleading burden on the scienter element." *Dougherty*, 905 F.3d at 980 (reversing dismissal). In *Tellabs*, the Supreme Court articulated the standards for evaluating a "strong inference" of scienter under the PSLRA, holding that "courts must . . . ***accept all factual allegations*** in the complaint as true[,]" "assess all the allegations ***holistically***[,]" and determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" 551 U.S. at 309-10 (emphasis omitted). Following *Tellabs* and *Matrixx*, which provided a "post-*Tellabs* example of how to consider scienter pleadings 'holistically,'" the Sixth Circuit made clear that the "***only*** appropriate approach" is to "review scienter pleadings based on the collective view of the facts, ***not*** the facts individually" and that its "former method of reviewing each allegation individually before reviewing them holistically risks

---

[14]    *See* Mot. Ex. 1 at 7-9, 17-18, 20, 22, 28, 55; Ex. 2 at 5-6, 15, 17-18, 21, 23-24, 43; Ex. 3 at 3-4, 10-11, 13, 15, 21, 35; Holley's 2022 Form 10-K at 3, 13, 15, 20.

[15]    The safe harbor does not apply to Defendants' oral statements on conference calls (*see, e.g.*, ¶¶126-130, 140-144, 156, 167-173, 184-190, 195-201) because "[t]he cautionary statements included at the beginning of each conference call were brief and generic" and failed to identify even a "single important factor that could lead to different results." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016); 15 U.S.C. §78u-5(c)(2)(B)(ii) (requiring an "accompanying oral statement" to identify "the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement").

losing the forest for the trees." *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011).

Defendants argue the SAC does not allege a strong inference of scienter because of its purported failure to address various "*Helwig* factors" with particularity. Mot. at 20-22. *Helwig* itself explained that while the factors it enumerated were "***usually*** relevant to scienter[,]" they were "***not*** exhaustive," but meant to be helpful in "guiding securities fraud pleading." 251 F.3d at 552. For this reason, courts in this Circuit have rejected Defendants' insinuation that the *Helwig* factors are a pleading necessity. *See Clover*, 587 F. Supp. 3d at 676 (treating the *Helwig* factors as a "pleading requirement" would be "unsupported by the caselaw"); *Heritage Glob. Network Los Angeles, Inc. v. Welch*, 2024 WL 695772, at *13 (M.D. Tenn. Feb. 20, 2024) (*Helwig* factors are "neither elements of any cause of action nor a checklist . . . . [M]ore than half of the *Helwig* factors involve situational circumstances with little bearing on many types of fraud.").[16]

The SAC alleges numerous particularized facts that collectively give rise to a strong inference of scienter. ¶¶234-253.[17] Defendants ignore some facts and launch piecemeal attacks on others, contravening *Tellabs*' mandate for a holistic analysis. But, none of their challenges

---

[16]  Courts have found scienter without referencing the *Helwig* factors ***at all*** (*see, e.g.*, *Burges v. BancorpSouth, Inc.*, 2015 WL 4198795, at *6 (M.D. Tenn. July 10, 2015); *Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at *9 (M.D. Tenn. Mar. 31, 2016)), or where only certain factors were present (*see Dana*, 646 F.3d at 959; *Strougo*, 551 F. Supp. 3d at 851; *Welch*, 2024 WL 695772, at *14; *Zaller v. Fred's, Inc.*, 560 F. Supp. 3d 1146, 1172 (W.D. Tenn. 2021)). While unnecessary, among the many compelling *indicia* of scienter alleged, the SAC alleges *Helwig* factors 3 (proximity between misstatements and disclosure of inconsistent information) and 6 (disregard of the most current factual information before making statements). *See* §§IV.C., IV.A., *infra*.

[17]  The SAC's particularized *indicia* of scienter are easily distinguished from those in *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 482 (6th Cir. 2014) (offering no concrete details or specific facts to show individual defendants received audit reports); *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 867 (W.D. Ky. 2014) (failing to plead that defendants, senior officers of a global restaurant chain with 39,000 franchises, had knowledge of or obligation to discover Chinese suppliers' failed test results); and *Teamster's Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525-34 (6th Cir. 2023) (more plausible opposing inference that defendants promptly disclosed termite-damage claims when they learned of their seriousness).

undermine the strong inference of scienter here.[18]

### A. The Individual Defendants Were Actively Involved in, Tracked, and Repeatedly Spoke About Holley's Central Business Operations

During the Class Period, Tomlinson, Bardos, and Nimmagadda were Holley's highest-ranking executives. ¶¶235-237. As confirmed by several FEs, they were hands-on executives who actively monitored, had full access to, and were made aware of the Company's performance throughout the Class Period. ¶¶243-246; *see also Palazzolo v. Fiat Chrysler Autos. N.V.*, 2017 WL 6389573, at *5, *9-10 (E.D. Mich. Dec. 14, 2017) (FEs' statements confirming executives were hands on with vehicle sales and thus were aware of, or directed, the alleged fraud supported scienter).[19] And, Holley's own 10-K described Tomlinson as the Company's "chief operating decision maker." ¶235. FEs confirm he was active with day-to-day processes, micromanaged operations, and made decisions on every single new project from the Company's engineers. ¶246. Bardos, as Holley's "principal financial and accounting officer" (Mot. Ex. 3 at 89), knowledgably reported on in-depth financial matters on earnings calls (*e.g.*, Mot. Ex. 4 at 5-6) and signed and certified Holley's financial filings (*e.g.*, ¶¶139, 157, 166, 183, 238). As EVP of Corporate Development & New Ventures, Nimmagadda was deeply involved with Holley's M&A and

---

[18]   Defendants wrongly argue that a lack of stock sales "undermines an inference of scienter." Mot. at 20. "[T]he absence of a motive allegation is not fatal[,]" and courts regularly find scienter without insider trading allegations. *Dougherty*, 905 F.3d at 982; *see also Grae*, 2017 WL 6442145, at *20; *Clover*, 587 F. Supp. 3d at 680 (same). Defendants' authorities fail to establish otherwise. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004) (emphasizing that the Sixth Circuit has "**never held that the absence of insider trading defeats an inference of scienter**") (abrogated by *Dana*, 646 F.3d at 961); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 834-35 (W.D. Mich. 2012) (noting "lack of motive is not critical").

[19]   Defendants' assertion that FEs who did not interact with the Individual Defendants "cannot support scienter" (Mot. at 23) is wrong. *See Grae*, 2017 WL 6442145, at *20 n.8 ("[Defendant] makes much of the fact that FE1 has not claimed to have spoken directly to any of the Individual Defendants. [Plaintiff], however, has explained the basis of FE1's claims: as a . . . manager, he was . . . knowledgeable of the company's practices.").

integration efforts, including the efficiency of post-acquisition processes. ¶¶69, 75, 245. For example, he was the point person on the AEM acquisition, touring the AEM facilities multiple times, relaying Holley's due diligence requests to AEM, and representing Holley when mass layoffs were announced at AEM. ¶¶75, 245. Because of Holley's deteriorating reseller relationships, he also "asked FE3 to rewrite the business model" for the reseller channel. ¶57.

The Individual Defendants' scienter is further supported by their access to reports generated by Sightline – the program Holley used to track Company-wide performance. ¶¶50, 244; *see also Shupe*, 660 F. Supp. at 679 (scienter supported by FE allegations that defendants had access to dashboard reports demonstrating key performance indicators); *Grae*, 2017 WL 6442145, at *20 (finding scienter where there was a divergence between public and non-public assessments and statements were made without regard for recent contradictory facts). Tomlinson received monthly Sightline reports, and reports available to Defendants showed real-time sales data and red flags such as cancellations and decreasing sales from repeat customers such as resellers. ¶¶50, 244.

Defendants nitpick these allegations, contending scienter is undermined because Plaintiff does not provide evidence, such as exactly when the Individual Defendants accessed Sightline and what data they analyzed. Mot. at 21. But Defendants' demand for this type of evidence is misplaced. *See In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at *20 (S.D. Ohio Mar. 7, 2022) (a plaintiff is not required "[t]o have knowledge of internal documents at this pre-discovery stage").[20] Tomlinson received monthly reports, and Defendants' access to key reports about

---

[20] Defendants' reliance on *PR Diamonds*, which relied on a pre-*Tellabs* piecemeal scienter calculus, is misplaced too. *Compare* 364 F.3d at 684-93, *with Dana*, 646 F.3d at 961 (citing and declining to follow the approach in *PR Diamonds*). *PR Diamonds* found access to financial information was insufficient to establish scienter because, in that case, unlike here, the false statements turned on arcane accounting issues concerning a subsidiary. 364 F.3d at 688. But *PR Diamonds* "included the important corollary that 'high-level executives ***can be presumed to be aware*** of matters ***central to their business's operation*.'" *Grae*, 2017 WL 6442145, at *21 (quoting

Holley's central business operations shows they were aware of Holley's true condition (as later admitted by Holley's new executives) or were reckless in not being aware of it.

Moreover, the Individual Defendants, as Holley's highest level executives, are presumed to be aware of matters central to Holley's business. *See Shupe*, 660 F. Supp. 3d at 683. Here, reseller relationships made up 80% of Holley's sales, and were at the core of Holley's operations. ¶¶239-242; *see Envision*, 2019 WL 6168254, at *22 (because "out-of-network billing" constituted "upwards of 35%" of revenues for Envision's largest division, "it [was] reasonable to presume" that the CEO and CFO had scienter for omitting out-of-network billing when discussing Envision's "drivers of growth"). And, Defendants described Holley's M&A activity as "a pivotal piece of [the Company's] growth strategy" and "a key strategic pillar to drive growth at Holley." ¶241; *see Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *19 (M.D. Tenn. Apr. 8, 2021) (finding scienter for misstatements about sales and marketing practices that executives held out as core operations).

Defendants' many statements about core aspects of Holley's business further bolster the inference of scienter. ¶237; *Cardinal Health*, 426 F. Supp. 2d at 744 (finding scienter for "high-level executives, responsible for day-to-day operations and issues relating to Cardinal's financial performance . . . [who] signed off on Cardinal's corporate disclosure statements or participated in conference calls with analysts and investors"). Indeed, Defendants responded in detail to analysts' questions about resellers and M&A, including denying and deflecting problems when "specifically asked, directly and repeatedly" about them. *See Avaya*, 564 F.3d at 269 (denials of problems "in

---

*PR Diamonds*, 364 F.3d at 688). Here, the Sightline reports contained data pertinent to the Company's central operations (*i.e.*, order cancellations and sales decreases impacting the channel responsible for *80%* of overall sales) and support a holistic finding of scienter. *See id.* (relationship providing 11-13% of annual revenue was "central" to operations); ¶¶50, 244.

response to repeated questions" by analysts supported scienter). For example, when asked about the intersection between DTC and Holley's resellers, Bardos denied any problems and called the relationships "strong and solid." ¶¶55, 129. When asked about AEM, Tomlinson said Holley was "working diligently" on the integration, despite taking no action, and said AEM teams were "folded in" even though AEM had been largely left alone. ¶¶71, 73, 123, 130, 156, 242, 245. Further, Tomlinson and Bardos blamed reseller drawdowns on "the Russian invasion of Ukraine" rather than damaged reseller relationships. ¶¶169-170.[21] These statements support scienter.

## B.      Suspiciously Timed Resignations Support Scienter

The abrupt departures of CEO Tomlinson and CFO Bardos support scienter. Tomlinson, a 20-year Holley veteran (¶24), and Bardos, whose Holley tenure lasted a little over one year (¶25), both left Holley within two years of it going public. Their departures coincided with the fraud being revealed and, combined with the totality of allegations herein, support scienter. ¶¶60, 94-95, 100-102, 179; §IV.A., *supra*; §IV.C.-D., *infra*; *see Dana*, 646 F.3d at 961 (scienter allegations included CFO retirement within months after the fraud was revealed); *Plagens v. Deckard*, 2023 WL 2711263, at *29 (N.D. Ohio Mar. 30, 2023) (CEO departure a "few weeks" after revelation of fraud helped tilt in favor of strong inference of scienter); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2021 WL 195370, at *7 (M.D. Tenn. Jan. 20, 2021) (abrupt resignation "with no notice" supported scienter); *Willis*, 2016 WL 8199124, at *34 (resignation on last day of class period supported scienter).

---

[21]   Defendants attack scienter with *Pittman v. Unum Grp.*, 861 F. App'x 51, 53, 55, 57 (6th Cir. 2021). Mot. at 23. Unlike *Pittman*, the SAC does far more than suggest fraudulent intent simply because the defendants were familiar with a core business line that involved complex accounting judgments. Here, Defendants affirmatively denied problems with reseller relationships, stressed "strict" adherence to MAP when it did not exist, and falsely touted Holley's successful M&A integrations, despite knowing these core problems were hurting Holley's financial performance and outlook.

### C.    Proximity Between Misstatements and Disclosures Supports Scienter

The temporal proximity between Defendants' false statements and the disclosures supports scienter. *See Helwig*, 251 F.3d at 553; *Zaller*, 560 F. Supp. 3d at 1155-56, 1172 (disclosure made "less than three months after" statement it corrected had "a relative closeness in time" supporting scienter). For example, on May 12, 2022, Defendants reaffirmed FY22 guidance and said that DTC "remains strong." ¶¶161-174. Then, on July 28, 2022, Defendants cut FY22 guidance and admitted that DTC growth was "more than offset by resellers" reducing purchases.[22] ¶¶175-178. On November 14, 2022 – close to year-end – Defendants touted the "solid demand we've seen for our products" and "progress" on M&A synergies (¶¶192-204),[23] while on February 6, 2023, the same day Holley announced Tomlinson's abrupt departure, Defendants' replacements (Weaver and Gloeckler) disclosed a "normalization of consumer demand to pre-COVID levels" that "reduced sales in the second half of 2022" and that Holley needed to quickly implement several measures to accelerate M&A "deal synergy capture" and "return to profitable growth" (¶¶205-209).[24, 25]

### D.    Holley's Admissions Support Scienter

In addition to Holley's admissions on February 6, 2023 detailed above, Holley's post-Class

---

[22]   In response, Holley's stock price dropped more than **47%** over two days. ¶¶59, 256. Less than two weeks later, Holley abruptly announced CFO Bardos' resignation. ¶¶60, 95, 179.

[23]   As Defendants made additional false statements, Holley also disclosed disappointing 3Q22 results as Holley's warranty costs skyrocketed as resellers, who were already cutting purchases from Holley and drawing down inventory, "caught up on" an unexplained "backlog of warranty returns[.]" ¶¶10-11, 257. As the market digested the news over the next two days, the stock price fell **20%**, closing at a record low price on November 16, 2022. ¶¶11, 99, 257, 261.

[24]   As a result of the February 6, 2023 revelations, Holley stock fell **31%** on February 7, 2023, and **9.75%** on February 8, 2023, a total drop of nearly **38%**. ¶¶101-103, 210-212, 258.

[25]   Defendants play loose with the facts to argue because "DTC business remained strong" and the "rest of the business fell short[,]" they could not have scienter. Mot. at 21. Plaintiff does not concede the DTC business was strong; rather, it alleges DTC was never enough to make up for the damage Defendants did to resellers by excluding them from promotions and only paying lip service to MAP. ¶176 (DTC growth "more than offset" by resellers reducing purchases).

Period admissions further support scienter. ¶¶247-253; *see In re Avon Sec. Litig.*, 2019 WL 6115349, at *11 (S.D.N.Y. Nov. 18, 2019) (new CEO's post-class period disclosures demonstrated scienter for ex-CEO's class period statements); *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 868, 874 (D. Kan. 2019) ("post-class-period admissions" supported scienter for failure to disclose the near-term negative impact of the "transition away from Curo's most profitable line of business"). A month after the Class Period, Tomlinson's and Bardos' replacements admitted that yearly and quarterly growth ***during 2020-2022*** was unsustainably elevated due to "a ton of [COVID] stimulus" that "distorted" financial results in 1Q22, and that Holley had struggled for "***several years***" to "realize synergies" from M&A. ¶¶213-219, 247-253.

Further evidencing Defendants' scienter, current CEO Stevenson admitted that Holley previously had little-to-no pricing discipline or MAP enforcement on its products and had been excluding resellers from sales promotions. ¶¶221, 223, 227-232. Even worse, Stevenson revealed that Holley would implement promotional planning and "close collaboration" with its distribution partners, which had "***never existed before***." ¶225. These specific admissions about the true state of Holley's business – following Tomlinson's and Bardos' departures – provide strong circumstantial evidence of Defendants' knowledge of these issues. If the new Holley executives could readily identify these shortcomings, it strains credulity to infer that Defendants were not aware of them, or were not recklessly indifferent to them, when they spoke to investors.

That Stevenson did not specifically "mention" the Individual Defendants or discuss their state of mind does not undercut the strong inference of their scienter. Mot. at 24; *see Avon*, 2019 WL 6115349, at *20.[26] Plaintiff is not trying to transfer Stevenson's scienter to Defendants. Rather,

---

[26]   The specificity of the admissions here distinguish them from those in *In re Biogen Inc. Sec. Litig.*, which did "not provide particularized insight into the defendants' knowledge at the time of the alleged misstatements." 857 F.3d 34, 44 (1st Cir. 2017).

Stevenson's admissions regarding the Company's prior practices with respect to reseller promotions and the Company's failure to monitor and adhere to MAP further support that Defendants were privy to these facts or recklessly disregarded them during the Class Period.

In sum, the SAC's well-pleaded allegations give rise to a strong inference that Defendants were aware of, or at a minimum, reckless in not being aware of, Holley's problems with resellers, M&A integrations, demand, and growth when Defendants spoke about these matters during the Class Period. §III.B.1.-2., *supra*. This also establishes Holley's scienter. *Clover*, 587 F. Supp. 3d at 675-76; *see also Astec*, 29 F.4th at 813-14 (CEO's scienter imputed to corporate defendant). Defendants' competing inference of non-culpability – that they acted in good faith[27] and with transparency during an uncertain post-COVID landscape (Mot. at 25) – is **not** more compelling and is belied by the specific information known to them during the Class Period. *Grae*, 2017 WL 6442145, at *21 ("The PSLRA does not require a plaintiff to definitively rule out non-fraudulent explanations of a defendant's behavior or even to establish, at the complaint stage, that the scales tip decidedly in favor of a finding of scienter.") (citing *Tellabs*, 551 U.S. at 326); *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *21 (N.D. Ill. Apr. 18, 2022) (where two contrary inferences of scienter are equally probable, the tie goes to the plaintiff).

## V.  CONCLUSION[28]

For the reasons described herein, Defendants' Motion should be denied in its entirety.

---

[27]  A "good faith" affirmative defense must be rejected at this stage. *See Niederst v. Minuteman Cap., LLC*, 2024 WL 3522413, at *16 (N.D. Ohio July 24, 2024) (motion to dismiss was an "inappropriate vehicle for testing an affirmative defense").

[28]  Defendants only challenge §20(a) by claiming there is no a primary violation of §10(b). Mot. at 25. Because Plaintiff alleged primary violations under §10(b), the Court should sustain Plaintiff's §20(a) claim. ¶¶285-288; *Dana*, 646 F.3d at 962-63.

DATED:  April 24, 2025

ROBBINS GELLER RUDMAN &
  DOWD LLP
ROBERT J. ROBBINS (admitted *pro hac vice*)
ELIZABETH A. SHONSON (admitted *pro hac vice*)
ANDREW T. REES (admitted *pro hac vice*)
ALEX KAPLAN (admitted *pro hac vice*)

/s/ Robert J. Robbins
ROBERT J. ROBBINS

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33423
Telephone:  561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com
eshonson@rgrdlaw.com
arees@rgrdlaw.com
akaplan@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
DAVID GARRISON (KY Bar No. 98258)
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
615/252-3798 (fax)
dgarrison@barrettjohnston.com

*Local Counsel*