**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT BOWLING GREEN**

| | |
|---|---|
| CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | |
| Plaintiff, | Case No. 1:23-cv-148-GNS |
| v. | Judge Greg N. Stivers |
| HOLLEY INC., TOM TOMLINSON, DOMINIC BARDOS, and VINOD NIMMAGADDA | Magistrate Judge H. Brent Brennenstuhl |
| Defendants. | |

**DEFENDANTS' ANSWER TO PLAINTIFF'S**
**SUPPLEMENTED AMENDED COMPLAINT FOR**
**<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

Sean M. Berkowitz (*pro hac vice*)
Eric R. Swibel (*pro hac vice*)
Nicholas J. Siciliano (*pro hac vice*)
Renatta A. Gorski (*pro hac vice*)
Latham & Watkins LLP
330 North Wabash Street, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Facsimile: 312.993.9767
Email: sean.berkowitz@lw.com
    eric.swibel@lw.com
    nicholas.siciliano@lw.com
    renatta.gorski@lw.com

Michele D. Johnson (*pro hac vice*)
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: 714.540.1235
Facsimile: 714.755.8290
Email: michele.johnson@lw.com

Michael P. Abate
Kaplan Johnson Abate & Bird LLP
710 W. Main St., 4th Floor
Louisville, KY 40202
Telephone: 502.540.8280
Email: mabate@kaplanjohnsonlaw.com

Defendants Holley Inc. ("Holley" or the "Company"), Tom Tomlinson, Dominic Bardos, and Vinod Nimmagadda (the "Individual Defendants," and together with Holley, "Defendants"), by and through their attorneys of record, respectfully submit Defendants' Answer to the Supplemented Amended Complaint for Violations of the Federal Securities Laws filed by Lead Plaintiff City of Fort Lauderdale General Employees' Retirement System ("Plaintiff") on March 20, 2025 (the "Supplemented Amended Complaint"). To the extent not expressly admitted, Defendants deny all allegations in the Supplemented Amended Complaint. Likewise, to the extent the headings and subheadings in the Supplemented Amended Complaint are intended to constitute factual allegations, Defendants deny the allegations insofar as they refer or relate to Defendants. Defendants lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in the Supplemented Amended Complaint's headings or subheadings and therefore deny those allegations.

Defendants' responses are made upon information and belief and may change subject to further investigation. Defendants expressly reserve the right to amend their Answer, or seek leave to amend their Answer, and to modify and/or assert all claims, defenses, counterclaims, and third-party claims permitted by law.

### Plaintiff's Preamble

Lead Plaintiff City of Fort Lauderdale General Employees' Retirement System ("Lead Plaintiff" or "Plaintiff"), by and through Plaintiff's undersigned attorneys, on behalf of itself and all others similarly situated, alleges the following against defendants Holley Inc. ("Holley" or the "Company"), f/k/a Empower Ltd. ("Empower"), Tom Tomlinson ("Tomlinson"), Dominic Bardos ("Bardos"), and Vinod "Vinny" Nimmagadda ("Nimmagadda") (collectively, "Defendants") upon personal knowledge, information and belief, and investigation of counsel as to those allegations concerning Plaintiff, and, as to all other matters, upon the investigation of counsel, which included,

1

without limitation:  (i) review and analysis of public filings made by Holley with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by certain Defendants and other related non-parties; (iii) review of news articles, securities analyst reports, and shareholder communications; (iv) review of other publicly available information concerning Defendants; (v) investigation of factual sources, including former employees of Holley;[1] and (vi) information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**ANSWER**: Defendants admit that Plaintiff purports to bring claims against Holley and the Individual Defendants.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the remainder of the preamble, and deny the allegations on that basis.  Except as expressly admitted, Defendants deny the remaining allegations in the preamble, and in footnote 1, including Plaintiff's characterization of the events at issue and any legal conclusions.

## I.      INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired Holley securities between July 21, 2021 and February 6, 2023, inclusive (the "Class Period"), seeking to pursue remedies and recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

**ANSWER**: Defendants admit that Plaintiff purports to bring a securities class action on behalf of all persons who purportedly purchased or otherwise acquired Holley securities between July 21, 2021

---

[1] Former Holley employees are referred to herein as "FE" to protect their confidentiality.

and February 6, 2023.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

2.    Empower previously operated as a blank check company, also referred to as a special purpose acquisition company ("SPAC").  A SPAC is a development stage company formed for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization, or other similar business transaction with one or more operating businesses or entities.  Empower raised $250 million in its initial public offering of common stock and warrants in October 2020, and was listed on the New York Stock Exchange ("NYSE") under the ticker symbols "EMPW," "EMPW-UN," and "EMPW-WT."

**ANSWER**: With regard to the first and second sentences in this paragraph, Defendants admit that Empower operated as a SPAC, which is a development stage company formed for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization, or other similar business transaction with one or more operating businesses or entities.  With regard to the third sentence in this paragraph, Defendants admit that Empower raised $250 million in its initial public offering in October 2020, and was listed on the NYSE under the ticker symbols "EMPW," "EMPW-UN," and "EMPW-WT."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

3.    On July 16, 2021, Empower completed a business combination with Holley Intermediate Holdings, Inc. ("Holley Intermediate"), a privately held company (the "Business Combination").  As a result of the Business Combination, among other things, the combined company became named "Holley Inc." and beginning on July 19, 2021, its common stock and warrants traded on the NYSE under the new ticker symbols "HLLY" and "HLLY WS," respectively.

3

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that on July 16, 2021, Empower completed a business combination with Holley Intermediate.  With regard to the second sentence in this paragraph, Defendants admit the combined company was named "Holley Inc." and beginning on July 19, 2021, its common stock and warrants traded on the NYSE under the new ticker symbols "HLLY" and "HLLY WS," respectively.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

4.     Holley designs, manufactures, and distributes performance automotive products to customers primarily in the United States, Canada, and Europe.  The Company's line of automotive products includes numerous items such as carburetors, fuel injection systems, exhaust products, transmission products, and automotive software products.  The Company's products are designed to enhance street, off-road, recreational, and competitive vehicle performance through increased horsepower, torque, and drivability.  Holley conducts operations through its various wholly owned subsidiaries, including Holley Performance Products Inc., Hot Rod Brands, Inc., Simpson Safety Solutions, Inc., B&M Racing and Performance Products, Inc., and Speedshop.com, Inc.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley designs, manufactures, and distributes performance automotive products to customers primarily in the United States, Canada, and Europe, and that the Company's line of automotive products includes carburetors, fuel injection systems, exhaust products, transmission products, and automotive software products.  With regard to the second sentence in this paragraph, Defendants admit that the Company's products are designed to enhance street, off-road, recreational, and competitive vehicle performance through increased horsepower, torque, and drivability.  With regard to the third sentence in this paragraph, Defendants admit that Holley operates through various wholly owned subsidiaries, including Holley Performance Products Inc., Hot Rod Brands, Inc., Simpson Safety Solutions, Inc.,

4

B&M Racing and Performance Products, Inc., and Speedshop.com Inc.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

5.      At the time of the Business Combination, Holley described itself as the "largest and fastest growing platform in the enthusiast branded performance automotive aftermarket category." Defendants told investors that, following the Business Combination, Holley would continue its rapid growth trajectory by: (i) accelerating its penetration of products across categories and platforms; (ii) supporting strategic mergers and acquisitions ("M&A") activity; and (iii) focusing on growing its burgeoning direct-to-consumer ("DTC") business.  Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and growth prospects, and omitted material information which made Defendants' statements misleading when made.  For example, Defendants stated they had "established mutually beneficial and long-term relationships with [] resellers" and would "maintain strong pricing discipline across [Holley's] channels with strict conformance to minimum advertised pricing" ("MAP").  Likewise, Defendants stated that organic growth was "supported by strong growth in [Holley's] DTC channel, but was also driven by growth to [Holley's] resale channel[]," and reassured investors that "[u]nderlying demand has remained solid despite [Holley's] supply chain challenges."  Specifically, Defendants touted to investors that Holley would continue driving growth through its key strategy of expanding the Company's DTC channel to deepen Holley's engagement with consumers, allowing Holley to directly sell products through the Company's fast-growing online platform – bypassing the distributors and resellers that comprised 80% of Holley's sales.  Nevertheless, Defendants assured investors that Holley's relationships with its resellers remained intact and strong, and that Holley's unique brand importance and strict pricing discipline supported the Company's reseller channel.  Defendants also touted Holley's robust and active M&A activity and pipeline, which rapidly expanded the Company as

it continually acquired other players in the automotive space to boost revenues. Defendants assured investors that Holley was successfully integrating the companies it acquired, telling investors about Holley's scalable business platform and ability to capture profit-building synergies.

**ANSWER**: Defendants aver that this paragraph purports to summarize statements made by Defendants without specifying who made the alleged statements or when and how they were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

6. In reality, however, Holley's rapid growth leading up to and during the Class Period was unsustainable. Holley faced contracting organic growth – which Defendants hid through burgeoning M&A activity – as the temporary boost in Holley's business from COVID dried up at the same time the Company seriously damaged its important relationships with resellers and distributors whose business comprised the vast majority of Holley's sales. Indeed, Holley wrecked its reseller relationships by undercutting them through discounting and a lack of pricing discipline in Holley's DTC channel – as subsequently confirmed by Matthew Stevenson ("Stevenson") who became Holley's Chief Executive Officer ("CEO") on June 6, 2023, after the close of the Class Period – despite the fact that DTC sales were not enough to replace losses from Holley's reseller channel. Simultaneously, Holley suffered from a material talent and knowledge base drain as it mangled the very acquisitions it touted to investors, failing to achieve synergies. As detailed herein, former CEO Tomlinson fostered a culture at Holley which prompted resignations, worsened working conditions for employees, and enabled his own misuse of Company resources. For a time, Defendants successfully concealed what was under Holley's hood through false statements and half-truths that left the market incapable of knowing Holley's true financial condition and that the Company's stock price was artificially inflated.

**ANSWER**: Defendants admit that on or around June 6, 2023, Stevenson became Holley's CEO. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

7.      The truth regarding Holley's sputtering business, however, was eventually revealed through a series of three disclosures. *First*, after the market closed on July 28, 2022, the Company announced its preliminary results for the second quarter of 2022 ("2Q22"). Not only did the preliminary financial results badly miss expectations, but the Company also slashed its 2022 outlook. Reversing past trends and the rapid growth investors had come to expect, Defendants disclosed that Holley's 2Q22 sales abruptly *dropped* 7% year-over-year to $179.4 million, far below analyst estimates of $205 million in revenue. Holley's gross profit also fell 7.3% to $75.3 million and its adjusted profits plunged by 31% to $37.2 million. For 2022, Defendants slashed sales guidance to a range of $700 million to $725 million, down from $765 million to $790 million, and stated that adjusted earnings were being cut 26% from a range of $186 million to $194 million to a range of $135 million to $145 million.

**ANSWER**: With regard to the second, third, fourth, and fifth sentences in this paragraph, Defendants admit that Holley announced 2Q22 sales, in a Form 8-K on July 28, 2022, of $179.4 million, and announced gross profits of $75.3 million and adjusted profits of $37.2 million in 2Q22. With regard to the sixth sentence in this paragraph, Defendants admit that in the same announcement, Holley adjusted its full year 2022 sales guidance to a range of $700-$725 million, and announced a revised guidance range for adjusted EBITDA of $135-$145 million. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

8.      Investors and analysts were shocked. For example, Jefferies said Holley's disclosure shook its confidence and that the magnitude of the unexpected 2Q22 shortfall and 2022 guidance cut was "jarring." In response, the price of Holley stock dropped *37%*, or $4.68 per share, from a close of

7

$12.67 per share on July 28, 2022, to a close of $7.99 per share on July 29, 2022, on unusually high trading volume. On the next trading day, August 1, 2022, the price of Holley stock fell an additional 16.5%, or $1.32 per share, to close at $6.67 per share.

**ANSWER**: With regard to the second sentence in this paragraph, Defendants aver that Plaintiff purports to summarize statements made by Jefferies without stating when or how they were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the third and fourth sentences in this paragraph, Defendants aver that the price and trading volume of Holley stock is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

9. On August 11, 2022, the Company announced its Chief Financial Officer ("CFO"), Bardos, had resigned effective September 30, 2022 to "pursue another opportunity and for personal reasons." Underscoring the unplanned nature of Bardos' departure, Holley announced that Stephen Trussell ("Trussell"), the Company's then-Vice President of Finance, would serve as Interim CFO while the Company searched for a permanent CFO replacement.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley filed a Form 8-K on August 11, 2022, which is publicly available and contains the language quoted in this sentence. Defendants aver that the Form 8-K stated that "Mr. Bardos's decision to resign from the Company was not the result of any disagreement relating to the company's strategy, operations, policies, or practices." With regard to the second sentence in this paragraph, Defendants admit that the same August 11, 2022 Form 8-K named Trussell, Holley's then-Vice President of Finance, as Holley's Interim CFO while the Company searched for a CFO replacement. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

8

10.    *Second*, after the market closed on November 14, 2022, the Company announced more disappointing financial results, this time for the third quarter of 2022 ("3Q22"), which included a 3% *decline* in net sales to $154.8 million, down from sales of $159.67 million in the third quarter of 2021 ("3Q21") (slightly beating analysts' consensus expectations of $152.77 million for 3Q22), a 25.8% decrease in gross profit, and a more than 50% decline in EBITDA compared to 3Q21.  Although the Company's earnings per share outpaced market expectations, Defendants blamed supply chain issues for Holley's sales decline.  Defendants once again cut Holley's forecasts for 2022, lowering net sales to a range of $695 million to $710 million and dropping adjusted earnings to a range of $118 million to $124 million, well below the 2022 numbers provided on July 28, 2022.  Defendants also disclosed that Holley's warranty costs suddenly skyrocketed "as resellers caught up on" what Defendants described as "a backlog of warranty returns[.]"  Nevertheless, Defendants assured investors the worst of the supply chain issues was in the Company's rearview mirror and that demand remained strong.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley announced results for 3Q22 in a Form 8-K filed on November 14, 2022, which is publicly available, and admit that Holley announced a decline in gross profit and EBITDA compared to 3Q21.  With regard to the third sentence in this paragraph, Defendants admit that Holley announced an expected net sales range of $695 million to $710 million and adjusted earnings range of $118 million to $124 million for 2022.  With regard to the fourth and fifth sentences in this paragraph, Defendants admit that Holley held an earnings call on November 14, 2022, a transcript of which is publicly available and contains the language quoted in these sentences.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

11.    Over the next two days as the market digested the disclosure and weighed the slight beat on sales, purportedly steady and strong customer demand, and the expected improvements to the supply

chain environment, the stock ultimately fell *20%*, dropping by $0.59 per share from its November 14, 2022 closing price of $2.99 per share to its November 16, 2022 closing price of $2.40 per share, a record low for the Company.

**ANSWER**: Defendants aver that the price of Holley stock is publicly available.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

12.    *Third*, on February 6, 2023, Holley shocked the market and announced that Company CEO, President, and member of the Board of Directors ("Board") Tomlinson was abruptly retiring, effective immediately, and resigning from the Board.  Holley revealed that the Board appointed Director Michelle Gloeckler ("Gloeckler") as Interim President and CEO while the Company conducted a "comprehensive search process to identify a permanent CEO."  The Company stated its search would be conducted with the help of Heidrick & Struggles, a company "retained by the Board in September 2022 for a comprehensive review of succession planning."

**ANSWER**: Defendants admit that Holley issued a press release and Form 8-K on February 6, 2023, which is publicly available, and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

13.    On top of Tomlinson's sudden departure, the Company also announced negative preliminary financial results for the fourth quarter of 2022 ("4Q22") and the fiscal year 2022, reporting EBITDA 30% below consensus estimates, and yet another drop in sales, with 4Q22 sales coming in 10% below estimates.  Specifically, Defendants revealed 4Q22 sales of $153-$155 million, down from $180 million in the fourth quarter of 2021 ("4Q21"), and below analysts' consensus estimates of $167.6 million.  Defendants also revealed a preliminary net loss of $19- $17 million, far below analysts' expectations of $1.7 million in profit. New Holley CFO Jesse Weaver ("Weaver") called the

Company's performance "disappointing." Moreover, the Company disclosed a "normalization" (*i.e.*, reduction) in customer demand for Holley's products, contracting to historical levels as the unsustainable COVID-fueled boost dried up. The Company also announced a slew of new initiatives to accelerate deal synergy capture, improve cash flow by realigning teams, streamline Holley's operations, and implement strategies to manage cost and inventory.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrase "consensus estimates" is vague and ambiguous, and deny the allegations in the first sentence on that basis. With regard to the second sentence in this paragraph, Defendants admit that Holley announced 4Q22 results that included 4Q22 sales of $153-$155 million, and a preliminary net loss of $19-$17 million. With regard to the fourth and fifth sentences in this paragraph, Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in these sentences, and that Weaver participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

14.    Analysts did not look favorably on Holley's slowing performance and expected Holley to suffer from declining organic sales as growth slowed to pre-COVID levels, driven by "wallet normalization," *i.e.*, decreased customer spending on Holley products. For example, Truist Securities said the "announcement continues a string of disappointing quarters" and expressed surprise at Holley's weakening consumer demand.

**ANSWER**: Defendants aver that this paragraph purports to summarize statements from investment analysts without specifying who made the alleged statements or when and how they were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

11

15.     On this news, the price of Holley stock fell *31%*, or $1.06 per share, to close at $2.36 per share on February 7, 2023, on unusually high trading volume. The following day, February 8, 2023, the price of Holley stock fell an additional 9.75%, or $0.23 per share, to close at $2.13 per share, down approximately *85%* from the Class Period peak of $14.52 per share on March 16, 2022.

**ANSWER**: Defendants aver that the price and trading volume of Holley stock is publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

16.     After the close of the Class Period, Holley hired new leadership, highlighting the "turnaround" experience of new CEO Stevenson in the May 17, 2023 press release announcing his hiring. Since stepping into the driver's seat at Holley, Stevenson made several statements that revealed the falsity of Defendants' Class Period statements regarding Holley's relationships with its resellers and distributors and Holley's purported "strong pricing discipline across [Holley's] channels with strict conformance to minimum advertised pricing." As made clear by Stevenson's statements, during the Class Period Holley: (a) excluded its resellers and distribution partners from Holley promotions that were offered in other channels, which resulted in them "not promoting [Holley] products" and "in some cases, even promoting [Holley's] competitors' products to preserve their margins"; and (b) failed to enforce MAP on the vast majority of the products Holley sold.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company issued a press release on May 17, 2023, which is publicly available, and which announces that Holley appointed Stevenson as the Company's new President and Chief Executive Officer. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

12

17.     As a result of Defendants' wrongful acts, false statements, omissions that made Defendants' statements misleading, violations of the federal securities laws, and the subsequent declines in the market value of Holley securities, Plaintiff and other members of the Class (defined below) suffered losses and damages.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER**: Defendants admit that the Supplemented Amended Complaint purports to assert claims arising under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

**ANSWER**: Defendants admit that this Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District.  The Company's headquarters are located in this District at 1801 Russellville Road, Bowling Green, Warren County, Kentucky 42101.

**ANSWER**: Defendants admit that venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), and that the Company's headquarters are located at 1801 Russellville Road, Bowling Green, Kentucky 42101.  Except as expressly admitted, Defendants deny

the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails, interstate telephone communications, and the facilities of the national securities markets.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## III.    PARTIES

### A.    Lead Plaintiff

22.     Plaintiff City of Fort Lauderdale General Employees' Retirement System, as set forth in the certification on file (ECF 21-4), incorporated by reference herein, purchased Holley shares at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein. *See also* ECF 21-5.  Plaintiff's offices are located in Broward County, Florida.

**ANSWER**: Defendants admit that the Court appointed City of Fort Lauderdale General Employees' Retirement System as Lead Plaintiff in this action on February 26, 2024.  Defendants also admit that Lead Plaintiff filed a Certification with the Complaint for Violations of the Federal Securities Laws, filed November 6, 2023 (Dkt. No. 1-A) that purports to reflect records of purchases of Holley common stock by Lead Plaintiff, but Defendants lack knowledge or information sufficient to form a belief as to the veracity of those records, and on that basis deny the allegations.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

14

**B.  Defendants**

23.     Defendant Holley Inc. is incorporated in Delaware and has its headquarters in this District.  Shares of Holley stock trade on the NYSE under the ticker symbol "HLLY," and Holley warrants trade on the NYSE under the ticker symbol "HLLY.WS."

**ANSWER**: Defendants admit that Holley Inc. is incorporated in Delaware with its headquarters in this District, and that shares of Holley stock trade on the NYSE under the ticker symbol "HLLY," and Holley warrants trade on the NYSE under the ticker symbol "HLLY.WS."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

24.     Defendant Tom Tomlinson was the Company's President and CEO from July 2021 until February 6, 2023, and was a member of the Board from July 2021 until February 6, 2023, when he abruptly stepped down and left Holley.  Prior to the Business Combination, Tomlinson was President and CEO of Holley Intermediate, positions he held since December 2009.  Prior to becoming President and CEO of Holley Intermediate, Tomlinson was Holley Intermediate's CFO from March 2003 until December 2009.  Tomlinson previously held a variety of accounting positions with PricewaterhouseCoopers LLP, and Tomlinson holds a bachelor's degree in accounting and finance from Liberty University.  Tomlinson is a resident of Warren County, Kentucky.

**ANSWER**: Defendants admit that Tomlinson was Holley's President and CEO from July 2021 until February 6, 2023, and was a member of the Board from July 2021 until February 6, 2023.  Defendants admit that prior to the Business Combination, Tomlinson was President and CEO of Holley's then-operating company, positions he held since December 2009, and prior to becoming President and CEO of the operating company, Tomlinson was the operating company's CFO from March 2003 until December 2009.  Defendants admit Tomlinson previously held accounting positions with PricewaterhouseCoopers LLP, and Tomlinson holds a bachelor's degree in accounting and finance

from Liberty University; and that Tomlinson is a resident of Warren County, Kentucky.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

25.    Defendant Dominic Bardos was the Company's CFO from July 2021 until September 30, 2022, when he abruptly resigned "to pursue another opportunity and for personal reasons."  Prior to the Business Combination, Bardos was the CFO of Holley Intermediate.  Prior to working at Holley Intermediate, Bardos was the Vice President of Finance for Tractor Supply Company from 2018 to 2021, and was the CFO for Cambridge Franchise Holdings from 2017 to 2018. Bardos has an MBA in finance and a bachelor's degree in management from the University of Memphis. Bardos is a resident of Shelby County, Tennessee.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Bardos was Holley's CFO from July 2021 until September 30, 2022.  Defendants aver that the first sentence purports to summarize statements without specifying who made the alleged statements or when and how they were made.  Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the second sentence in this paragraph, Defendants admit that prior to the Business Combination, Bardos was the CFO of Holley's then-operating company, and prior to working at the operating company, Bardos was the Vice President of Finance for Tractor Supply Company from 2018 to 2021, and was the CFO for Cambridge Franchise Holdings from 2017 to 2018.  With regard to the third sentence in this paragraph, Defendants admit that Bardos has an MBA in finance and a bachelor's degree in management from the University of Memphis.  With regard to the fourth sentence in this paragraph, Defendants admit Bardos is a resident of Shelby County, Tennessee.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

26.     Defendant Vinod Nimmagadda is the Company's Executive Vice President of Corporate Development & New Ventures and served in this role for the entire Class Period.  Prior to starting at Holley in July 2021, Nimmagadda served as a Vice President within Jefferies Group LLC from 2019 to 2021, and had served in various other investment banking roles at Jefferies Group LLC since 2015.  Before that, he served as an investment banking analyst within BB&T's investment banking division from 2014 to 2015.  Nimmagadda has a bachelor's degree in financial economics from Columbia University.  Nimmagadda is a resident of Davidson County, Tennessee.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Nimmagadda is Holley's Executive Vice President of Corporate Development & New Ventures and served in this role during the purported Class Period.  With regard to the second sentence in this paragraph, Defendants admit that prior to starting at Holley in July 2021, Nimmagadda served as a Vice President within Jefferies Group LLC from 2019 to 2021, and had served in various other investment banking roles at Jefferies Group LLC since 2015, and that he served as an investment banking analyst within BB&T's investment banking division from 2014 to 2015.  With regard to the third and fourth sentences in this paragraph, Defendants admit that Nimmagadda has a bachelor's degree in financial economics from Columbia University and is a resident of Davidson County, Tennessee.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

27.     Defendants Tomlinson, Bardos, and Nimmagadda are collectively referred to as the "Individual Defendants."  The Individual Defendants, together with Holley, are collectively "Defendants."

**ANSWER**: Defendants admit that the Supplemented Amended Complaint purports to refer to Tomlinson, Bardos, and Nimmagadda collectively as the "Individual Defendants" and, together with Holley, as "Defendants."

17

28.     Each of the Individual Defendants acted and/or made the statements detailed herein in his capacity as an officer and/or director of Holley. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the term "acted" and the phrase "detailed herein" are vague and ambiguous, and deny the allegations in the first sentence on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

29.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

18

**IV.    SUBSTANTIVE ALLEGATIONS**

**A.    Background**

30.    Holley is a designer, marketer, and manufacturer of high-performance automotive aftermarket products serving car and truck enthusiasts, including fuel injection systems, tuners, exhaust products, carburetors, safety equipment, and various other performance automotive products. Founded in 1903, Holley has been a part of the automotive industry for well over a century. Holley Intermediate was incorporated in Delaware on September 12, 2018, as the holding company of the various operating entities that then comprised the Holley business.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley is a designer, marketer, and manufacturer of high-performance automotive aftermarket products serving car and truck enthusiasts, including fuel injection systems, tuners, exhaust products, carburetors, safety equipment, and various other performance automotive products. With regard to the second sentence in this paragraph, Defendants admit that Holley was founded in 1903. With regard to the third sentence in this paragraph, Defendants admit that Holley Intermediate was incorporated in Delaware on September 12, 2018. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

31.    Historically, Holley focused on developing the "fuel system" for internal combustion engine vehicles, which consists of the fuel tank, pump, filter, and typically either an electronic fuel injector ("EFI") or carburetor, and is responsible for delivering fuel to the engine as needed. Holley's website touts the Company as the "Undisputed Leader In Fuel Systems[.]"

**ANSWER**: Defendants admit that Holley's website is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations

19

in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

32.     To that end, Holley's largest brand is Holley EFI, which accounted for 17%, 16%, and 14% of Holley's sales for 2020, 2021, and 2022, respectively.  This brand, as the name suggests, focuses on EFI technology and is the primary showcase for Holley's new product development.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrase "largest brand" is vague and ambiguous, and deny the allegations in the first sentence on that basis. Defendants admit that Holley EFI accounted for 17%, 16%, and 14% of Holley's sales in 2020, 2021, and 2022, respectively.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

33.     Holley's products span a number of automotive platforms and are sold across multiple channels.  Holley attributes a major component of its success to its brands, including "Holley," "APR," "MSD," and "Flowmaster," among others.

**ANSWER**: Defendants aver that the phrases "number of automotive platforms," "multiple channels," and "major component" are vague and ambiguous, and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

34.     Leading up to and during the Class Period, Holley rapidly expanded its business and revenues and added to its brand lineup through a series of at least 15 acquisitions between 2019 and 2022, including its 2020 acquisitions of Simpson Race Products, Inc. ("Simpson") for $117.4 million, Drake Automotive Group, LLC ("Drake") for $49.1 million, and Detroit Speed, Inc. ("Detroit Speed") for $11.3 million, and its 2021 acquisition of AEM Performance Electronics ("AEM") for $51.5 million. Through its many acquisitions, Holley increased its market position in the otherwise highly fragmented performance automotive aftermarket industry and boosted its revenues.  Nevertheless, Defendants

assured investors Holley was growing by more than just acquisitions, and that its revenues and organic growth – premised on strong reseller relationships, pricing discipline, customer demand, and a seemingly surging DTC business – were strong and sustainable. Defendants also assured investors that Holley was successfully integrating the businesses it acquired in order to capture key synergies and boost Holley's profitability, future growth prospects, and DTC business. Put simply, Defendants presented Holley as a company with its foot on the gas pedal and ready to accelerate its growth.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley completed several acquisitions between 2019 and 2022, including Simpson Race Products, Inc. for $117.4 million, Drake Automotive Group, LLC for $49.1 million, Detroit Speed, Inc. for $11.3 million, and AEM Performance Electronics for $51.5 million. With regard to the second sentence in this paragraph, Defendants admit that Holley increased its market position through acquisitions. Except as expressly admitted, Defendants deny the allegations, including Plaintiff's characterization of the events at issue and any legal conclusions.

35.     Resellers and distributors, and Holley's relationships with them, are critical to Holley's business. Holley historically – and at all relevant times to this action – sold the vast majority of its products through resellers who would purchase products from Holley and then resell them through various channels to end users.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrase "critical to Holley's business" is vague and ambiguous, and deny the allegations on that basis. With regard to the second sentence in this paragraph, Defendants aver that the phrase "vast majority of its products" is vague and ambiguous, and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

36.    The Company's resellers consist of e-tailers, warehouse distributors, traditional retailers, and jobber/installers, with: (i) e-tailers and warehouse distributors accounting for 63%, 59% and 60% of Holley's sales in 2020, 2021, and 2022, respectively; (ii) Holley's top ten resellers accounting for 48% of its sales in 2020, 42% in 2021, and 39% in 2022, with Holley's largest reseller making up 22% of Holley's sales in 2020, 19% in 2021, and 19% in 2022; and (iii) all top ten accounts growing from 2019 to 2020 at an overall combined compound annual growth rate ("CAGR") of 37%.

**ANSWER**: Defendants admit that (i) e-tailers and warehouse distributors accounted for 63%, 59% and 60% of Holley's sales in 2020, 2021, and 2022, respectively; (ii) Holley's top ten resellers accounted for 48% of its sales in 2020, 42% in 2021, and 39% in 2022, with Holley's largest reseller making up 22% of Holley's sales in 2020, 19% in 2021, and 19% in 2022; and (iii) all top ten accounts grew from 2019 to 2020 at an overall combined compound annual growth rate ("CAGR") of 37%.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

37.    While later revealed following the Class Period as untrue (*see* §VII, below), during the Class Period, Defendants consistently told investors that it had "established mutually beneficial and long-term relationships with [its] resellers" that allowed Holley to "maintain strong pricing discipline" across its channels and operate with "strict conformance to minimum advertised pricing[,]" which supported the value of Holley's products in the market and supported Holley's profit margins.  Holley stated that its resellers benefitted from the Company's "broad suite of product offerings" that could be used to "meet consumer demand across multiple product categories."  Investors, therefore, understood that Holley's relationship with its resellers was critically important to the Company's overall financial performance and outlook.

**ANSWER**: With regard to the first and second sentences in this paragraph, Defendants aver that these sentences purport to summarize statements made by Defendants without specifying who made

22

the alleged statements or when and how they were made.  Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the third sentence in this paragraph, Defendants lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## B.     Holley Accelerates DTC Sales at the Expense of Its Critically Important Resellers

38.     Leading up to the Class Period, Defendants shifted Holley's sales focus from its reseller channel to its DTC channel, explaining the shift to investors as a way to drive highly profitable, high-margin growth for the Company without cannibalizing Holley's reseller relationships.  For example, while appearing on the "Absolute Return Podcast,"[2] on April 23, 2021, shortly before the start of the Class Period, Tomlinson stated DTC "definitely" was a focus for Holley on a "go-forward" basis and that it was not only the "fastest growing part of [Holley's] distribution[,]" but also had the "highest margin" in terms of profits.  Tomlinson described DTC in positive terms, highlighting that it was important to building relationships with consumers.  For example, Tomlinson, when describing the Company going public through Empower, touted DTC and digital sales as "a great opportunity to really supercharge the growth of the company," and stated that Holley could tap into Empower's digital "know-how" for connecting with consumers. But Tomlinson also made clear the Company's DTC focus was not harming its reseller relationships, stating that "our top resellers… [are] growing very nicely and growing with us."

---

[2] The Absolute Return Podcast describes itself as a source for stock market analysis, global macro "musings[,]" and hedge fund investment strategies.  A transcript of Tomlinson's interview is available at:  https://accelerateshares.com/podcasts/absolute-return-podcast-140-leadership- chat-holley-ceo-tom-tomlinson/.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that this sentence purports to summarize statements made by Defendants without specifying who made the alleged statements or when and how they were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the second through fifth sentences in this paragraph, Defendants admit that Tomlinson spoke on a podcast on April 23, 2021, the transcript of which is publicly available and contains the language quoted in these sentences. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph and footnote, including Plaintiff's characterization of the events at issue and any legal conclusions.

39.    As Defendants oversaw and implemented the shift in Holley's business strategy during the Class Period, they falsely assured investors that Holley continued to maintain its "established mutually beneficial and long-term relationships with [its] resellers" that allowed Holley to operate with "strong pricing discipline" and "strict conformance to minimum advertised pricing."

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

40.    In many statements throughout the Class Period, including the Proxy Statement/Prospectus incorporated into the Company's July 21, 2021 Form 8-K (defined below), Holley described how it "historically sold the majority of [its] products through resellers who purchase [Holley's] products and resell them through various channels." Those resellers consisted of performance e-tailers, warehouse distributors, traditional retailers, and jobber/installers, with just performance e-tailers and warehouse distributors accounting for *63%* of sales in 2020.

**ANSWER**: Defendants aver that "many statements throughout the Class Period" is ambiguous and vague, and deny the allegations on that basis. Defendants admit that the Company filed a Form 8-K on July 21, 2021, which is publicly available and contains the language quoted in this paragraph.

24

Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

41. Pricing was a critical component of Holley's "mutually beneficial and long-term relationships" with its resellers. To that end, Defendants repeatedly told investors that Holley had the ability to and did "maintain strong pricing discipline" with "strict conformance to minimum advertised pricing." Defendants also stated that because of the "value" Holley could offer its resellers through access to a broad suite of product offerings, Holley was "able to operate with pricing discipline that support[ed] the value of [Holley] products in the marketplace and buttresse[d] [Holley's] profit margins." Defendants added that Holley's "pricing discipline" and "approach to pricing" allowed Holley to "better understand consumer demand and identify what [Holley's] end consumers are buying."

**ANSWER**: Defendants aver that this paragraph purports to quote statements made by the Company without specifying who made the alleged statements or when and how they were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

42. But the "strict" pricing discipline Defendants described was an illusion. In fact, during the Class Period, Holley undermined and materially hurt its reseller relationships by selling its products below the minimum advertised price through the Company's DTC channel. Despite professing "strong pricing discipline" and "strict conformance to minimum advertised pricing[,]" Holley's new CEO Stevenson admitted after the Class Period that, previously, Holley's "distribution partners were not included in [Holley's] promotional efforts[,]" which "resulted in them not promoting [Holley] products as desired during these time periods and in some cases, even promoting [Holley's] competitors' products to preserve their margins." CEO Stevenson also made statements on November 8, 2024 which indicate.

25

When viewed in context, that the Company failed to adhere to MAP on the vast majority of its stock keeping units ("SKUs") during the Class Period. *See* §VII, below.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

43.    Holley's failure to "maintain strong pricing discipline" and "strict conformance to minimum advertised pricing[,]" which was not disclosed to investors, was confirmed by the independently corroborating accounts of several former Holley employees.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

44.    For example, FE1[3] and FE2[4] were each aware that Holley historically had agreements in place with resellers that set MAP.  Pursuant to the MAP policy, Holley promised its critically important resellers that Holley would not advertise below certain thresholds, so as not to undercut resellers and the resellers' ability to sell Holley products profitably.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "FE1" and "FE2" and deny the allegations in this paragraph and footnotes three and four on that basis.  Defendants deny the remaining

---

[3] FE1 worked at Holley from June 2020 through September 2022, first as a Technical Sales Team Representative and then as a Technical Sales Team Lead.  FE1 led a team of over 40 employees, eight to ten of whom were supervisors.  FE1's responsibilities included overseeing the provision of customer service and technical support to Holley's customers across the Company's various product lines.  In this role, FE1 worked closely with Holley's partners, and also assisted other teams at the Company to address technical issues.

[4] FE2 began working at Holley in March 2016 as a Sales Analyst.  FE2 was promoted to Customer Service Manager in March 2017 and remained in that position until FE2 left the Company in June 2023.  FE2 focused on customer service for Holley's distribution partners and outside DTC consumers as it related to product orders, handling returns, and formulating problem resolutions for disagreements.  FE2 led a team of two supervisors and an additional staff of at least ten employees at any given time.

allegations in this paragraph and footnotes, including Plaintiff's characterization of the events at issue and any legal conclusions.

45.     Nevertheless, as disclosed by CEO Stevenson after the Class Period, Holley was indeed excluding its distribution partners from Holley's promotional efforts, which resulted in those distribution partners **not** promoting Holley products and, in some cases, even promoting competitors' products so that the distribution partners could preserve their margins. *See* §VII, below.  These actions violated Holley's agreements with its distribution partners and resellers not to sell below MAP.  When viewed in context, CEO Stevenson's statements imply that during the Class Period, Holley failed to enforce MAP on the vast majority of its total product lines.  FE3[5] recalled that Holley offered "flash sales" through the DTC channel on Holley's website to sell its products at prices well below the agreed-upon minimum advertised prices, effectively undercutting those resellers – such as Summit Racing, American Muscle, Jegs Performance, and Speedway Motorsports – which had previously purchased those products from Holley in order to sell to end users.  According to FE3, Holley's enhanced focus on DTC – along with Holley's decision to discount items below prices previously agreed upon with resellers – forced resellers to compete with Holley, resulting in resellers decreasing their orders from Holley and increasing their orders from Holley's competitors, such as Aeromotive Inc. and Alltech Motorsports.  FE4[6] was aware from discussions with others at Holley that Holley was not adhering to minimum advertised pricing in its DTC channel.  FE1 stated that resellers resented Holley for

---

[5] FE3 started working at Holley as a Vice President when it acquired AEM in April 2021.  Before working at Holley, FE3 was employed as a Vice President at AEM, a position FE3 held for over 20 years. FE3 left Holley in September 2022. FE3 managed employees working in sales and marketing.

[6] FE4 worked at Holley from 2010 through March 2023, with the exception of several months in 2013.  FE4 began as a manufacturing engineer, and prior to the Class Period was promoted to a manufacturing and industrial engineering manager, holding that title throughout the Class Period. While serving in the managerial role, during 2021 and 2022 FE4 visited several acquired companies' plants, including Baer Brakes, Arizona Desert Shocks ("ADS"), and Finspeed LLC, to ascertain what types of equipment they had and whether it could be assimilated into Holley's existing infrastructure.

undercutting them on price, and that the Company was running holiday sales, clearance sales, and huge discounts that offered lower prices in the DTC channel than what was offered to resellers. FE1 stated that the DTC approach was poorly conceived, as it: (i) severely damaged the Company's relationships with resellers and distributors; (ii) pushed those resellers and distributors to purchase from Holley's competitors instead; and (iii) was unable to replace the revenue lost from alienating resellers.

**ANSWER**: With regard to the fourth through eighth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "FE1," "FE2," "FE3" or "FE4" and deny the allegations in this paragraph and footnotes five and six on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

46. After Holley went public, Defendants accelerated DTC efforts, in part by discounting pricing on the Company's website, undercutting agreements with resellers not to advertise a product below the agreed-upon minimum advertised price, and enticing end users to buy products directly from Holley rather than shop with resellers. In other words, rather than offering a complementary sales channel, Holley utilized DTC sales to undercut its own reseller pricing, and thus sales, damaging its reseller relationships in the process. FE1 recalled that Holley often offered clearance sales via its DTC channel shortly before quarterly earnings deadlines in order to boost and demonstrate sales growth. FE1 recalled that these sales posted on the Holley website would use pricing well below the minimum advertised price that Holley previously agreed to with its resellers. FE1 stated that Holley began experimenting with such sales during the COVID pandemic, but ramped them up in 2022 to include a significantly larger quantity of products than previously included, also adding a dedicated page on Holley's website solely selling clearance items in order to encourage DTC sales. As a result, Holley advertised and sold products to consumers below the minimum advertised pricing, destroying the "strict" pricing discipline it touted to investors.

28

**ANSWER**: With regard to the third, fourth, and fifth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

47.     On the other hand, reneging on minimum advertised pricing was a decidedly one- way street.  FE2 recalled that if a reseller advertised below the minimum advertised pricing, Holley would place that reseller on a "Do Not Sell" list and prohibit future sales to that reseller until the reseller corrected its advertised pricing.  FE2 stated the "Do Not Sell" list was available to all Holley employees and that the list was updated every two weeks.

**ANSWER**: With regard to the second and third sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE2 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

48.     Another way that Holley damaged its critically important relationships with resellers was by eliminating bulk order discounts.  The result was that at the same time Holley was undercutting its own minimum advertised pricing with resellers – which resellers were forbidden from doing – it was also squeezing its resellers' profit margins by removing or decreasing bulk buying incentives. Several former Holley employees detailed these practices.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

49.     For example, FE1 was aware that because Holley historically placed so much value and emphasis on its relationships with resellers, and wanted them to continue doing business with Holley,

29

Holley would offer discounts of up to 30% to resellers, which Holley called its "Net Pricing Discount." This discount was not available through Holley's DTC channel (such as on Holley's website), it was only available to resellers.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

50. Holley tracked all resellers eligible for the Net Pricing Discount on an internal software program called Sightline. According to FE2 and FE5,[7] Sightline was the main program Holley used to track its performance. Sightline kept track of all sales, returns, purchases, shipments, on-shelf inventories, and other day-to-day activities. Sightline was also capable of generating various reports regarding the Company's operational performance. FE5 confirmed Sightline was available companywide and portrayed sales-related activity in real-time, while FE2 further confirmed that Tomlinson's direct reports provided him with Sightline reports on a monthly basis. According to FE5, "scheduling reports" showing product sales information were generated on a daily and weekly basis on Holley's intranet system, based on sales-related data entered into Sightline, and anyone at the Company could access those scheduling reports and view sales activities. According to FE5, based on information in Sightline, Holley's companywide intranet also contained "expedite" and "de-expedite" reports available companywide – which would have included the Individual Defendants – which showed orders that had been cancelled for any reason. When a de-expedite order was generated, the

---

[7] FE5 worked at Holley from August 2019 through April 2022 as a Scheduler. FE5's responsibilities included focusing on supply planning and scheduling for Holley's day-to-day operations. FE5 used data analytics and decision-making skills to work through Holley's material requirements planning processes to ensure that the Company had sufficient materials in place to process orders in a timely manner. FE5's role required close cooperation with Holley's operations teams, giving FE5 visibility into a vast amount of the Company's overall sales performance.

product would be placed in inventory stock for future sale because there was not a then-current need for that specific product. According to FE5, the decision to place cancelled order items in inventory stock tied up resources and cash flow, and Holley's executive management – which would have included the Individual Defendants – had access to reports showing sales-related red flags, such as order cancellations and decreases in sales from repeat customers, including resellers.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE2 and FE5 and deny the allegations in this paragraph and footnote 7 on that basis. Defendants deny the remaining allegations in this paragraph and footnote, including Plaintiff's characterization of the events at issue and any legal conclusions.

51.  Prior to the Class Period, Holley tightened its Net Pricing Discount "without warning," according to FE1, by limiting the discount to resellers who purchased a minimum of $70,000 of products from Holley. However, this restriction did not satisfy Holley, and according to FE1, during the fall of 2022, Holley cut its Net Pricing Discount again "without warning," renaming it to "Net Plus Ten," and dropping the maximum pricing discount for resellers from 30% to 10%. But, FE1 stated that because dealers and resellers paid shipping and other fees, such as credit card fees, the Net Plus Ten program essentially eliminated the reseller discount in its entirety for most Holley product purchases. According to FE1, Holley's implementation of Net Plus Ten "wiped out" the Company's reseller network.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

31

52.     At the same time Holley was all but eliminating bulk purchase discounts to resellers, it broadened the discounts available to its DTC customers through sales and clearance promotions, such as through its "Holley Day Sales" event. Prior to the Class Period, Holley would run the Holley Day Sales event as a big end-of-year sale that occurred just before Thanksgiving and concluded shortly after Christmas. The event encouraged larger purchases by resellers, and thus boosted Holley's financial performance. FE2 recalled that, prior to the Class Period, the way that the Holley Day Sales event worked was that resellers became eligible for discounts if they made bulk purchase orders, meaning that Holley would effectively allow resellers to buy below the minimum advertised pricing through this annual sales event occurring just prior to year-end. According to FE2, prior to the Holley Day Sales event, all resellers who had active email addresses on file with Holley were sent notifications regarding the new promotion, including the dates for which the Holley Day Sales event would be in effect.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE2 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

53.     Once Holley went public and the Class Period began, however, the Holley Day Sales changed to a general clearance sale, by which Holley marked products down across the board, eliminating any minimum purchase requirement in order to be eligible for deals. As such, bulk buyers – *i.e.*, resellers – no longer received unique benefits for purchasing in bulk, which further damaged Holley's reseller relationships.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

54.     Holley's actions to bolster its DTC channel angered its critically important reseller channel purchasers. Holley alienated the very reseller customers to whom Holley historically sold the

32

vast majority of its products and whose relationships Defendants touted to investors during the Class Period. Specifically, after Holley rolled back the Net Pricing Discount, changed the terms of the Holley Day Sales event, and increasingly offered DTC discounts through its website that undercut minimum advertised pricing, bulk resellers were less incentivized to transact with Holley. To that end, many of its largest customers shifted their business to Holley's competitors. As admitted by Holley CEO Stevenson, "in some cases" Holley's distribution partners were "even promoting [Holley's] competitors' products to preserve their margins." *See* §VII, below. FE1 stated that Holley's largest rivals, to whom customers turned, were companies such as FuelTech USA and ACES Performance Fuel Injection, and Haltech Performance.

**ANSWER**: With regard to the fifth sentence in this paragraph, Defendants admit that Holley held an earnings call on February 28, 2024, the transcript of which is publicly available and contains the language quoted in this sentence. With regard to the sixth sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this sentence on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

55. While Holley was busy undercutting its resellers and distributors on the one hand, Defendants were, on the other hand, busy assuring investors the opposite was true. For example, on the Company's August 11, 2021 earnings call, while discussing Holley's results for the second quarter of 2021 ("2Q21"), Defendants were asked whether Holley's retail partners were giving "pushback" or "frustrated with the shift towards DTC." In response, Bardos assured investors there was no conflict, that Holley had communicated its intentions with its reseller partners, that DTC sales created value for its retail partners, and that the "relationships" with resellers were "strong and solid." FE3, who would dial in and listen to earnings calls, recalled that what Holley was saying at this time was

33

"ludicrous." FE3 had established relationships with many distributors in Holley's network, and recalled hearing them say things such as they would do everything in their power to not buy from Holley because of the shift to DTC and undercutting of resellers' profit margins.

**ANSWER**: With regard to the second and third sentences in this paragraph, Defendants admit that Holley held an earnings call on August 11, 2021, the transcript of which is publicly available and contains the language quoted in these sentences. With regard to the fourth and fifth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

56.    Knowing that Holley was undermining its reseller relationships, and that resellers were increasingly refusing to buy from Holley if possible, FE3 recalled asking Nimmagadda to show FE3 Holley's plans for successfully transferring sales from resellers/distributors to DTC. FE3 stated that Nimmagadda never articulated or showed FE3 a plan; rather, he told FE3 that Holley sought to sell as much product as possible to consumers through any channel.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

57.    Holley's situation with its resellers – the traditional bread-and-butter of Holley's sales and business – was so bad that Nimmagadda had asked FE3 to rewrite the business model for Holley in order to improve relations with resellers and improve margin compression in the reseller channel. Nimmagadda and the other Defendants, however, did not adopt FE3's model, and Holley continued damaging its reseller relationships.

34

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

58.    Holley's alienation of – and deteriorating relationships with – resellers first came to a head on July 28, 2022, when Holley announced its preliminary 2Q22 results and disclosed that sales to resellers had declined below what resellers were selling to their customers, meaning that resellers were drawing down their inventory of Holley products and not ordering replacement products from Holley. While microchip shortages and supply chain pressures purportedly affected Holley's sales, Defendants also revealed that:

> ***Growth in DTC sales was more than offset by resellers that reduced their purchases below their out-the-door sales levels***, ***indicating that some sell-down of reseller inventory also occurred in the quarter***.

**ANSWER**: With regard to the second sentence in this paragraph, Defendants admit that the Defendants announced preliminary 2Q22 financial results in a Form 8-K on July 28, 2022, which is publicly available and includes the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

59.    On top of this disclosure, Holley substantially lowered its financial outlook for the remainder of 2022. As a result, the price of Holley stock plummeted by *37%*, or $4.68 per share, from a close of $12.67 per share on July 28, 2022, to a close of $7.99 per share on July 29, 2022, on unusually high trading volume, with the price continuing to fall the next trading day, August 1, 2022, by an additional *16.5%*, or $1.32 per share, to close at $6.67 per share.

**ANSWER**: Defendants admit that Holley filed a Form 8-K on July 28, 2022, which is publicly available and revised the Company's guidance range for the full year 2022. Defendants aver that the

35

price and trading volume of Holley stock is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

60. The results were so bad that within two weeks, on August 11, 2022, the Company announced that CFO Bardos would resign, effective September 30, 2022, to "pursue another opportunity and for personal reasons[,]" with the then-Vice President of Finance Trussell serving as Interim CFO while the Company searched for a permanent replacement.

**ANSWER**: Defendants admit that Holley issued a press release on August 11, 2022, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

61. That same day, Tomlinson told investors that the Company saw "*meaningful reseller de-stocking* in the quarter as resellers *reduced their purchases well below their out-the- door sales* of our products[,]" contributing to Holley's decision to "reduce [its] outlook for the remainder of the year." Holley disclosed that net sales "decreased 7.1% to $179.4 million in the second quarter of 2022 compared to $193.0 million in the second quarter of 2021[,]" and that "*destocking from our resellers*" and "reduced consumer demand" contributed to the sales decline. Nevertheless, Defendants assured investors there was "far more demand" than what was "visible in [Holley's] numbers" and that demand remained "solid."

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley held an earnings call on August 11, 2022, the transcript of which is publicly available and contains the language quoted in this sentence. With regard to the second sentence in this paragraph, Defendants admit that Holley filed a Form 10-Q on August 11, 2022, which is publicly available and contains the language quoted in this sentence. With regard to the third sentence in this paragraph, Defendants

36

admit that on the August 11, 2022 earnings call, the transcript of which is publicly available, Tomlinson is quoted as stating:

> So we look at it as fear-based or maybe an emotional reaction to the bad economic news. And the last time we saw this was in 2020, right after all the COVID lockdowns occurred. And what we saw on our DTC side, DTC charged right on through with high rates of growth, and resellers pulled back dramatically. And the conditions were such at that time that they had to come right back in within a month or 2 and start raising their orders. So I mean, I'm not suggesting that, that's going to happen this time. The economic conditions, I think, are much different. But we do think that there is far more demand there than is visible in our numbers, hence my comment that we believe the demand for our products is solid. And we've got some categories that are up, some categories that are down. We wanted to kind of talk about both sides of that to be fair and balanced.

Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

62.    More problems were revealed on November 14, 2022, when the Company reported its 3Q22 financial results and stated that "[c]hannel inventories" (*i.e.*, reseller inventories) continued to decline in July and August 2022, before partially recovering in September 2022. The Company also revealed abnormally high product returns from resellers, stating that resellers suddenly and unexpectedly "caught up on a backlog of warranty returns[.]" During a conference call that day, Tomlinson stated Holley's resellers had been sitting on a "backlog of warranty claims or warranty returns[,]" which, for unexplained reasons, all hit Holley in the 3Q22.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley reported its preliminary 3Q22 results in a Form 8-K on November 14, 2022, which is publicly available and contains the language quoted in this sentence. With regard to the second and third sentences in this paragraph, Defendants admit that Holley held an earnings call on November 14, 2022, the transcript of which is publicly available and contains the language quoted in these sentences. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

63.     FE3 recalled Holley's 3Q22 reporting of an extraordinary amount of product returns and Defendants' statements to investors during the 3Q22 earnings announcement.  FE3 recalled that Holley had a generous return policy and typically processed returns quickly. According to FE3, "at most" a distributor might do a 30-day bulk return of items for warranty claims, as distributors did not want unsold warranty items stored on their shelves.  FE3 clearly recalled Defendants' 3Q22 warranty return statements and stated that so many warranty returns hitting at once did not make any sense. Indeed, the Company's quarterly report filed with the SEC on Form 10-Q on November 14, 2022 ("3Q22 10-Q") stated that the amount of money "[a]ccrued for current year warranty claims" was over $6.5 million for 3Q22, which was a $4.5 million increase as compared to the $2 million amount accrued for 3Q21.  Stated differently, the Company's warranty claims for 3Q22 *increased by approximately 325%* as compared with 3Q21. Upon information and belief, Plaintiff alleges the sudden spike in Holley's warranty returns – which were significant enough to materially and negatively impact Holley's 3Q22 financial performance – were caused by the Company's deteriorating relationships with resellers.

**ANSWER**: With regard to the first through fourth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations in this paragraph on that basis.  With regard to the fifth sentence in this paragraph, Defendants admit that Holley filed a Form 10-Q on November 14, 2022, which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

**C.**   **Holley's Acquisition Binge Saddled It with Disparate Systems and Hid Weak Demand**

64.   Between 2020 and the end of the Class Period, Holley completed at least 15 acquisitions that required the integration of many different enterprise resource planning ("ERP") systems.  Thus, at the same time Holley was focusing on DTC so much that it damaged its relationships with its critical resellers by, among other things, undercutting minimum advertised pricing and squeezing their profit margins, Holley was also aggressively pursuing M&A opportunities  and  touting  its  successful integration  efforts.  Throughout  the  Class  Period, Defendants repeatedly told investors that one of Holley's main growth drivers would continue to be M&A, and that acquisitions and their subsequent integrations would not only increase Holley's revenues, but also its profits and DTC growth. Defendants  repeatedly  stated  that  acquisitions  and  integrations  were  critical  for  the  Company, conditioning the market to believe that Holley would continue to be acquisitive and that Holley was successfully integrating the companies it already acquired.  Indeed, one of the "key" elements of Holley's growth strategy was "a robust M&A pipeline."  According to the 2021 10-K, the Company "historically  used  strategic  acquisitions  to  (i)  expand  [its]  brand  portfolio,  (ii)  enter  new  product categories and consumer segments, (iii) increase direct-to-consumer ('DTC') scale and connection, (iv) expand share in current product categories and (v) realize value-enhancing revenue and cost synergies."

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrase "required the integration of many different enterprise resource planning ('ERP') systems" is vague and ambiguous and deny the allegations on that basis.  With regard to the sixth sentence in this paragraph, Defendants deny that Holley's 2021 10-K contains the language quoted in this sentence. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

39

65.     Holley, however, consistently failed to integrate the companies it acquired, which meant that Holley's key "M&A pipeline" might as well have been running dry.  Instead of integrating those companies in order to "realize value-enhancing revenue and cost synergies[,]" Holley simply gutted them to cut costs by, among other things, conducting mass layoffs, which often had the effect of slamming the brakes on further development of acquired products and limiting potential growth. For example, FE2 stated that Holley fired staff after each merger, causing Holley to suffer from a substantial loss of employees' expertise and the indispensable institutional knowledge base needed at Holley. Likewise, FE5 stated that although Holley acquired numerous companies, it did not have the infrastructure to support them and there was not enough organizational support for the companies that Holley acquired.  For example, instead of hiring more people in the purchasing department to support increased sales that came from acquisitions – sales which were not organic – Holley just added to the existing employees' workload, resulting in numerous challenges and dysfunction inside Holley.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE2 or FE5 and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

66.     According to FE2, Holley's mergers were disasters and the integration process was a "***hot mess***."  FE2 stated that Holley killed purchased companies' brands and terminated their employees.  When Holley acquired a company, FE2 and FE2's department were tasked with providing Sightline training to new hires.  However, once the new hires were trained, Holley would typically fire most of those newly acquired employees to lower its costs.  According to FE2, when layoffs happened, they often occurred shortly before the end of a fiscal quarter so that Holley could report reduced costs by quarter-end.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE2 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

67. In fact, according to FE3, Holley had a reputation in the industry for "screwing up" post-acquisition integrations in the name of short-term cost savings. A prime example highlighting Holley's integration struggles was its acquisition of AEM, which the Company acquired in April 2021 for $52 million in cash. Holley described the AEM acquisition as one of the three "most significant" acquisitions impacting Holley's operating results from 2019 through 2021, and one of the five "most significant" acquisitions impacting its operating results from 2020 through 2022. And although Holley touted the acquisition, it was, in reality and as described by FE1, a "*disaster*."

**ANSWER**: With regard to the first sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations in this sentence on that basis. With regard to the second and third sentences in this paragraph, Defendants aver that these sentences purport to summarize statements made by Holley without specifying when or how the statements were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the fourth sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this sentence on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

68. FE3 knew AEM well. During FE3's more than 20 years at AEM, FE3 was responsible for developing its sales channel, which had profit margins that exceeded Holley's. AEM also had a

41

uniform pricing policy which ensured that when distributors and resellers bought AEM products, they would be able to sell the products at a profit, which led to stable and beneficial relationships with resellers. FE3 recalled that when Holley bought AEM, many of AEM's distributors – including AEM's three largest accounts – became extremely unhappy because Holley had a track record of "decimating" companies.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

69. One of the primary reasons Holley acquired AEM was to gain access to its successful electric vehicle ("EV") business. Because the acquisition was very important to Holley and its efforts to penetrate into the EV world, Holley's highest-ranking executives were involved with the AEM acquisition. According to FE3, Nimmagadda was the "point person" on the AEM acquisition, toured the AEM facilities multiple times prior to the acquisition, and relayed Holley's due diligence requests to AEM.

**ANSWER**: With regard to the first and second sentences in this paragraph, Defendants aver that the phrases "gain access," "very important," and "highest-ranking executives" are vague and ambiguous and deny the allegations on that basis. With regard to the third sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

70. Prior to Holley's acquisition of AEM, AEM's business model had been historically rooted in selling to resellers, and AEM had no desire to shift to the DTC model. AEM executives were

also aware of prior acquisitions Holley had made, such as of AEM competitor Racepak, which, according to FE3, consisted of Holley firing everyone at Racepak and gutting much of what made that company successful, including the eradication of most of Racepak's product line. In fact, AEM voiced concerns of being "Racepaked" post-acquisition, referring to mass layoffs and large-scale discontinuations of product offerings. According to FE3, AEM was also concerned that by being acquired, Holley would force AEM to convert to a DTC model, despite the fact that nearly all of AEM's historic revenues came from its reseller channel as AEM barely sold anything DTC. According to FE3, in order to allay AEM's concerns, Holley and AEM entered into a handshake agreement, through which they agreed that Holley would acquire AEM, but – other than provide funding to AEM – would leave AEM alone to function as a standalone business.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, including statements purportedly made by FE3, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

71. However, on August 11, 2021, four months after the AEM acquisition, Holley held an earnings call to discuss its 2Q21 financial results. On the call, in response to a question about the progress and timeline of the AEM integration, Tomlinson falsely responded by saying Holley was "working diligently to integrate" AEM, despite having taken no action to that point to integrate AEM.

**ANSWER**: Defendants admit that Holley held an earnings call on August 11, 2021, the transcript of which is publicly available and contains the language quoted in this paragraph. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

72. According to FE3, shortly after analysts began asking about integration efforts, the Defendants took some steps to start integrating AEM. Holley instituted a revised price logbook, issued

43

new price cards, and changed the terms and conditions for AEM's distributors, forcing channel margin compression on AEM's distributors. FE3 asked Nimmagadda what Holley's plan was to tackle potential margin compression with AEM's distributors, and rather than offer a solution, Nimmagadda told FE3 "don't worry about it" and that Holley had "done this before."

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

73. Other than those changes, Holley left AEM alone for the time being. However, that all changed after Holley's March 3, 2022 earnings call, during which Defendants discussed Holley's financial results for 4Q21 and the full year ended December 31, 2021 ("FY21"). On that call, analysts specifically asked about AEM, with one analyst asking about changes with the Company's work on vehicle components and asking about the AEM "integration plan" and "profitability" from the acquisition. Tomlinson responded by assuring listeners that regarding the AEM integration, "[*w*]*e've got those teams on the innovation side folded in together*" and the Defendants were "very excited to be making progress with that[,]" misrepresenting and omitting that AEM was, pursuant to the handshake agreement, effectively functioning as a standalone company with little integration efforts by Holley.

**ANSWER**: With regard to the second, third, and fourth sentences in this paragraph, Defendants admit that Holley held an earnings call on March 3, 2022, the transcript of which is publicly available and contains the language quoted in these sentences, and that Tomlinson participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

74.    Based on that call and the analysts' questions about the AEM integration, Defendants quickly (and privately) executed a U-turn on the Holley-AEM relationship.  According to FE3, whereas Holley had taken a hands-off approach to AEM for nearly a year because of the handshake agreement, in reaction to Tomlinson's false statement during the call, Defendants suddenly sought to quickly integrate AEM.  Defendants, therefore, abruptly reneged on the handshake agreement with AEM, required AEM to refocus its research and development ("R&D") to primarily deal with only EV components, laid off employees who worked on anything outside of AEM's EV business, and forced AEM to shift to Holley's DTC model which further compressed margins.  Because of the channel compression, AEM customers switched to buying competitors' products rather than transacting with Holley-AEM at reduced profit levels.

**ANSWER**: With regard to the second sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations in the second sentence on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

75.    In fact, shortly after the March 3, 2022 earnings call, Holley began to turn the kill switch on the handshake agreement.  A few days after the earnings call, Holley held a meeting at AEM's California facilities with AEM's employees.  According to FE3, Nimmagadda and a member of Holley's human resources department were in attendance.  During the meeting, according to FE3, Holley announced a mass layoff of AEM employees, impacting most of the AEM sales team, as well as employees in non-EV verticals.  However, the mass layoff had unintended consequences.  According to FE3, as a result of the unexpected and poorly executed shift, many of AEM's "core" engineers left, as did the remaining members of the AEM sales team.

**ANSWER**: With regard to the third, fourth, and sixth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations on that basis. Defendants aver that the phrases "mass layoff" and "unintended consequences" are vague and ambiguous and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

76. According to FE3, in order to fill the place of the terminated sales team workers, Holley assigned the Company's Bowling Green, Kentucky-based salespeople to respond to calls about AEM-related sales and technical assistance, despite the fact that those employees were unfamiliar with AEM products and struggled to provide the same assistance that AEM's former sales team did. Holley also forced all remaining AEM non-EV engineers to become EV engineers, regardless of their prior experience with Evs. Holley also stopped any AEM activity dealing with engine management, which resulted in the resignations of engineers who had been working on engine management.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

77. As a result of Holley's sudden and heavy-handed "integration" and related cost- cutting measures, AEM's sales and margins declined significantly according to FE3, counteracting key reasons why Holley acquired AEM. According to FE3, nearly all of AEM's revenues historically came from its reseller channel as AEM barely sold anything DTC. Holley forcing AEM to shift to DTC negatively impacted AEM's margins, eliminating most of AEM's revenue stream. Likewise, FE1 agreed that AEM historically had a very good product line and loyal customers, but by "killing" most of AEM's

46

product lines and terminating many of AEM's employees about a year after the acquisition, Holley destroyed AEM's brand and reputation and pushed away many of AEM's customers.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and FE3 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

78.    Holley's unsustainable revenue generation practices were not limited to an acquisition binge which disregarded integration for short-term success. In fact, Holley's revenues were unsustainably boosted by COVID stimulus packages provided to companies and United States citizens during 2020 and 2021, including for customers of companies that Holley acquired. Similar to how the Company shortsightedly forecasted M&A growth, Holley also had forecasted that its revenue increases would continue into 2022, despite the fact that COVID stimulus checks were providing a temporary boost to its customers, resulting in temporary, unsustainable demand and revenue growth. FE4 explained that while Holley's sales increased in 2020 and 2021, the revenue increases were due to a temporary boost from the COVID stimulus packages. Because end-users now had more dollars available to spend on automotive projects, and because they were, by and large, required to stay home because of COVID policies, customers temporarily increased their spending with Holley. FE4 recalled sales surging during this time frame, but understood that such sales were unsustainable.

**ANSWER**: With regard to the fourth and sixth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE4 and deny the allegations on that basis. With regard to the fifth sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny them on that basis. Defendants deny the remaining allegations

47

in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

79. Similarly, FE1 stated that Holley's sales rose in 2020 and 2021 due to a temporary boost from the COVID stimulus packages. FE1 also confirmed that end users had more money available to work on their cars while working remotely. FE1 further stated that the Company's resulting sales rates were unsustainable and an anomaly, and that Holley was going to experience revenue declines in the coming years. According to FE1, it was clear that COVID helped the Company's sales, and that those sales were recorded in numerous reports that were examined and reviewed by Holley's executive management.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

80. FE2 confirmed that the boosted sales were unsustainable, and that after COVID largely abated and people stopped receiving COVID stimulus payments, Holley's sales started declining and Holley's revenues declined in 2022 and 2023.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE2 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

> **D. During the Class Period, Holley Suffered from Significant Cultural Problems and a "Brain Drain" that Negatively Impacted Holley's Performance and Outlook**

81. Holley's practice of gutting the companies it acquired led to a significant "brain drain" as Holley lost substantial amounts of technical know-how and critical connections to consumers. FE1

and FE2 each recalled that Holley's practice of using employee layoffs to cut costs – both from newly acquired companies and from long-standing Holley personnel – in the Company's customer service and sales divisions resulted in a critical loss of the technical expertise needed to assist customers with product issues.

**ANSWER**: With regard to the second sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and FE2 and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

82.     The impact of such short-term cost-cutting was evident in one of Holley's main appeals to customers: its dedicated customer service lines which historically allowed customers to call and get step-by-step assistance with product installation and troubleshooting of complicated automotive modifications, which were the bread-and-butter of Holley's business.  Historically, Holley's customer service representatives had a reputation for in-depth technical knowledge of the products Holley sold, and effectively served as over-the-phone mechanics.  To that end, FE6[8] stated that customers informed FE6 that while Holley's products were often more expensive than competitors', the customers chose to buy from Holley because of the technical support team.

**ANSWER**: With regard to the first and second sentences in this paragraph, Defendants aver that the phrases "impact," "main appeals," "historically," "bread-and-butter," and "over-the-phone mechanics" are vague and ambiguous and deny the allegations on that basis.  With regard to the third sentence and footnote 8 in this paragraph, Defendants lack knowledge or information sufficient to

---

[8] FE6 worked at Holley from March 2021 through August 2021 as a Technical Sales Representative, which involved answering product questions, resolving technical issues, and selling merchandise to consumers.

form a belief as to the truth of the allegations regarding statements purportedly made by FE6 and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph and footnote, including Plaintiff's characterization of the events at issue and any legal conclusions.

83. For example, FE6 recalled that customers often had issues with products including Holley's top-selling "Sniper throttle bodies" and "Terminator throttle bodies" due to their complicated installation processes. One such issue was that in those two throttle bodies, Holley's engineering department would sometimes install critical injector rings upside-down, leading to product malfunctions. As part of FE6's job, FE6 – like other members of Holley's well-respected customer service department – would spend significant amounts of time assisting customers with installation and troubleshooting. However, in tandem with Holley's mass layoffs and change in business strategy after it went public through the Business Combination, Holley's customer service culture changed as well. FE6 stated that FE6's group originally reported to a seasoned, 20-plus year Holley veteran named Shane Whitescarver who was a Technology Service Representative. In turn, Whitescarver reported to Greg Senser, Holley's Director of Sales and Technical Support. Following the Business Combination, Senser was replaced with a director who FE6 stated knew nothing about cars and had "zero" automotive knowledge. FE6 stated the new director was focused only on daily call volume and the amount of time the technicians spent on the phone, whereas Holley's former managers were primarily focused on resolving customers' issues.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE6 and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

50

84.     According to FE6, the department's direction shifted quickly, and the detrimental culture ramped up during the lead-up to Holley going public, as its customer service culture became that of a "call center."

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE6 and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

85.     Whereas previous customer interactions could take an hour or more to adequately address the customers' automotive product issues, under Holley's new direction the time spent talking to customers to help them with their problems was drastically cut.  With the culture now shifted to that of a call center, gone were the days of Holley know-how and encouraging its customer service representatives to serve as over-the-phone mechanics and give each customer the adequate amount of time to deal with their complex product issues.  FE6 also monitored the official Holley Facebook group and noted that there was a change in customers' perception towards Holley.  FE6 noted numerous postings stating that technical call center help line wait times spiked to very high levels and that the Company was no longer providing actual help to its customers. FE6 further noted that after resigning – which was due to the declining culture and the customer service department becoming more of a "call center" – former colleagues who remained at Holley confirmed that customers' negative feedback relating to customer service continued well into the Class Period.

**ANSWER**: With regard to the first and second sentences in this paragraph, Defendants aver that the phrases "drastically," "know-how," "over-the-phone mechanics," and "adequate amount of time" are vague and ambiguous and deny the allegations on that basis.  With regard to the third, fourth, and fifth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE6 and deny the

51

allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

86. The remaining customer service representatives who were not laid off were expected to pick up the work of the terminated ex-employees, which now required not only handling a larger volume of customer calls per representative, but also ensuring that those calls with customers were as short as possible so as to maximize call volume.

**ANSWER**: Defendants aver that the phrases "pick up the work," "larger volume of calls," "short as possible," and "maximize call volume" are vague and ambiguous and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

87. FE1 confirmed that, historically, most of the people working in Holley's customer service department were car enthusiasts who were qualified and able to help customers with automotive issues. FE1 confirmed that when Holley changed how the technical support department functioned and shifted the department's culture to that of a "call center," many of the technical support employees chose to resign. According to FE1, Holley would replace those employees with lower-salaried individuals in order to reduce costs, but those new employees lacked the same technical knowledge and expertise needed to assist customers, which ultimately impacted technical support capabilities and lowered call quality for customers, resulting in Holley's customers turning to competitors, negatively impacting the Company's sales. What Holley saved in salary, it more than lost in alienated and upset customers. Holley did not disclose the negative impacts of its technical advisory staff layoffs. Quite the opposite, contemporaneous with its layoffs of these employees, Holley touted its "knowledgeable phone technical sales advisors" as one of the ways it "deepen[ed]… engagement with… enthusiast consumers" to "[e]xpand DTC [s]ales[,]" as discussed in the Proxy Statement/Prospectus (incorporated

in the July 21, 2021 Form 8-K, defined below), July 2021 Prospectus (defined below), and February 2022 Prospectus (defined below).

**ANSWER**: With regard to the first, second, and third sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in the first three sentences of this paragraph on that basis.   With regard to the sixth sentence in this paragraph, Defendants admit that Holley issued the alleged Proxy Statement/Prospectus, July 2021 Prospectus, and February 2022 Prospectus, which are publicly available and contain the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

88.    Likewise, FE3 recalled that AEM relied on its distributors/resellers to provide AEM's end users with assistance, training, and problem resolution to the various dilemmas those users encountered with AEM products.  But by alienating AEM's distributors and resellers, Holley lost that technical network and a substantial amount of that historical institutional knowledge base, which also alienated end users and ultimately hurt Holley's business.  By switching from a tried-and-true distribution network for customer interfacing to Holley's call center, Holley lost the technical knowledge needed to resolve customers' issues with AEM products.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations on that basis.  Defendants deny the allegations, including Plaintiff's characterization of the events at issue and any legal conclusions.

89.    Customer complaints echo the experiences of the Fes detailed herein.  For example, Better Business Bureau and Pissed Consumer complaints beginning shortly before Holley went public

and then continuing through the Class Period make clear that Holley's customers were increasingly frustrated with the newfound lack of customer service as a result of Defendants' actions:

- April 26, 2021:  I have been trying to obtain technical support for a Sniper EFI for 10 days without any success.  Each time I have tried calling the tech support number - ************ - *I am placed in a queue in which I waited 45 – 60 minutes and forced to hang-up without ever being connected to a tech*.  *Needless to say*, *I can't sit around for hours with my progress in addressing my issue limited to being placed on hold*.  Holley promises quality technical support, which is what I seek.  I want Holley to contact me to schedule a tech support phone call.  A direct phone number for a tech support supervisor is also requested.

- May 11, 2021:  I purchased an ignition controller, part number ********* on 5/5/20 through ****** ******.  I have had problems with the part, pretty much from the get-go.  I tried to correct any of the known issues with this part, mostly these issues are related to bad grounds.  I contacted MSD support and got an RMA # issued.  I sent the unit back to MSD on 4/23/21. It has been more than two weeks now since I sent the part back; I have been without my truck for several months.  *I have tried to call to get a status on the RMA*, *but I never get through*.  *I have literally been on hold*, *listening to bad guitar music for 5 hours this week*.  I just want an update as to when I will get my $400 part back so I will have my transportation again.

- June 14, 2021:  I orders [sic] a complete LS engine swap kit including motor mounts, fuel pump, lines, etc, all parts were designed to work together but I never 54reate54z [sic] the fuel tank.  It has been many months now and many many hours on the phone to be told they don't know when I will 54reate54 [sic] my part.  All I want is the part or the ability to return all of the other parts that I can not [sic] use without the proper fuel tank.  I really need help to resolve this issue.  *They put me on hold for hours at a time*, *then say they will call back and never do*.

- June 17, 2021:  I bought a long amount of parts for me and ** **** project and only had a set amount for parts.  Holley started shipping everything out as single shipments.  I had a set of headers I was waiting on and kept getting delayed so I asked to have them changed with another set they had the tech said he would ask since they were 80 dollars more and would call me back. He never did he just replaced the headers and since they cost more they held the rest of my order and charged me for shipping on all the parts they sent. So I asked to cancel the rest of the order and kept 60 dollars from my original order.  *The customer service didn't want to hear want I was telling her and hung up after it took me 45 minutes to talk to someone*.  They still owe me 60 dollars

- March 10, 2022:  *If you dont* [sic] *want to wait 2 hours for them to answer dont* [sic] *bother calling* Ive  [sic] been trying to get in contact with them for a week this is ridiculous

- May 18, 2022:  A Holley super sniper unit that I purchased from Holley has went bad. I contacted Holley and was told I would receive a return shipping label within 1-2 hours, *after 4 days and 3 phone calls later* I finally received a shipping label.  A week

and a half goes by and I have not heard from Holley even though I was told over the phone that I would hear something within 3-4 days of them receiving it. *After several phone calls and waiting on hold for hours my issue is still not resolved*. I was told that they would send me a new unit but that they do not have any in stock at the moment, even though that on their website it shows that the parts are in stock. I've been out of a vehicle for 3 weeks and who knows how long this will take to get resolved.

- June 28, 2022: Trying to get some information on which adaptor plate to use for my Snipper EFI system. *On hold for over 1 hour and no answer (on hold). Why is there no customer support personal to answer your question. If you purchase an item and have a question, good luck getting information. Still haven't got an answer. Buy a different product than Holley* (they don't have any tech personal [sic] that will answer the phone, (again on hold for over 1 hour and no answer). VERY poor customer service at best.

- July 21, 2022: My wife purchased the Holley Sniper EFI and Hyper Spark Ignition, Hyper Spark Distributor and Coil. She spent a little over $2000 dollars for it. My problem is It [sic] has problems, no spark and can't program the ECU. *I've tried contacting Holley tech support for over 3weeks [sic] by email, no response, by phone after wait times over an hour no getting answers, the install manual has nothing about ether [sic] problem. I'm very frustrated.*

- August 4, 2022: *Took an hour to get an agent on the line. Then they put me back on hold to never return. Left phone on hold for over an hour.* They used usps to ship my parts, which were sent to the other side of the country. Everyone knows usps sucks but now holley sucks too. Lady said they could fix it but *i [sic] can not [sic] get anyone to answer phone! Never again will i [sic] buy from these clowns!*

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by customers and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

90. Holley's R&D employees and engineers were not spared by layoffs either. According to FE4, there was a "*mass*" layoff in the product engineering department in mid-to-late 2022, which resulted in the termination of a "*substantial*" number of product engineering department employees.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrase "not spared by layoffs either" is vague and ambiguous and deny the allegations on that basis. With regard

55

to the second sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE4 and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

91.    Further describing the deteriorating culture at Holley, former employees recounted that Tomlinson diverted Holley employees from working for the Company to working on Tomlinson's personally owned cars. For example, according to FE1, Tomlinson treated the Company like his "personal playground" by having Holley engineers work on Tomlinson's own vehicles instead of working on products for the Company. FE2 recalled similar facts, stating that Tomlinson had Holley employees work on his personally owned vehicles, and that Tomlinson had a Holley employee report directly to him who managed all of his personal cars. FE2 further elaborated that when Holley conducted mass layoffs in 2022, engineers working on Tomlinson's cars were going to be laid off, but Tomlinson intervened and insisted that they be retained and other engineers be laid off instead.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "former employees," FE1, and FE2 and deny the allegations in the first sentence on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

92.    FE1 described Holley as a poorly run, dysfunctional organization saddled with weak leadership. FE1 noted that Holley reduced its R&D undertakings and decreased salaries of employees working on R&D, resulting in significant turnover. As a result of these R&D declines, merchandise updates and product improvements were left unaddressed, resulting in a negative sales impact for Holley. According to FE2, Tomlinson would direct engineers to build products because Tomlinson thought they would look good on his cars.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and FE2 and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

### E.    Holley's True Financial Condition Begins to Emerge

93.    Despite Defendants' positive portrayal of Holley's business, acquisition integrations, strict pricing discipline, and relationships with key resellers, the wheels started to come off in the summer of 2022.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

94.    ***First***, on July 28, 2022, the Company announced preliminary 2Q22 results and cut its 2022 outlook – outlook that Defendants reaffirmed on May 12, 2022. The Company's results came in well below expectations, falling short on revenue, gross margin, and EBITDA, with those numbers dropping 7.1%, 7.3%, and 31.3% year-over-year, respectively. While the Company pointed to microchip shortages and supply chain challenges, it also revealed that DTC growth was "more than offset" by resellers "that reduced their purchases below their out-the-door sales levels[.]" Tomlinson stated this reseller de-stocking indicated that "some sell-down of reseller inventory also occurred in the quarter" amid "softening consumer demand." At the same time, however, Holley also indicated that its DTC channel posted year-over-year growth, indicating that end-consumer demand was stable. Taking these two facts together, it was clear that Holley was experiencing unique problems with its resellers that were not impacting its DTC business.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company announced its preliminary 2Q22 results in a July 28, 2022 press release. With regard to the second sentence in this paragraph, Defendants admit that the July 28, 2022 press release stated that

57

preliminary net sales in 2Q22 declined by 7.1% as compared to 2Q21; preliminary gross profit in 2Q22 declined by 7.3% as compared to 2Q21; and preliminary adjusted EBITDA in 2Q22 declined by 31.3% as compared to 2Q21.  With regard to the third and fourth sentences in this paragraph, Defendants admit that the July 28, 2022 press release, which is publicly available, contains the language quoted in these sentences.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

95.    On August 11, 2022, Holley announced CFO Bardos' resignation, effective September 30, 2022.  Holley also held its 2Q22 earnings call before the market opened on August 11, 2022.  During the call, Tomlinson reiterated that it was "very clear that there was meaningful reseller destock – destocking in the quarter."  He added that Holley's top resellers reduced their purchases "well below their out-the-door sales" of Holley products, but also stated that resellers' ability "to continue to reduce their inventory is limited."  And while Holley saw a decline in consumer demand for electronic tuning products, Tomlinson assured investors that "overall consumer demand for [Holley's] products is solid[,]" that the DTC channel was growing, and that supply chain improvements would "accelerate" during "the balance of 2022."

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley announced CFO Bardos' resignation on August 11, 2022, effective September 30, 2022.  With regard to the second sentence in this paragraph, Defendants admit that Holley held its 2Q22 earnings call on August 11, 2022.  With regard to the third, fourth, and fifth sentences in this paragraph, Defendants admit that the August 11, 2022 earnings call, the transcript of which is publicly available, contains the language quoted in these sentences.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

58

96.     Two weeks after the July 28, 2022 disclosure during which Holley announced it was slashing guidance amid DTC growth being "more than offset by resellers that reduced their purchases below their out-the-door sales levels," on August 11, 2022 Holley admitted through a press release that 2Q22 "[s]ales excluding the impact of acquisitions… *more than offset*[] *the growth from the acquisitions*."

**ANSWER**: Defendants admit that Holley issued press releases on July 28, 2022 and August 11, 2022, both of which are publicly available and contain the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

97.     *Second*, the Company's November 14, 2022 earnings release further revealed that Holley implemented "recent cost saving initiatives" through a "decrease of $1.6 million in administrative and sales personnel costs," referring to layoffs described above.

**ANSWER**: Defendants admit that Holley issued a press release on November 14, 2022, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

98.     Holley's 3Q22 10-Q also revealed that R&D costs for 3Q22 "decreased $1.1 million, or 15.3%" as compared to 3Q21, and that this decrease "was *primarily due to headcount reductions*, reflecting the Company's implementation of recent cost saving initiatives."  The press release further disclosed that "[*w*]*arranty costs*" *increased* "*as resellers caught up on a backlog of warranty returns*."

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley filed its 3Q22 10-Q on November 14, 2022, which is publicly available and contains the language quoted in this sentence.  With regard to the second sentence in this paragraph, Defendants admit that Holley

59

issued a press release on November 14, 2022, which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

99.    Over the next two days as the market digested the disclosure, Holley's stock price fell from $2.99 per share on November 14, 2022 to close at $2.40 per share on November 16, 2022, falling *20%* while losing $.59 per share over the two-day period.

**ANSWER**: Defendants aver that the price of Holley stock is publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

100.    ***Third***, the extent of the damage became clear when the Company announced on February 6, 2023 that longtime CEO Tomlinson tendered his resignation to the Board on February 4, 2023. The Company also stated that the search for a permanent CEO would be conducted with the help of Heidrick & Struggles, a company "retained by the Board in September 2022 for a comprehensive review of succession planning[,]" which would have been in the month following the announcement of Bardos' resignation, ***and had not been previously announced to the public***.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley filed a Form 8-K and issued a press release on February 6, 2023, which are publicly available and stated that Tomlinson gave notice to the Board on February 4, 2023 that he would retire as President and Chief Executive Officer and resign from the Board. With regard to the second sentence in this paragraph, Defendants admit that the February 6, 2023 Form 8-K and press release contain the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

101.    However, despite the Company's struggles under Tomlinson's helm, he received his full "separation payments and benefits," which included continued payment of his base salary for 12 months, a pro-rated annual bonus with the possibility of an additional bonus of 50% of the target bonus, 12 months of fully covered healthcare with the option to extend for an additional six months, as well as on-time vesting of his restricted stock units.

**ANSWER**: Defendants admit that Holley filed a Form 8-K on February 6, 2023, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

102.    Tomlinson's abrupt and unplanned resignation was accompanied by the Company revealing that 4Q22 sales fell short of market estimates, and that the adjusted EBITDA figure was "'disappointing,'" as described by new Holley CFO Weaver.  On February 6, 2023, Holley also disclosed that it experienced a "***normalization of consumer demand to pre-covid levels***" which led to sales reductions in the second half of 2022, and that it had struggled with "synergy capture" of its acquisitions.

**ANSWER**: Defendants admit that Holley issued a press release on February 6, 2023, which is publicly available, and which contains the language quoted in this paragraph and states that Tomlinson gave notice to the Board on February 4, 2023 that he would retire as President and Chief Executive Officer and resign from the Board.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

103.    On the above news, the price of Holley stock, which had closed at $3.42 on February 6, 2023, fell *31%*, or $1.06 per share, to close at $2.36 per share on February 7, 2023, on unusually high trading volume.  The following day, February 8, 2023, the price of Holley stock fell an additional

61

9.75%, or $0.23 per share, to close at $2.13 per share, down approximately **85%** from the Class Period peak of $14.52 per share on March 16, 2022.  The total stock price decline over this two-day period was **nearly 38%**.

**ANSWER**: Defendants aver that the price and trading volume of Holley stock is publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

104.    In total, Holley investors suffered significant damages when the truth was revealed through the above disclosures, causing the artificial inflation to come out of the stock price.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

105.    However, the full extent of the under-the-hood damage done with Tomlinson at the wheel did not arrive until more than a month later, after the Class Period ended.  On March 9, 2023, the Company hosted an earnings call to discuss its 4Q22 and full year ended December 31, 2022 ("FY22") results.  Interim CEO, Interim President, and Director Gloeckler admitted in her opening remarks that "2022 was a challenging year for Holley" under Tomlinson's leadership, the Company "did not meet [its] targets in 2022," and that the prior year "surfaced many areas of improvement for our broader organization."

**ANSWER**: With regard to the second and third sentences in this paragraph, Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in these sentences.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

106.    The executives who replaced Tomlinson and Bardos spoke extensively about the Company's excessive M&A activity and resulting integration struggles which occurred during the Class

62

Period. CFO Weaver disclosed that the Company will "*pause on M&A activity* in 2023 and focus M&A efforts on finalizing successful integrations and synergy capture." CEO Gloeckler also revealed that with regard to "a lot" of the acquisitions "over the past several years[,]" the Company was "*still working through those to find and realize synergies*." Gloeckler further revealed that the Company "*rationalized more than 20,000 SKUs across 18 brands*" during 4Q22, doing so "with an eye toward what items were duplicated." Paired with the Company's need to "pause" M&A in 2023 to focus on integration, this bloat of 20,000 duplicative SKUs was likely the cause of Holley's excessive M&A activity done without attending to properly integrating acquisitions, contrary to what Defendants told the public during the Class Period.

**ANSWER**: With regard to the second sentence in this paragraph, Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in this sentence, and that Weaver participated in the call. With regard to the third sentence in this paragraph, Defendants admit that on the March 9, 2023 earnings call, the transcript of which is publicly available, Gloeckler is quoted as stating:

> You mentioned mergers and acquisitions, and yes, we have had a lot of them over the past several years. And we're still working through those to find and realize synergies. Most of them are on our ERP systems. Most of them are in our distribution centers, and most of them have centralized back-office things like payroll. But there are other unique things to each business that we are focused on listening to the folks that are running those brands and businesses and making sure that we're optimizing them, both from a marketing standpoint and a manufacturing.

With regard to the fourth sentence in this paragraph, Defendants admit that the March 9, 2023 earnings call, the transcript of which is publicly available, contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

107.    Holley's integration failures undoubtedly constituted a key driver of the Company's poor financial performance during the Class Period. When CFO Weaver stated that the Company would

63

"pause" its M&A activity in 2023 to focus on "finalizing successful integrations and synergy capture" on the acquisitions it had already made (and, inferentially, failed to integrate), he revealed that this pause was done "*to restore Holley's profitability*, *improve*[] *free cash flow*, *optimize working capital and de*[-]*lever the balance sheet*."

**ANSWER**: With regard to the second sentence in this paragraph, Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available, and in which Weaver is quoted as stating:

> Since I joined Holley late last year, the key objectives for our team have been to restore Holley's profitability, improved free cash flow, optimize working capital and de[-]lever the balance sheet. These will continue to be the main objectives for our team this year while we pause on M&A activity in 2023 and focus M&A efforts on finalizing successful integrations and synergy capture.

Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

108.    The post-Class Period revelations were not limited to Holley's integration efforts; rather, once Holley hired Stevenson as its CEO, Stevenson made a series of four statements regarding Holley's relationships with its distribution partners and Holley's failure to adhere to MAP on the vast majority of its products.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

109.    First, on February 28, 2024, Stevenson stated that previously, Holley's "*distribution partners were not included in our promotional efforts*" which "*resulted in them not promoting [Holley] products as desired during these time periods and in some cases, even promoting [Holley's] competitors' products to preserve their margins*."

**ANSWER**: Defendants admit that Holley held an earnings call on February 28, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as

64

expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

110.    **Second**, on May 8, 2024, Stevenson further confirmed that prior to his tenure as Holley's President and CEO, when Holley "ran a promotion, we didn't include our distribution partners and we felt that was a real miss as an important part of our go-to-market strategy."

**ANSWER**: Defendants admit that Holley held an earnings call on May 8, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

111.    **Third**, on August 7, 2024, Stevenson made clear that the Company's implementation of promotional planning with its distribution partners "**never existed before**."

**ANSWER**: Defendants admit that Holley held an earnings call on August 7, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

112.    **Fourth**, on November 8, 2024, Stevenson stated that prior to the quarter ended September 30, 2024 ("3Q24"), the **number of SKUs that Holley was** "**monitoring and enforcing was very low**, **compared to what we're doing now**." Specifically, Stevenson stated that "**MAP enforcement**" was "now in place for over 20,000 SKUs" which was "**12 times more than it was just a short time ago**[,]" marking the first time since the Class Period began that Holley provided actual numbers behind its MAP enforcement. Stevenson added that MAP enforcement was "**key to earning trust with distributors** and keeping everyone on a level playing field" and that "[p]ricing is a discipline we've been working on **putting into this organization for over the last year**." Stevenson further added that the newly enforced MAP provided "great benefits" to the Company because it "builds confidence

65

in your distribution partners to invest in your brands because they know you're going to hold everybody on a level playing field *and people won't be undercutting them in the market*."

**ANSWER**: Defendants admit that Holley held an earnings call on November 8, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS WHICH MADE DEFENDANTS' STATEMENTS MISLEADING DURING THE CLASS PERIOD

### A. July 2021 Form 8-K

113. The Class Period begins on July 21, 2021, when the Company filed with the SEC a Form 8-K providing details regarding the various transactions that were part of the Business Combination ("July 21, 2021 Form 8-K"). The July 21, 2021 Form 8-K incorporated by reference numerous parts of the Proxy Statement/Prospectus, issued in connection with the Business Combination and filed with the SEC on Form S-4 on April 8, 2021, as amended, which stated that Holley would drive growth and value for shareholders through several key strategies, including continued M&A and expansion of Holley's DTC sales:

- **Accelerate Growth Through Continued M&A**: We maintain a robust M&A pipeline and we believe that our scalable business platform, *relationships with our distribution and channel partners*, strong loyalty of our growing consumer base, experienced management team and board of directors, and strong cash generation *position us to continue to acquire and integrate value-enhancing acquisitions*;

- **Expand DTC Sales and Further Engage with Our Consumers**: *We are highly focused on deepening our engagement with our enthusiast consumers and selling them products through our fast growing online platform*. We have multiple touch points in our consumer ecosystem, ranging from social media to our website, to our many in-person enthusiast events.

66

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Plaintiff purports to represent a class over a purported Class Period beginning on July 21, 2021, and that the Company filed a Form 8-K on that day.  With regard to the second sentence in this paragraph, Defendants admit that the July 21, 2021 Form 8-K incorporated portions of a Proxy Statement/Prospectus filed with the SEC by Empower Ltd. On April 8, 2021, the latter of which is publicly available and contains the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

114.    The Proxy Statement/Prospectus stated that "[o]ver the past three years, [Holley's] direct-to-consumer ('DTC') and digital capabilities have been *core drivers*" of Holley's "positive sales growth," adding:

> For the year ended December 31, 2020, we generated approximately $84 million in sales through *our DTC channel*, which *continues to be our fastest growing sales channel*.

**ANSWER**: Defendants admit that Empower Ltd. Filed a Form S-4 on April 8, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

115.    The Proxy Statement/Prospectus described the Company's "highly disciplined and focused approach to M&A" as well as Holley's "*experience* sourcing, executing and *integrating value-enhancing acquisitions* in a highly fragmented market."  Holley also touted the historic successes of its acquisitions model and how its "*track record* of recent acquisitions" indicated that the Company would continue to complete further "transformational acquisitions," stating:

> *We have historically used strategic acquisitions to* (i) expand our brand portfolio, (ii) enter new product categories and consumer segments, (iii) *increase DTC scale and connection*, (iv) expand share in current product categories *and* (v) *realize*

67

*value-enhancing revenue and cost synergies*.  We believe our track record of recent acquisitions is indicative of our ability to make both transformational acquisitions, such as the acquisitions of MSD in 2015 and Driven Performance Brands in 2018, as well as strategic bolt-ons such as the recent acquisitions of Drake, Simpson and Detroit Speed in 2020.

**ANSWER**: Defendants admit that Empower Ltd. Filed a Form S-4 on April 8, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

116.    The Proxy Statement/Prospectus described Holley's "diverse omni-channel distribution strategy *led by our growing DTC channel*."  At the same time, Holley highlighted its "*mutually beneficial relationships with* [*its*] *resellers*" and Holley's ability to "*maintain strong pricing discipline across* [*its*] *channels with strict conformance to minimum advertised pricing*."

**ANSWER**: Defendants admit that Empower Ltd. Filed a Form S-4 on April 8, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

117.    Discussing Holley's growth drivers, the Proxy Statement/Prospectus touted Holley's ability to "*create value through integration*" and described DTC – which was supported by Holley's "*knowledgeable phone technical sales advisors*" – as the Company's "*fastest- growing sales channel*, with annual gross sales increasing from $10 million in 2014 to $84 million in 2020, representing a 43% CAGR."  The Proxy Statement/Prospectus sent a clear message that DTC was important to the Company's growth strategies and future financial performance.

**ANSWER**: Defendants admit that Empower Ltd. Filed a Form S-4 on April 8, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted,

68

Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

118.    The Proxy Statement/Prospectus also positively described Holley's relationship with its resellers, stating that "[p]erformance e-tailers and warehouse distributors accounted for 63% of [Holley's] sales in 2020," and that Holley has "established *mutually beneficial and long- term relationships with our resellers*."  Holley added that because of the "value" proposition it offered to resellers, the Company was "*operating with pricing discipline that supports the value of* [*Holley's*] *products in the marketplace and buttresses* [*Holley's*] *profit margins*" and that Holley's "approach to pricing allows [the Company] to better understand consumer demand and identify what our end consumers are buying."

**ANSWER**: Defendants admit that Empower Ltd. Filed a Form S-4 on April 8, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

119.    On July 28, 2021, the Company filed with the SEC a prospectus relating to the offer and sale by the "selling securityholders" of: (i) up to 109,257,218 shares of Holley common stock; and (ii) up to 6,333,334 warrants to purchase Holley common stock (the "July 2021 Prospectus"). The selling securityholders, which included Holley Parent Holdings, LLC, Empower Sponsor Holdings LLC, and numerous other entities and individuals who held large amounts of Holley securities as a result of the Business Combination, stood to make enormous sums of money through the sale of their stock, which closed at $11.11 on July 27, 2021, up substantially from the closing price of $9.78 on July 21, 2021, the first day of the Class Period.  Discussing the Company's M&A activity and its "Proven Acquisition Platform," the July 2021 Prospectus stated:

> *We maintain a highly disciplined and focused approach to M&A and have experience* sourcing, executing and *integrating value-enhancing acquisitions in a highly fragmented market*.  From 2014 to the end of 2020, we completed eight accretive acquisitions that have contributed meaningful sales and earnings growth, added new product categories and brands and have increased our market position in the otherwise highly fragmented performance automotive aftermarket industry. *We believe our highly scalable operational platform enables us to efficiently and effectively integrate acquired businesses into our operations and realize cost savings opportunities as well as revenue and distribution increases*.
>
> *We have historically used strategic acquisitions to* (i) expand our brand portfolio, (ii) enter new product categories and consumer segments, (iii) *increase DTC scale and connection*, (iv) expand share in current product categories *and* (v) *realize value-enhancing revenue and cost synergies*.  We believe our track record of recent acquisitions is indicative of our ability to make both transformational acquisitions, such as the acquisitions of MSD in 2015 and Driven Performance Brands in 2018, as well as strategic bolt-ons such as the recent acquisitions of Drake, Simpson and Detroit Speed in 2020 and AEM in 2021.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit the allegations. With regard to the third sentence in this paragraph, Defendants admit that Holley filed a Prospectus on July 28, 2021, which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

120.    The July 2021 Prospectus also touted the Company's successful and "growing DTC channel[,]" as well as the Company's strict pricing discipline, stating, in part:

> *We have a diverse omni-channel distribution strategy led by our growing DTC channel*.  Our omni-channel model enables us to reach our consumers through the DTC, Performance E-tailer, Traditional Retailer, and Performance Jobber channels. *We have mutually beneficial relationships with our resellers and are able to maintain strong pricing discipline across our channels with strict conformance to minimum advertised pricing*.

**ANSWER**: Defendants admit that Holley filed a Prospectus on July 28, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

121.    The July 2021 Prospectus also described the Company's growth strategies, touting the Company's use of DTC sales and highlighting the Company's "***knowledgeable phone technical sales advisors***," stating, in relevant part:

> ***DTC represents our fastest-growing sales channel***, with annual gross sales increasing from $10 million in 2014 to $84 million in 2020 on a pro forma basis after giving effect to our acquisitions of Simpson, Drake and Detroit Speed as if each had occurred on January 1, 2020, ***representing a 43% CAGR***. ***We intend to continue to drive direct sales to our enthusiast consumers primarily through our Holley.com website***, ***our primary hub for consumer engagement***. Engagement on our website has increased meaningfully, with 17.6 million web sessions during the first ten months of 2020, up 45% from 2019 and 85% from 2017. We recently launched a new content marketing initiative called MotorLife within Holley.com. MotorLife is a digital publication and since its launch, we have seen an improvement in web traffic as well as improvement in crucial search rankings for high priority keywords. ***As our online presence expands***, ***we will continue to focus on increasingly building personalized experiences for our consumers***, ***which will*** both deepen our consumer engagement and ***drive additional sales***.

**ANSWER**: Defendants admit that Holley filed a Prospectus on July 28, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

122.    The July 2021 Prospectus also added the following about Holley's resellers:

> We have historically sold the majority of our products through resellers who purchase our products and resell them through various channels. These resellers consist of performance e-tailers, warehouse distributors, traditional retailers, and jobber/installers with (i) performance e-tailers and warehouse distributors accounting for 63% of our sales in 2020, (ii) our top ten resellers accounting for 48% of our sales in 2020, with our largest reseller making up 22% of our sales in 2020, and (iii) all top ten accounts growing from 2019 to 2020 at an overall combined CAGR of 37%.
>
> ***We have established mutually beneficial and long-term relationships with our resellers***. We believe resellers benefit from our broad suite of product offerings that they can leverage to meet consumer demand across multiple product categories. ***Based on the value that we offer to our resellers***, ***we are able to operating with pricing discipline that supports the value of our products in the marketplace and buttresses our profit margins***. We believe our approach to

71

pricing allows us to better understand consumer demand and identify what our end consumers are buying.

**ANSWER**: Defendants admit that Holley filed a Prospectus on July 28, 2021, which is publicly available and contains the language quoted in this paragraph.   Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

123.    The statements referenced in ¶¶113-122 above were materially false and misleading, and omitted material information which made Defendants' statements misleading because:

(a)    at all relevant times, Holley did not operate with "strong pricing discipline across [its] channels with strict conformance to minimum advertised pricing[,]" because, in reality, "the number of SKUs [Holley was] monitoring and enforcing was very low" according to Stevenson, Holley excluded resellers from pricing promotions which were offered in the DTC channel, and Holley failed to adhere to MAP on the vast majority of its SKUs during the Class Period (*see* §VII, below);

(b)    Defendants failed to disclose that as a result of the Company's extensive focus on its DTC channel and failure to adhere to MAP, the Company's critically important relationships with its resellers and distributors, whose business made up the vast majority of the Company's revenue, were suffering significant damage;

(c)    Holley used discounting and other similar efforts to grow its DTC channel, which undermined the pricing discipline Holley historically had with its resellers and distributors, and further damaged the Company's relationships with its resellers and distributors by undercutting them;

(d)    As a result of Holley's strained relationships with its resellers and distributors, those resellers and distributors were decreasing their purchases of Holley products, returning

72

products already purchased at significant levels that were far above historical norms, increasing their purchases of competitors' products, and promoting Holley's competitors' products;

(e)    Holley's growing DTC channel could not offset the negative financial impact of Holley's increasingly strained relationships with its resellers and distributors and, as a result, rather than keeping its foot on the gas, Holley was actually slamming the brakes on its critical reseller/distributor relationships;

(f)    Holley was riding a wave of COVID-related stimulus money that temporarily boosted its sales and performance, and despite this unsustainable, temporary boost, Defendants misled investors to believe the growth was sustainable and the result of persistent demand, and supportive of positive financial guidance;

(g)    Holley had failed to successfully integrate and capture synergies from its numerous acquisitions, which left the Company with inefficient operations, excess costs, and inventory management problems; and

(h)    As a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times, as were Defendants' material omissions of fact which made Defendants' statements misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

B.    **Second Quarter 2021 Financial Results**

124.    On August 11, 2021, the Company announced its 2Q21 financial results, touting "[s]*trong organic growth* and *execution against strategic initiatives* [*to*] *drive performance*[.]" In addition to highlighting the AEM acquisition, the 2Q21 earnings release misleadingly touted "[c]*ontinued execution on direct-to-consumer channel growth strategy*[.]" The 2Q21 earnings release included positive financial results for the Company, including:

73

- Net Sales increased 54% to $193.0 million compared to $125.3 million in 2020

- Gross Profit increased 48% to $81.2 million compared to $54.8 million last year

- Operating Income increased 52% to $40.1 million compared to $26.3 million in 2020

- Net Income increased 85% to $23.1 million from $12.5 million last year

- Adjusted EBITDA increased 49% to $54.1 million compared to $36.4 million in 2020

- Acquired AEM Performance Electronics ("AEM") adding to Holley's electronics offering

- ***Continued execution on direct-to-consumer channel growth strategy***

(Footnote omitted.)

**ANSWER**: Defendants admit that Holley issued a press release on August 11, 2021, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

125. The 2Q21 earnings release included the following statement from Tomlinson commenting on the Company's 2Q21 results and outlook:

> ***Consumer demand for our products was strong in the second quarter and we continued to see excellent growth in our direct-to-consumer channel***. Our team performed well, ***captured significant additional demand in the quarter***, and delivered great overall results.

**ANSWER**: Defendants admit that Holley issued a press release on August 11, 2021, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

126. On the same day, August 11, 2021, the Company also hosted an earnings call to discuss its 2Q21 results, with Tomlinson, Bardos, and Nimmagadda speaking on behalf of the Company. During his opening remarks on the call, Tomlinson boasted of strong demand, stating, in relevant part:

74

> *Our organic growth was driven by strong consumer demand across our categories*, with electronic products performing particularly well.  We continued to see exceptional levels of enthusiast engagement, and *excellent growth in our direct to consumer channel*.

**ANSWER**: Defendants admit that Holley held an earnings call on August 11, 2021, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

127.    In his opening remarks, Bardos touted Holley's reseller and DTC growth, stating in relevant part:

> *Strong organic growth was once again supported by strong growth in our DTC channel*, *but was also driven by growth to our resale channel*'s quarter.

**ANSWER**: Defendants admit that Holley held an earnings call on August 11, 2021, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

128.    Bardos added that some "resellers [previously] reduced purchases in the second quarter of 2020[,]" but misleadingly attributed the reduction to "*the economic uncertainty created by the COVID-19 pandemic*[,]" and assured investors that reseller purchases were strong and would remain at higher levels, stating:

> *This year's higher growth in the quarter reflects more 75reate75ze75* [*sic*] *purchasing activity associated with high consumer demand*.

**ANSWER**: Defendants admit that Holley held an earnings call on August 11, 2021, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

75

129.    During the 2Q21 earnings call, Defendants were asked about "pushback" from Holley's "retail partners" and whether those retail partners were "frustrated with the shift towards DTC." In response, Bardos assured analysts and investors that Holley was not suffering from any conflict between its resellers on the one hand and the DTC channel on the other, stating:

> With respect to the channel conflict question that you're referring to, we've been selling direct to consumer now for many, many years, and it really got started because our consumers came to us and told us they wanted to buy directly from us. **So, we've worked through that with our reseller partners and part and parcel to that is that we have let them know very clearly how we intend to create value for them, and we have been delivering on those promises year-over-year.** It goes back largely to our strategy of creating demand through our compelling marketing and consumer engagement, which draws product their organisations [sic]. And then, also, our innovation strategy, and they 76reate76ze [sic] the value of new product[s] and how that excites consumers about brands. **So, the relationships are strong and solid.**

**ANSWER**: Defendants admit that Holley held an earnings call on August 11, 2021, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

130.    In response to a question about the timeline of integrating recent acquisitions, including "AEM," and moving those acquired companies' products "online," Tomlinson misleadingly stated the Company was actually working to integrate AEM and that applying the DTC **strategy** would boost the Company's sales and performance in 2022, stating:

> **We are working diligently to integrate those businesses.** Obviously we haven't completed those efforts at this time. There is a lot that goes into it. **But I would expect early in 22 to begin to see the effects of really pushing forward with the direct to consumer strategy at those acquired businesses.**

**ANSWER**: Defendants admit that Holley held an earnings call on August 11, 2021, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly

admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

131.    On August 12, 2021, the Company filed with the SEC a Form 8-K/A to amend the July 21, 2021 Form 8-K by including: (i) the unaudited condensed consolidated financial statements of Holley Intermediate as of and for the 26 weeks ended June 27, 2021; (ii) Holley Intermediate's Management's Discussion and Analysis of Financial Condition and Results of Operations for the 26 weeks ended June 27, 2021 and June 28, 2020; and (iii) the unaudited pro forma condensed combined balance sheet as of June 30, 2021 and the unaudited pro forma condensed combined statement of operations for the six months ended June 30, 2021 and the year ended December 31, 2020.  Regarding the Company's use of acquisitions and DTC, the Form 8- K/A stated:

> ***In addition***, ***we have historically used strategic acquisitions to*** (***i***) expand our brand portfolio, (ii) enter new product categories and consumer segments, (***iii***) ***increase direct-to-consumer*** ("***DTC***") ***scale and connection***, (iv) expand share in current product categories and (v) ***realize value-enhancing revenue and cost synergies***.  While we believe our business is positioned for continued organic growth, we intend to continue evaluating opportunities for strategic acquisitions that would complement our current business and expand our addressable target market.  Between 2014 and the end of 2020 we completed eight acquisitions, which, in total, have generated $35 million of cost saving synergies through reductions in product cost, elimination of headcount, facility costs and other SG&A expenses.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit the allegations. With regard to the second sentence in this paragraph, Defendants admit that Holley filed a Form 8-K on August 12, 2021, which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

132.    On October 18, 2021, Holley filed with the SEC the Company's October 2021 "Lender Presentation," wherein Holley sought to refinance its existing indebtedness.  The Lender Presentation described Holley as "the largest and fastest growing platform in the performance enthusiast automotive

aftermarket space reaching consumers with the most iconic brands, continuous product innovation and a powerful distribution network." The Lender Presentation boasted that Holley was a "***DTC Powerhouse***" with a "Proven M&A Platform," and that its "***DTC strategy is core to what we do***[,]" *as compared with* "***Other Industry Players***" *who have* "***Limited DTC capability***."

**ANSWER**: Defendants admit that Holley filed with the SEC the Company's October 2021 "Lender Presentation" on October 18, 2021, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

133. The Lender Presentation added that Holley was experiencing "[o]rganic growth driven by iconic brands, continuous innovation and unmatched go-to-market capabilities." It added that post-COVID lockdown trends were working in the Company's favor as there was a "rebound in vehicle miles traveled," along with average vehicle age and used vehicle transactions. It also added that "[b]eneficial trends from COVID" that would "continue to drive interest in the [automotive] enthusiast lifestyle." The presentation also touted the "[m]assive $35B U.S. market" opportunity for Holley with "decades of uninterrupted growth" and that Holley's products were "***driving long-term organic growth***." It added that the performance automotive aftermarket showed "[***n***]*o* [***s***]*igns of* [***s***]*lowing* [***d***]*own*." The Lender Presentation touted that the Company's use of "***DTC Allows Holley to Control its Own Destiny***" and that Holley's eCommerce business was growing "***2.5x faster than the market***[.]" The Lender Presentation included as "Key Credit Highlights" the following:

- "Powerhouse of product innovation with iconic brands driving long-term organic growth";

- "Transformational digital and DTC opportunity with omni-channel distribution"; and

- "Proven acquisition platform with a robust M&A pipeline."

78

**ANSWER**: Defendants admit that Holley filed with the SEC the October 2021 Lender Presentation on October 18, 2021, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

134.    The statements referenced in ¶¶124-133 above were materially false and misleading, and omitted material information which made Defendants' statements misleading because:

(a)    at all relevant times, Holley was, in fact, experiencing a "channel conflict" and instead of "79reate[ing] value" for its distribution partners, Holley was excluding them from pricing promotions, which were offered in the DTC channel, and failing to adhere to MAP on the vast majority of its SKUs during the Class Period (*see* §VII, below);

(b)    Defendants failed to disclose that as a result of the Company's extensive focus on its DTC channel and failure to adhere to MAP, the Company's critically important relationships with its resellers and distributors, whose business made up the vast majority of the Company's revenue, were suffering significant damage;

(c)    Holley used discounting and other similar efforts to grow its DTC channel, which undermined the pricing discipline Holley historically had with its resellers and distributors, and further damaged the Company's relationships with its resellers and distributors by undercutting them;

(d)    As a result of Holley's strained relationships with its resellers and distributors, those resellers and distributors were decreasing their purchases of Holley products, returning products already purchased at significant levels that were far above historical norms, increasing their purchases of competitors' products, and promoting Holley's competitors' products;

(e)    Holley's growing DTC channel could not offset the negative financial impact of Holley's increasingly strained relationships with its resellers and distributors and, as a result, rather

than keeping its foot on the gas, Holley was actually slamming the brakes on its critical reseller/distributor relationships;

(f)     Holley was riding a wave of COVID-related stimulus money that temporarily boosted its sales and performance, and despite this unsustainable, temporary boost, Defendants misled investors to believe the growth was sustainable and the result of persistent demand, and supportive of positive financial guidance;

(g)     Holley had failed to successfully integrate and capture synergies from its numerous acquisitions, which left the Company with inefficient operations, excess costs, and inventory management problems; and

(h)     As a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times, as were Defendants' material omissions of fact which made Defendants' statements misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

C.     **Third Quarter 2021 Financial Results**

135.     On November 10, 2021, the Company issued a release announcing its 3Q21 financial results, which also reiterated Holley's outlook and guidance for 2021, and stated the Company's results "***demonstrate continued strong consumer demand*** and enthusiast engagement[.]"  Detailing the Company's 3Q21 "Highlights[,]" the release stated:

- Net Sales increased 19.8% to $159.7 million compared to $133.3 million in 2020

- Gross Profit increased 17.4% to $65.2 million compared to $55.5 million last year

- Net Loss of $(30.2) million, or $(0.28) per share, compared to Net Income of $13.5 million, or $0.20 per share, in third quarter 2020

- Adjusted Net Income of $13.5 million, flat to Net Income of $13.5 million reported last year

- Adjusted EBITDA rose to $35.5 million compared to $34.6 million in 2020

- Record attendance at three Holley consumer events in Bowling Green, Kentucky, including Holley LS Fest East, Holley MoParty, and The Holley Intergalactic Ford Festival

(Footnotes omitted.)

**ANSWER**: Defendants admit that Holley issued a press release on November 10, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

136.    The 3Q21 release included the following statement by Tomlinson, which highlighted strong demand while also disclosing that some of the Company's expected 3Q21 sales had shifted into the next quarter because of a "cybersecurity incident."  Specifically, Tomlinson stated:

> ***We continued to see solid consumer demand during the third quarter***.  Our team capitalized on this demand and delivered excellent results despite continued supply chain challenges and a cybersecurity incident that caused some sales to shift into our fourth quarter. ***As expected***, ***we are seeing a return to more normal seasonality in demand***.

**ANSWER**: Defendants admit that Holley issued a press release on November 10, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

137.    Providing more detail on the Company's 3Q21 financial results, the release stated that, excluding acquisitions, 3Q21 sales declined by 2.6% year-over-year:

> Net sales increased 19.8% to $159.7 million in the third quarter of 2021, up from $133.3 million in the third quarter of 2020.  Non-comparable sales associated with acquisitions contributed $29.8 million, or 22.4%, of net sales growth in the quarter. ***Sales excluding the impact of acquisitions declined by $3.4 million (2.6% from the prior year quarter.  We estimate that $7 million of sales was deferred from our third quarter into the fourth quarter due to a cybersecurity incident near the end of the quarter***.

**ANSWER**: Defendants admit that Holley issued a press release on November 10, 2021, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

138.    The 3Q21 release also contained a quote from Bardos labeling the "'cybersecurity incident'" as a "challenge," but assuring investors that Holley's underlying business was experiencing strong demand, stating:

> Holley embarked on a new journey as a public company this quarter. Consumer ***demand remains strong and the underlying business remain***[***s***] ***healthy and growing***. The cybersecurity incident presented another challenge for the team to overcome, but I'm pleased with the speed at which we returned to normal operations to meet the needs of our consumers.

**ANSWER**: Defendants admit that Holley issued a press release on November 10, 2021, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

139.    Also on November 10, 2021, the Company filed with the SEC its 3Q21 quarterly report on Form 10-Q ("3Q21 10-Q"), which reiterated the financial results from the 3Q21 earnings release and was signed by Bardos, and contained Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Tomlinson and Bardos attesting that the 3Q21 10-Q did not contain any untrue statements or omissions of material facts. Describing the Company's operations, the 3Q21 10-Q stated, in part:

> ***In addition***, ***we have historically used strategic acquisitions to*** (i) expand our brand portfolio, (ii) enter new product categories and consumer segments, (iii) ***increase direct-to-consumer*** ("***DTC***") ***scale and connection***, (iv) expand share in current product categories and (v) ***realize value-enhancing revenue and cost synergies***. While we believe our business is positioned for continued organic growth, we intend to continue evaluating opportunities for strategic acquisitions that would complement our current business and expand our addressable target market.

**ANSWER**: Defendants admit that Holley filed a Form 10-Q on November 10, 2021, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

140.    On the same day, November 10, 2021, the Company also hosted an earnings call to discuss its 3Q21 financial results, with Tomlinson, Bardos, and Nimmagadda speaking on behalf of the Company.  In his opening remarks, Tomlinson discussed the Company's declining 3Q21 organic sales, but blamed the shift on "a cybersecurity incident that *impacted organic sales*" and assured investors that but for the incident, "*organic sales had been on track for positive growth in the quarter*."  Tomlinson indicated that because of the incident, approximately $7 million of sales were deferred into 4Q21.

**ANSWER**: With regard to the first and second sentences in this paragraph, Defendants admit that Holley held an earnings call on November 10, 2021, the transcript of which is publicly available and contains the language quoted in the second sentence, and that Tomlinson participated in the call.  With regard to the third sentence in this paragraph, Defendants admit that on the November 10, 2021 earnings call, Tomlinson stated that "[d]ue to the timing of the incident near the end of the quarter, we estimate that $7 million of sales were deferred into the fourth quarter."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

141.    As the call continued, Defendants were asked about "market demand durability" and whether Defendants could share any "data points" on demand from Holley's customer base "continuing to be very robust" and how Defendants "think about that demand over the next few years through this year."  In response, Tomlinson stated that "*everything we see at this* point *points towards continued strong demand for our products*."  Continuing, Tomlinson stated:

*Our enthusiast consumers are very engaged. And when you look at the, basically, the trend for growth in the industry and when we think about and see additional consumers coming into the enthusiast category every year, I mean, we think that outlook is very positive.* And we're continuing to pursue our core strategies of focusing on our enthusiast consumer, getting them what they need, what they want. And those are products that allow them to, step-by-step, go through their modification journey for the cars and trucks they love.

**ANSWER**: Defendants admit that Holley held an earnings call on November 10, 2021, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

142.    Adding to Tomlinson's answer, Bardos stated that although the "back half" of 2020 was "a little bit unusual in terms of the seasonality," Holley was "*seeing very consistent 2-year stacks with consumer demand and [Holley's] sales*" and that Defendants were "*very pleased to see the continuation of that demand.*"

**ANSWER**: Defendants admit that Holley held an earnings call on November 10, 2021, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Bardos participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

143.    As the call continued, Defendants were asked to provide further color around the intersection of the Company's traditional reseller business and the DTC business. In response, Tomlinson discussed the impact of the "cybersecurity incident" on the reseller channel while touting the strength of the DTC channel and strong demand across all the Company's channels, stating:

*DTC continues to be the fastest-growing channel.* And when we look at the quarter, the cybersecurity incident would have had a greater impact on basically our reseller channels. *Demand of – and then across the channels remain strong.*

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that this sentence purports to summarize statements made during an earnings call without specifying how the statement

84

was made or who made it.  Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the second sentence in this paragraph, Defendants admit that Holley held an earnings call on November 10, 2021, the transcript of which is publicly available and contains the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

144.    As the 3Q21 earnings call continued, Defendants were asked, regarding the cybersecurity incident, whether they had seen any effects on Holley's relationships with resellers.  Tomlinson assured investors there were no negative effects with resellers, stating:

> *No*, ***not at all***.  ***I was just going to say no effects with resellers***.  ***They're very supportive***.  ***Our brands are must-carry brands***.  And they were – for the period of time we were down, again, they were very supportive and very anxious to get us back up and shipping to them.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that this sentence purports to summarize statements made during an earnings call without specifying how the statement was made or who made it.  With regard to the second sentence in this paragraph, Defendants admit that Holley held an earnings call on November 10, 2021, the transcript of which is publicly available and contains the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

145.    The statements referenced in ¶¶135-144 above were materially false and misleading, and omitted material information which made Defendants' statements misleading because:

(a)    at all relevant times, Holley excluded resellers from pricing promotions which were offered in the DTC channel and failed to adhere to MAP on the vast majority of its SKUs during the Class Period (*see* §VII, below);

(b)    Defendants failed to disclose that as a result of the Company's extensive focus on its DTC channel and failure to adhere to MAP, the Company's critically important relationships with its resellers and distributors, whose business made up the vast majority of the Company's revenue, were suffering significant damage;

(c)    Holley used discounting and other similar efforts to grow its DTC channel, which undermined the pricing discipline Holley historically had with its resellers and distributors, and further damaged the Company's relationships with its resellers and distributors by undercutting them;

(d)    As a result of Holley's strained relationships with its resellers and distributors, those resellers and distributors were decreasing their purchases of Holley products, returning products already purchased at significant levels that were far above historical norms, increasing their purchases of competitors' products, and promoting Holley's competitors' products;

(e)    Holley's growing DTC channel could not offset the negative financial impact of Holley's increasingly strained relationships with its resellers and distributors and, as a result, rather than keeping its foot on the gas, Holley was actually slamming the brakes on its critical reseller/distributor relationships;

(f)    Holley was riding a wave of COVID-related stimulus money that temporarily boosted its sales and performance, and despite this unsustainable, temporary boost, Defendants misled investors to believe the growth was sustainable and the result of persistent demand, and supportive of positive financial guidance;

(g)    Holley had failed to successfully integrate and capture synergies from its numerous acquisitions, which left the Company with inefficient operations, excess costs, and inventory management problems; and

86

(h)    As a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times, as were Defendants' material omissions of fact which made Defendants' statements misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

### D.    February 2022 Prospectus

146.    On February 23, 2022, the Company filed with the SEC a Rule 424(b)(3) prospectus ("February 2022 Prospectus") for the offer and sale by "selling securityholders" of up to 106,117,871 shares of Holley common stock and up to 6,333,334 warrants to purchase common stock ("February 2022 Prospectus"). The February 2022 Prospectus also applied to the issuance by Holley of up to an aggregate of 6,333,334 shares of Holley common stock issuable upon exercise of the warrants being offered. The February 2022 Prospectus laid out the Company's "Business Summary," which contained a section titled "Our Strengths," and included Holley's "Proven Acquisition Platform[,]" and "Digital and *DTC Opportunity* with Omni-Channel Distribution[.]"

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit the allegations. With regard to the second sentence in this paragraph, Defendants admit the allegations. With regard to the third sentence in this paragraph, Defendants admit that the Rule 424(b)(3) prospectus the Company filed on February 23, 2022, which is publicly available, contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

147.    Regarding its "strengths," the February 2022 Prospectus claimed the following about its purported proven acquisition platform:

> *We maintain a highly disciplined and focused approach to M&A and have experience* sourcing, executing and *integrating value-enhancing acquisitions in a highly fragmented market*. From 2014 to the end of 2021, we completed 16

accretive acquisitions that have contributed meaningful sales and earnings growth, added new product categories and brands and have increased our market position in the otherwise highly fragmented performance automotive aftermarket industry. We believe our highly scalable operational platform enables us to *efficiently and effectively integrate acquired businesses into our operations and realize cost savings opportunities as well as revenue and distribution increases*.

*We have historically used strategic acquisitions to (i) expand our brand portfolio*, (ii) enter new product categories and consumer segments, (iii) *increase DTC scale and connection*, (iv) expand share in current product categories and (v) *realize value-enhancing revenue and cost synergies*. We believe our track record of recent acquisitions is indicative of our ability to make both transformational acquisitions, such as the acquisitions of MSD in 2015 and Driven Performance Brands in 2018, as well as strategic bolt-ons such as the recent acquisitions of Drake, Simpson and Detroit Speed in 2020 and AEM, Finspeed, Classic Instruments, ADS, Baer, Brothers, Rocket, and Speartech in 2021.

**ANSWER**: Defendants admit that the Rule 424(b)(3) prospectus the Company filed on February 23, 2022, which is publicly available, contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

148.    The February 2022 Prospectus also claimed the following about its purported digital and *DTC opportunity* with its omni-channel distribution:

We have a diverse omni-channel distribution strategy *led by our growing DTC channel*. Our omni-channel model enables us to reach our consumers through the DTC, Performance E-tailer, Traditional Retailer, and Performance Jobber channels. *We have mutually beneficial relationships with our resellers and are able to maintain strong pricing discipline across our channels with strict conformance to minimum advertised pricing*.

*Consumers are increasingly meeting us online through our DTC channel*, which, on a pro forma basis after giving effect to our acquisitions of Simpson, Drake and Detroit Speed, as if each had occurred on January 1, 2020, grew at a CAGR of 43% between 2014 and the end of 2020. Our DTC channel provides consumers full access to all of our brands, our unique branded content and our full product assortment. *We have turned Holley.com into our primary hub for consumer communication and continue to add features and brands that make it an increasingly attractive digital destination for our consumers*. *Our DTC channel enables us to directly interact with our customers*, *more effectively control our brand experience*, *better understand consumer behavior and preferences*, *and offer exclusive products*, *content*, *and customization capabilities*. We believe our

control over our DTC channel provides our customers with quality brand engagement and further builds customer loyalty, while generating attractive margins.

**ANSWER**: Defendants admit that the Rule 424(b)(3) prospectus the Company filed on February 23, 2022, which is publicly available, contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

149.    Describing the Company's core growth strategies, the February 2022 Prospectus stated that the Company would accelerate its growth through M&A and expand its DTC sales.

**ANSWER**: Defendants aver that this paragraph purports to summarize statements made by Holley without identifying any specific statements. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

150.    Regarding the acceleration of growth through M&A, the February 2022 Prospectus stated:

> *We maintain a robust M&A pipeline and we believe that our scalable business platform*, *relationships with our distribution and channel partners*, *strong loyalty of our growing consumer base*, *experienced management team and board of directors*, *and strong cash generation position us to continue to acquire and integrate value- enhancing acquisitions*. Our strong existing platform in the enthusiast performance automotive aftermarket creates a large and highly fragmented addressable market with a broad set of potential acquisition targets. *We believe our scale*, *management team and board's experience with integration*, together with access to capital, will allow us pursue both small and large future acquisitions and *create value through integration*.

**ANSWER**: Defendants admit that the Rule 424(b)(3) prospectus the Company filed on February 23, 2022, which is publicly available, contains the language quoted in this paragraph. Except as

expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

151.    Describing Holley's expansion of its DTC sales, the February 2022 Prospectus stated:

> ***DTC represents our fastest-growing sales channel***, ***with annual gross sales increasing from $10 million in 2014 to $84 million in 2020 on a pro forma basis after giving effect to our acquisitions of Simpson***, ***Drake and Detroit Speed as if each had occurred on January 1***, ***2020***, ***representing a 43% CAGR***. ***We intend to continue to drive direct sales to our enthusiast consumers primarily through our Holley.com website***, ***our primary hub for consumer engagement***. Engagement on our website has increased meaningfully, with 20.5 million web sessions during 2021, up 17% from 2020 and 74% from 2019. We recently launched a new content marketing initiative called MotorLife within Holley.com. MotorLife is a digital publication and since its launch, we have seen an improvement in web traffic as well as improvement in crucial search rankings for high priority keywords. ***As our online presence expands***, ***we will continue to focus on increasingly building personalized experiences for our consumers***, ***which will both deepen our consumer engagement and drive additional sales***.

**ANSWER**: Defendants admit that the Rule 424(b)(3) prospectus the Company filed on February 23, 2022, which is publicly available, contains the language quoted in this paragraph.   Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

152.    The statements referenced in ¶¶146-151 above were materially false and misleading, and omitted material information which made Defendants' statements misleading because:

(a)    at all relevant times, Holley did not operate with "strong pricing discipline across [its] channels with strict conformance to minimum advertised pricing[,]" because, in reality, "the number of SKUs [Holley was] monitoring and enforcing was very low" according to Stevenson, Holley excluded resellers from pricing promotions which were offered in the DTC channel, and Holley failed to adhere to MAP on the vast majority of its SKUs during the Class Period (*see* §VII, below);

(b)     Defendants failed to disclose that as a result of the Company's extensive focus on its DTC channel and failure to adhere to MAP, the Company's critically important relationships with its resellers and distributors, whose business made up the vast majority of the Company's revenue, were suffering significant damage;

(c)     Holley used discounting and other similar efforts to grow its DTC channel, which undermined the pricing discipline Holley historically had with its resellers and distributors, and further damaged the Company's relationships with its resellers and distributors by undercutting them;

(d)     As a result of Holley's strained relationships with its resellers and distributors, those resellers and distributors were decreasing their purchases of Holley products, returning products already purchased at significant levels that were far above historical norms, increasing their purchases of competitors' products, and promoting Holley's competitors' products;

(e)     Holley's growing DTC channel could not offset the negative financial impact of Holley's increasingly strained relationships with its resellers and distributors and, as a result, rather than keeping its foot on the gas, Holley was actually slamming the brakes on its critical reseller/distributor relationships;

(f)     Holley was riding a wave of COVID-related stimulus money that temporarily boosted its sales and performance, and despite this unsustainable, temporary boost, Defendants misled investors to believe the growth was sustainable and the result of persistent demand, and supportive of positive financial guidance;

(g)     Holley had failed to successfully integrate and capture synergies from its numerous acquisitions, which left the Company with inefficient operations, excess costs, and inventory management problems; and

91

(h)    As a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times, as were Defendants' material omissions of fact which made Defendants' statements misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

### E.    Fourth Quarter 2021 and Full Year 2021 Financial Results

153.    On March 3, 2022, the Company issued a release announcing its financial results for 4Q21 and FY21, and also providing outlook and guidance for FY22.  Detailing the Company's 4Q21 "Highlights[,]" the release stated:

- Net Sales increased 29.9% to $179.8 million compared to $138.4 million in 2020

- Gross Profit increased 37.0% to $74.7 million compared to $54.6 million last year

- Net Loss of $(18.0) million, or $(0.16) per share, compared to Net Income of $2.0 million, or $0.03 per share, in fourth quarter 2020
- Adjusted Net Income of $9.0 million, compared to Adjusted Net Income of $2.0 million reported last year

- Adjusted EBITDA rose to $36.1 million compared to $30.4 million in 2020

(Footnotes omitted.)

**ANSWER**: Defendants admit that the Company issued a press release on March 3, 2022, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

154.    The release touted that the Company's results were "***driven by robust sales growth and strong underlying consumer demand***[,]" and included the following statements by Tomlinson and Bardos:

**Tomlinson**: "Holley delivered very solid fourth quarter results, capping off what has been a milestone year for the Company  ***Strong consumer demand for our***

92

*products continues to drive growth across our various sales channels* and we look forward to driving further consumer engagement as we enter 2022."

**Bardos**: "We are encouraged by our performance in 2021 with strong financial results in our first year as a public company  *As we look to 2022, we believe we are positioned to achieve a good balance of organic and acquired growth* while we welcome new enthusiasts to the Holley family."

**ANSWER**: Defendants admit that the Company issued a press release on March 3, 2022, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

155.    For 2022, Holley provided the following guidance, representing significantly improved financial performance over 2021:

- Net Sales in the range of $765-$790 million

- Adjusted EBITDA of $186-$194 million

- Capital Expenditures in the range of $14-$16 million

- Depreciation and Amortization Expense of $24-$26 million

- Interest Expense in the range of $30-$32 million

**ANSWER**: Defendants admit that the Company issued a press release on March 3, 2022, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

156.    On the same day, March 3, 2022, the Company hosted an earnings call to discuss its 4Q21 and FY21 financial results, with Tomlinson, Bardos, Nimmagadda, and non-defendant Chief Marketing Officer Sean Crawford speaking on behalf of the Company.  During the question and answer portion of the call, Tomlinson responded to a question regarding "the integration plan" for AEM and "where we sit as you look at AEM."  Rather than disclose the "handshake" agreement that Holley would

93

leave AEM untouched as a standalone vertical, Tomlinson spoke positively of the then-nonexistent integration efforts, stating, in relevant part:

> When you – in the context of integration, *we made progress during the second half of the year*, still a lot of work to do there. You mentioned *AEM*. We are excited to be working more closely with that group. *We've got those teams on the innovation side folded in together*. They are very focused on providing us with the electronic products that facilitate EV conversions on classic vehicles. *So, very excited to be making progress with that*.

**ANSWER**: Defendants admit that Holley held an earnings call on March 3, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Tomlinson, Bardos, Nimmagadda, and Crawford participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

157.    On March 15, 2022, the Company filed its 2021 10-K with the SEC, which was signed by Tomlinson and Bardos, among others, and included SOX certifications signed by Tomlinson and Bardos attesting that the 2021 10-K did not contain any untrue statements or omissions of material facts. The 2021 10-K described the Company's business strategy to drive growth and value for shareholders through the key strategies of growing through continued M&A and expanding DTC sales:

- **Accelerate Growth Through Continued M&A**: *We maintain a robust M&A pipeline and we believe that our scalable business platform*, *relationships with our distribution and channel partners*, *strong loyalty with our growing consumer base*, *experienced management team and board of directors*, *and strong cash generation position us to continue to acquire and integrate value-enhancing acquisitions*….

- **Expand Direct-to-Consumer ("DTC") Sales and Further Engage with Our Consumers**: *We are highly focused on deepening our engagement with our enthusiast consumers and selling them products through our fast growing online platform*. We have multiple touch points in our consumer ecosystem, ranging from social media to our website, to our many in-person enthusiast events….

**ANSWER**: Defendants admit that on March 15, 2022, the Company filed a Form 10-K for the year ended December 31, 2021, which is publicly available and contains the language quoted in this paragraph and SOX certifications signed by Tomlinson and Bardos. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

158. The 2021 10-K described several factors that purportedly distinguished Holley from its competitors, stating, in part:

- **Operational ability that enables efficient order execution**: *we make significant investments in sourcing*, *manufacturing and distribution excellence*, *enabling management of multiple product lines while maintaining scale and attractive relative pricing*.

- **Differentiated go-to-market strategy**: *we offer a mix of single product and platform-oriented solutions across DTC and reseller channels*, *delivering a strong overall consumer experience*.

**ANSWER**: Defendants admit that on March 15, 2022, the Company filed a Form 10-K for the year ended December 31, 2021, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

159. The 2021 10-K also described the Company's sales and distribution strategy, touting Holley's DTC efforts and the Company's "mutually beneficial" and "long-term" relationships with resellers:

*We have a diverse omni-channel distribution strategy led by our growing DTC channel*. *Our omni-channel model enables us to reach our consumers through DTC*, *E-tailer*, *warehouse distributor*, *traditional retailer*, *and jobber/ installer channels*. *We have mutually beneficial relationships with our resellers* and are able to maintain strong pricing discipline across our channels with *strict conformance to minimum advertised pricing*.

*DTC channel*: *Consumers are increasingly meeting us online through our DTC channel*. *Our DTC channel provides consumers full access to all of our brands*, *our unique branded content and our full product assortment*. We have turned

Holley.com into our primary hub for consumer communication and continue to add features and brands that make it an increasingly attractive digital destination for our consumers. ***Our DTC channel enables us to directly interact with our customers***, more effectively control our brand experience, better understand consumer behavior and preferences, and offer exclusive products, content, and customization capabilities. ***We believe our control over our DTC channel provides our customers with quality brand engagement and further builds customer loyalty, while generating attractive margins***.

***Resellers***: ***We have historically sold the majority of our products through resellers who purchase our products and resell them through various channels***. These resellers consist of E-tailers, warehouse distributors, traditional retailers, and jobber/installers with (i) ***E-tailers and warehouse distributors accounting for 59% of our sales in 2021***, (***ii***) ***our top ten resellers accounting for 42% of our sales in 2021***, ***with our largest reseller making up 19% of our sales in 2021***, ***and*** (***iii***) ***the top ten accounts growing 14% from 2020 to 2021***.

***We have established mutually beneficial and long-term relationships with our resellers***. We believe resellers benefit from our broad suite of product offerings that they can leverage to meet consumer demand across multiple product categories. ***Based on the value that we offer to our resellers***, ***we are able to operate with pricing discipline that supports the value of our products in the marketplace and buttresses our profit margins***. ***We believe our approach to pricing allows us to better understand consumer demand and identify what our end consumers are buying***.

**ANSWER**: Defendants admit that on March 15, 2022, the Company filed a Form 10-K for the year ended December 31, 2021, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

160.    The statements referenced in ¶¶153-159 above were materially false and misleading, and omitted material information which made Defendants' statements misleading because:

(a)    at all relevant times, Holley did not operate with "strong pricing discipline across [its] channels with strict conformance to minimum advertised pricing[,]" because, in reality, "the number of SKUs [Holley was] monitoring and enforcing was very low" according to Stevenson, Holley excluded resellers from pricing promotions which were offered in the DTC channel, and

Holley failed to adhere to MAP on the vast majority of its SKUs during the Class Period (*see* §VII, below);

(b)     Defendants failed to disclose that as a result of the Company's extensive focus on its DTC channel and failure to adhere to MAP, the Company's critically important relationships with its resellers and distributors, whose business made up the vast majority of the Company's revenue, were suffering significant damage;

(c)     Holley used discounting and other similar efforts to grow its DTC channel, which undermined the pricing discipline Holley historically had with its resellers and distributors, and further damaged the Company's relationships with its resellers and distributors by undercutting them;

(d)     As a result of Holley's strained relationships with its resellers and distributors, those resellers and distributors were decreasing their purchases of Holley products, returning products already purchased at significant levels that were far above historical norms, increasing their purchases of competitors' products, and promoting Holley's competitors' products;

(e)     Holley's growing DTC channel could not offset the negative financial impact of Holley's increasingly strained relationships with its resellers and distributors and, as a result, rather than keeping its foot on the gas, Holley was actually slamming the brakes on its critical reseller/distributor relationships;

(f)     Holley was riding a wave of COVID-related stimulus money that temporarily boosted its sales and performance, and despite this unsustainable, temporary boost, Defendants misled investors to believe the growth was sustainable and the result of persistent demand, and supportive of positive financial guidance;

(g)     Holley had failed to successfully integrate and capture synergies from its numerous acquisitions, which left the Company with inefficient operations, excess costs, and inventory management problems; and

97

(h)    As a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times, as were Defendants' material omissions of fact which made Defendants' statements misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

F.    **First Quarter 2022 Financial Results**

161.    On May 12, 2022, the Company issued a release announcing its financial results for the first quarter of 2022 ("1Q22"), and reaffirming the Company's 2022 outlook.  The release provided the following 1Q22 "Highlights":

- Net Sales increased 24.8% to $200.1 million compared to $160.3 million in 2021

- Gross Profit increased 25.9% to $82.7 million compared to $65.7 million last year

- Net Income of $16.9 million, or $0.15 per diluted share, compared to Net Loss of $(2.1) million, or $(0.03) per diluted share, in first quarter 2021

- Adjusted Net Income of $21.5 million, compared to Adjusted Net Income of $15.1 million reported last year

- Adjusted EBITDA rose to $46.0 million compared to $43.8 million in 2021

(Footnotes omitted.)

**ANSWER**: Defendants admit that the Company issued a press release on May 12, 2022, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

162.    The release also touted the Company's success with increased demand and its impact on year-over-year growth, stating that "[s]trength in consumer demand drives 25% year- over-year sales growth."

98

**ANSWER**: Defendants admit that the Company issued a press release on May 12, 2022, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

163.    The 1Q22 earnings release quoted Tomlinson as stating:

Holley delivered solid first quarter results ***with strong growth in consumer demand for our products continuing into 2022***... While we are facing persistent supply chain disruptions and inflationary headwinds, we've kept our foot on the gas and continued to invest in the development of innovative new products that will be exciting to our enthusiast consumers.

**ANSWER**: Defendants admit that the Company issued a press release on May 12, 2022, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

164.    The 1Q22 earnings release reaffirmed Holley's 2022 outlook, stating:

- Net Sales in the range of $765-$790 million

- Adjusted EBITDA of $186-$194 million

- Capital Expenditures in the range of $14-$16 million

- Depreciation and Amortization Expense of $24-$26 million

- Interest Expense in the range of $30-$32 million

**ANSWER**: Defendants admit that the Company issued a press release on May 12, 2022, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

165.    The 1Q22 earnings release included the following comment by Bardos regarding the Company's performance and outlook:

> *We are off to a strong start in fiscal 2022, delivering on our financial objectives in the first quarter, and are reaffirming our previously stated 2022 guidance*.... While it is not our policy to provide quarterly guidance, I believe it is important to recognize that current economic conditions and supply chain headwinds may continue to impact margins in the near term. *That said*, *we remain well positioned to drive long-term growth for our shareholders*.

**ANSWER**: Defendants admit that the Company issued a press release on May 12, 2022, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

166.    Also on May 12, 2022, the Company filed with the SEC its quarterly report on Form 10-Q for the 1Q22 ("1Q22 10-Q"), which reiterated the financial results in the 1Q22 earnings release, was signed by Bardos, and included SOX certifications signed by Tomlinson and Bardos attesting that the 1Q22 10-Q did not contain any untrue statements or omissions of material facts. Providing an overview of the Company's business, the 1Q22 10-Q stated, in relevant part:

> *In addition*, *we have historically used strategic acquisitions to* (i) expand our brand portfolio, (ii) enter new product categories and consumer segments, (iii) *increase direct-to-consumer* ("*DTC*") *scale and connection*, (iv) expand share in current product categories and (v) *realize value-enhancing revenue and cost synergies*.  While we believe our business is positioned for continued organic growth, we intend to continue evaluating opportunities for strategic acquisitions that would complement our current business and expand our addressable target market.

**ANSWER**: Defendants admit that the Company filed a Form 10-Q on May 12, 2022, which is publicly available and contains the language quoted in this paragraph and SOX certifications signed by Tomlinson and Bardos.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

167.    On the same day, May 12, 2022, the Company also hosted an earnings call to discuss its 1Q22 results, with Tomlinson, Bardos, and Nimmagadda speaking on behalf of the Company.

During the call, Defendants reaffirmed the Company's 2022 outlook, with Bardos stating the Company would see "annual net sales in the range of $765 million to $790 million [.]" During his planned remarks on the call, Nimmagadda reiterated that Holley would stay aggressive in M&A and was successfully integrating its acquisitions, stating, in relevant part:

> *As we have discussed on previous calls*, *M&A remains a pivotal piece of our growth strategy*. Our dedicated M&A team continues to manage a robust pipeline of acquisition opportunities, frequently engaging with potential targets in our industry. We are focused on attractive companies that will allow Holley to expand share in current product categories, enter new product categories, *increase our DTC scale and ultimately drive shareholder value*.
>
> During the first quarter, sales associated with our 9 recent acquisitions contributed $18.1 million or 11.3% of year-over-year growth, further highlighting the strength of our platform and the synergies we are able to capture. Not only are these acquisitions accretive to the business, but they will also provide a more complete [easiest] journey and ultimately foster customer loyalty. *As it relates to recent acquisitions*, *we are well on track to integrate these businesses*, *realize cost savings synergies and drive growth*. *We are also actively exploring opportunities to further accelerate the execution of our integration efforts in order to maximize value creation in the year*.

(Brackets in original.)

**ANSWER**: Defendants admit that Holley held an earnings call on May 12, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Tomlinson, Bardos, and Nimmagadda participated in the call. With regard to the third sentence in this paragraph, Defendants aver that the phrases "stay aggressive in M&A" and "successfully integrating its acquisitions" are vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

168.    As set forth in the 1Q22 earnings release, sales for the quarter increased 25% year-over-year, growing by approximately $39.8 million. Of that amount, Tomlinson stated during the 1Q22 earnings call that sales from acquisitions made up $18.1 million, leaving $21.6 million to organic

growth, as a seemingly strong number.  But in his opening remarks on the call, Bardos made clear that

although the Company experienced organic growth (not from acquisitions) during the quarter, the

substantial majority of it – 63% – came from pricing actions, and not increased sales of Holley products.

To the extent the Company did see a sales uptick in terms of volume, it was only $8 million out of the

Company's $200 million in sales, which, as discussed during the call, came from the Company's DTC

channel – not resellers.  Defendants knew or recklessly disregarded that this was, in reality, a red flag

as Holley's relationships with its resellers were crumbling.  To that end, during the call Bardos made

clear Holley was standing by its 2022 guidance, stating, in relevant part:

> And there's still a lot of the year ahead of us.... [W]e have 3 quarters to go.  So we just don't believe that it's appropriate to change the guidance.  We have enough confidence in our ability to hit that range that we just don't want to make any adjustments to that at this time.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company

issued a press release on May 12, 2022, which is publicly available, and which stated that the

Company's 1Q22 net sales increased 24.8% to $200.1 million compared to $160.3 million in 1Q21.

With regard to the second sentence in this paragraph, Defendants aver that this sentence purports to

summarize statements made by Tomlinson without specifying how the statement was made.

Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny

the allegations on that basis.  With regard to the third sentence in this paragraph, Defendants aver

that this sentence purports to summarize statements made by Bardos without specifying how the

statement was made.  Defendants thus lack information sufficient to form a belief as to the truth of

the allegations and deny the allegations on that basis.  With regard to the fourth sentence in this

paragraph, Defendants aver that this sentence purports to summarize statements made during the

earnings call without specifying how the statement was made or who made it.  Defendants thus lack

information sufficient to form a belief as to the truth of the allegations and deny the allegations on

102

that basis.  With regard to the sixth sentence in this paragraph, Defendants admit that the Company held an earnings call on May 12, 2022, the transcript of which is publicly available and contains the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

169.    Nevertheless, when asked about whether Holley was experiencing any changes in demand, including changes between the Company's DTC channel or "pullback from [Holley's] retail partners[,]" Tomlinson praised the strength of the DTC channel and noted that Holley saw resellers pull back "a little bit[,]" but attributed the pullback to resellers' concerns "*about the economy*[,]" stating, in relevant part:

> I mean, I will say that *direct-to-consumer has continued to be very strong*, *and we do have the ability for some of our resellers also to look at their out-the-door sales*.  And so through – for the quarter, which is the visibility we have, *direct-to-consumer remains strong*.  *And one of the things that we have seen historically is that our resellers*, *particularly the ones that carry inventory*, *do have the ability to pull back and reduce their inventory when they become concerned about the economy*.  *And so we did see a little bit of that in the quarter*.

**ANSWER**: Defendants admit that Holley held an earnings call on May 12, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

170.    Adding on, Bardos attributed the reseller inventory drawdown not to reduced demand or severely damaged relationships with resellers, but instead pointed to "*the Russian invasion of Ukraine* [.]"

**ANSWER**: Defendants admit that Holley held an earnings call on May 12, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly

admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

171.    As the call continued, Defendants were asked specifically about the DTC business and "how it performed in the quarter" and "what percentage of sales it is today." Bardos would not directly answer the question, instead stating:

> *We haven't released individual quarterly DTC because there is some fluctuation in that. But DTC did outpace our organic growth and continue to do that just as we saw through 2021.* So on 2021, I believe we landed around 17%, Tom, if I – I'm trying to do that off the top of my head there. I think it was about 17% of our sales in 2021, 16%, 17%.

**ANSWER**: Defendants admit that Holley held an earnings call on May 12, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

172.    Tagging on, Tomlinson made clear that DTC made up "pretty close" to "16% or 17%" of the "sales number" for 2021, "not the growth number." By not discussing the percentage of sales growth coming from DTC versus the Company's resellers, Defendants kept investors in the dark as to the true state of affairs with Holley's reseller relationships, the slowdown in demand, and the extent to which resellers were buying less from Holley.

**ANSWER**: Defendants admit that Holley held an earnings call on May 12, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

173.    Later in the 1Q22 earnings call, Defendants were asked about progress on Holley's integration of AEM, which Holley acquired about a year earlier, and whether the integration was in the "eighth or ninth inning of the ball game" or whether "is it still sixth or seventh inning[.]" In response,

104

Tomlinson misrepresented the status of Holley's botched integration of AEM, and falsely assured the

market that the AEM integration was almost complete, stating:

> ***We have made progressive moves at AEM***. Our primary focus right now is
> wrapping up the Simpson integration, which is the largest acquisition that we've
> done relatively recently, although it's worth saying that we didn't start integrating
> that for a year – until a year after the acquisition date because of an earn-out. I think
> that's – I think we pretty thoroughly discussed that. And so that actually is the
> priority. We plan to have that done in the second quarter. ***We should – we would
> also expect to have AEM finished in the third quarter***.

**ANSWER**: Defendants admit that Holley held an earnings call on May 12, 2022, the transcript of

which is publicly available and contains the language quoted in this paragraph. Except as expressly

admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's

characterization of the events at issue and any legal conclusions.

174.    The statements referenced in ¶¶161-173 above were materially false and misleading,

and omitted material information which made Defendants' statements misleading because:

(a)    at all relevant times, Holley excluded resellers from pricing promotions which

were offered in the DTC channel and failed to adhere to MAP on the vast majority of its SKUs during

the Class Period (*see* §VII, below);

(b)    Defendants failed to disclose that as a result of the Company's extensive focus

on its DTC channel and failure to adhere to MAP, the Company's critically important relationships

with its resellers and distributors, whose business made up the vast majority of the Company's

revenue, were suffering significant damage;

(c)    Holley used discounting and other similar efforts to grow its DTC channel,

which undermined the pricing discipline Holley historically had with its resellers and distributors,

and further damaged the Company's relationships with its resellers and distributors by undercutting

them;

(d)    As a result of Holley's strained relationships with its resellers and distributors, those resellers and distributors were decreasing their purchases of Holley products, returning products already purchased at significant levels that were far above historical norms, increasing their purchases of competitors' products, and promoting Holley's competitors' products;

(e)    Holley's growing DTC channel could not offset the negative financial impact of Holley's increasingly strained relationships with its resellers and distributors and, as a result, rather than keeping its foot on the gas, Holley was actually slamming the brakes on its critical reseller/distributor relationships;

(f)    Holley was riding a wave of COVID-related stimulus money that temporarily boosted its sales and performance, and despite this unsustainable, temporary boost, Defendants misled investors to believe the growth was sustainable and the result of persistent demand, and supportive of positive financial guidance;

(g)    Holley had failed to successfully integrate and capture synergies from its numerous acquisitions, which left the Company with inefficient operations, excess costs, and inventory management problems; and

(h)    As a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times, as were Defendants' material omissions of fact which made Defendants' statements misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## VI.    EVEN AS THE TRUTH BEGAN TO EMERGE, DEFENDANTS CONTINUED TO MISLEAD THE MARKET

### A.    Second Quarter 2022 Financial Results

175.    After the market closed on July 28, 2022, the Company announced its preliminary results for its 2Q22. Not only did the preliminary results badly miss expectations, but the Company also

106

slashed its recently-affirmed FY22 outlook.  The Company revealed shockingly poor financial results, which included:

- Preliminary Net Sales of $179.4 million, down $13.6 million (7.1%) from second quarter 2021

- Preliminary Gross Profit of $75.3 million, down $5.9 million (7.3%) from second quarter 2021

- Preliminary Net Income of $40.6 million, up $17.5 million from the $23.1 million recorded in the second quarter of 2021

- Preliminary Adjusted EBITDA of $37.2 million, down $16.9 million (31.3%) from 2021

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company announced its preliminary 2Q22 financial results in a Form 8-K on July 28, 2022.  With regard to the second sentence in this paragraph, Defendants lack knowledge as to whose expectations the allegations refer to or whether those expectations were "badly miss[ed]" and deny the allegations on that basis.  Defendants further aver that the phrase "slashed" is vague and ambiguous and deny the allegations on that basis.  With regard to the third sentence in this paragraph, Defendants admit that the Company issued a press release on July 28, 2022, which is publicly available and contains the information quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

176.    Defendants also revealed substantial cuts to Holley's recently-reaffirmed 2022 guidance, with 2022 sales guidance slashed 8.4% from a previous range of between $765 million and $790 million to only $700 million to $725 million, and adjusted earnings slashed 26% from a range of $186 million to $194 million to only $135 million to $145 million.  The 2Q22 preliminary earnings release included the following statement from Tomlinson, which revealed a substantial drop in sales to Holley's resellers:

Second quarter sales fell short of expectations, driven by microchip shortages and other supply chain challenges that prevented us from building and shipping many of our most popular products... ***Growth in DTC sales was more than offset by resellers that reduced their purchases below their out-the-door sales levels***, ***indicating that some sell-down of reseller inventory also occurred in the quarter***. This is all against the backdrop of challenging economic conditions and softening consumer demand.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company issued a press release on July 28, 2022, which is publicly available and in which the Company revised its full year 2022 outlook for net sales to a range of $700-725 million and for adjusted EBITDA to a range of $135-145 million.  With regard to the second sentence in this paragraph, Defendants admit that the Company's July 28, 2022 press release contains the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

177.    In response, the price of Holley stock dropped 37%, or $4.68 per share, from a close of $12.67 per share on July 28, 2022, to a close of $7.99 per share on July 29, 2022, on unusually high trading volume.  The following trading day, August 1, 2022, the price of Holley stock fell an additional ***16.5%***, or $1.32 per share, to close at $6.67 per share.

**ANSWER**: Defendants aver that the price and trading volume of Holley stock is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

178.    Analysts were shocked by the results, with multiple downgrades and across-the- board price target cuts on Holley stock:

(a)    J.P. Morgan reported it was "puzzled" by the "sharp degree of downside since the midpoint of the quarter" and downgraded Holley stock from "overweight" to "neutral," pointing out that "growth in DTC sales was more than offset by resellers replenishing inventory slower than out-the door sales[.]" J.P. Morgan also noted that there was now a "lack of conviction in forecasting

108

the business," slashed its price target on Holley stock from $14 per share to $9 per share, and

expressed shock at the difference between the Company's 2Q22 results and what Defendants said

earlier that year: "Said succinctly, *these results are drastically different from our takeaways from*

*the 1Q call and conversations with the company*."

(b)      Jefferies downgraded Holley to "hold," slashed its price target for Holley

stock from $18 per share to $10 per share, and stated that the preliminary results and revised guidance

"[*s*]*hake* [*o*]*ur* [*c*]*onfidence*." Jefferies also pointed out that DTC growth was "*more than offset by*

*declines in retail*[,]" and noted Holley was performing much worse than other companies, stating

that the "*magnitude of the 2Q shortfall and cut to the FY guide is jarring in the context of much*

*better tone from companies in our coverage that have reported thus far* (e.g. [Brunswick Corp.],

[Polaris Inc.]), and *highlights the risks associated with HLLY's distribution* (*retailers = ~80% of*

*sales*)[.]"

(c)      BofA Securities downgraded Holley stock from "buy" to "neutral," lowered its

price target from $13 per share to $9 per share, and stated that it was downgrading Holley stock

because of the decline driven by:

> (1) microchip shortages & other supply chain challenges that limited supply
> availability; (2) *resellers reduced purchasing below their sell-through trends at*
> *retail*; & (3) challenging economic conditions and softening consumer demand.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of

the allegations regarding analysts' beliefs or feelings and deny the allegations in this paragraph on

that basis. Defendants further aver that the analyst reports referenced and quoted in this paragraph

are publicly available. Defendants deny the remaining allegations in this paragraph, including

Plaintiff's characterization of the events at issue and any legal conclusions.

179.    On August 11, 2022, the Company stunned investors and announced that CFO Bardos

had resigned, effective September 30, 2022, to "pursue another opportunity and for personal reasons."

Holley announced that Trussell, the Company's then-Vice President of Finance, would serve as Interim

CFO while the Company searched for a permanent replacement.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company

filed a Form 8-K on August 11, 2022, which is publicly available, and which stated that "Mr.

Bardos's decision to resign from the Company was not the result of any disagreement relating to the

Company's strategy, operations, policies, or practices."  With regard to the second sentence in this

paragraph, Defendants admit that the August 11, 2022 Form 8-K stated that "Stephen Trussell, the

Company's current Vice President of Finance, will serve as interim Chief Financial Officer, effective

upon Mr. Bardos's departure."  Except as expressly admitted, Defendants deny the remaining

allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal

conclusions.

180.    Also on August 11, 2022, the Company issued a release announcing its final 2Q22

financial results, which reiterated the poor preliminary results announced on July 28, 2022.  The 2Q22

earnings release included the following statement by Tomlinson:

> Our financial results for the second quarter fell short of expectations primarily due to supply chain challenges including both (1) slower than expected production and movement of goods from global suppliers and (2) shortages in automotive-grade microchips that negatively impacted our ability to build and ship many or our most popular electronic products... ***We also saw meaningful reseller de-stocking in the quarter as resellers reduced their purchases well below their out-the-door sales of our products***. ***These issues***, ***against a backdrop of reduced discretionary consumer spending and the resultant softer demand we experienced in certain categories***, ***caused us to reduce our outlook for the remainder of the year***. We are slowing our spending in an effort to optimize our performance and stay ahead of what will likely be a challenging economic environment in the months ahead.

**ANSWER**: Defendants admit that the Company issued a press release on August 11, 2022, which is

publicly available and contains the language quoted in this paragraph.  Except as expressly admitted,

Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization

of the events at issue and any legal conclusions.

110

181.    Providing more detail on the Company's poor financial results, the 2Q22 release added:

Net sales decreased 7.1% to $179.4 million in the second quarter of 2022 compared to $193.0 million in the second quarter of 2021. Non-comparable sales associated with acquisitions contributed $9.4 million, or 4.8%, of year-over-year net sales growth in the second quarter. *Sales excluding the impact of acquisitions decreased by $23.0 million*, *or 11.9%*, more than offsetting the growth from the acquisitions. *The decline in comparable sales was driven by reduced unit volumes*, *destocking from our resellers*, *and reduced consumer demand* in certain categories including tuning.

**ANSWER**: Defendants admit that the Company issued a press release on August 11, 2022, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

182.    The 2Q22 release reiterated the lowered 2022 guidance previously announced by the Company and added the following statement by Bardos:

Our outlook for the full year 2022 is consistent with the previously communicated full year guidance issued on July 28, 2022, and reflects the current supply chain pressures, inventory, *and demand trends* we have seen in recent weeks . . . . We do not expect to fully resolve the supply chain and inventory issues that are impacting our sales in the near-term, and we have reduced our sales projections accordingly.

**ANSWER**: Defendants admit that the Company issued a press release on August 11, 2022, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

183.    Also on August 11, 2022, the Company filed with the SEC its quarterly report on Form 10-Q for the 2Q22 ("2Q22 10-Q"), which reiterated the financial results in the 2Q22 earnings release, was signed by Bardos, and included SOX certifications signed by Tomlinson and Bardos attesting that

111

the 2Q22 10-Q did not contain any untrue statements or omissions of material facts. Providing an overview of the Company's business, the 2Q22 10-Q stated, in relevant part:

> *In addition*, *we have historically used strategic acquisitions* to (i) expand our brand portfolio, (ii) enter new product categories and consumer segments, (iii) *increase direct-to-consumer* ("*DTC*") *scale and connection*, (iv) expand share in current product categories and (v) *realize value-enhancing revenue and cost synergies*. While we believe our business is positioned for continued organic growth, we intend to continue evaluating opportunities for strategic acquisitions that would complement our current business and expand our addressable target market.

**ANSWER**: Defendants admit that the Company filed a Form 10-Q on August 11, 2022, which is publicly available and contains the language quoted in this paragraph and SOX certifications signed by Tomlinson and Bardos. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

184.    On the same day, August 11, 2022, the Company also hosted an earnings call to discuss its 2Q22 results, with Tomlinson, Bardos, and Nimmagadda speaking on behalf of the Company. During his opening remarks on the call, Tomlinson addressed the Company's poor quarterly performance, which he attributed to several factors, including "reseller destocking" and "softer consumer demand[.]" Specifically, Tomlinson stated there was "meaningful reseller destock[,]" but assured investors stated that "[resellers'] *ability to continue to reduce their inventory is limited*" because of "*our policies and supply chain constraints that have existed over the last few years*," and also contrasted reseller shortfalls with the "*margin-accretive*" DTC channel. Specifically, Tomlinson stated:

> Shifting gears to distribution. *It is very clear that there was meaningful reseller destock – destocking in the quarter*. *Our top resellers reduced their purchases well below their out-the-door sales of our products. Given our policies and supply chain constraints that have existed over the last few years*, *we believe reseller inventory levels are currently low*, *and their ability to continue to reduce their inventory is limited* [W]e continue to believe that overall consumer demand for

*our products is solid*.  Our past-due orders remain elevated and ended the quarter more than 3x the net sales decline from the prior year.  We expect to be able to fill most of this demand in future quarters as product becomes available to ship.  ***Our DTC channel is growing and is margin-accretive*.  *DTC sales were up 7% despite the significant supply chain challenges***.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company held an earnings call on August 11, 2022, the transcript of which is publicly available, and that Tomlinson, Bardos, and Nimmagadda participated in the call.  With regard to the second, third, and fourth sentences in this paragraph, Defendants admit that the transcript of the August 11, 2022 earnings call, which is publicly available, contains the language quoted in these sentences.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

185.    Addressing demand in more detail, Tomlinson pinned declining demand on "the result of lower new vehicle production levels" that created a "reduction in used vehicle transactions as well." Pinning the slowdown on broader economic issues, Tomlinson falsely assured investors that "***we continue to believe that overall consumer demand for our products is solid***."

**ANSWER**: Defendants admit that the Company held an earnings call on August 11, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

186.    Nimmagadda then presented his prepared remarks, in which he emphasized acquisitions as "a ***key strategic pillar to drive growth*** at Holley" which will "***increase our DTC scale and ultimately drive shareholder value***[,]" adding that Holley was "***meaningfully accelerating the integration of more recent acquisitions*** to realize value within the year."

**ANSWER**: Defendants admit that the Company held an earnings call on August 11, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except

113

as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

187.    At the outset of the question and answer portion of the call, Defendants were asked what Holley was experiencing in terms of "shipments, demand, et cetera[,]" in July and August 2022, which would cover a substantial portion of Holley's 3Q22 performance.  In response, Bardos diverted to Holley's 2022 guidance and stated, "we're not prepared to make any other comments about Q3."

**ANSWER**: Defendants admit that the Company held an earnings call on August 11, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

188.    As the call continued, Defendants were asked what was driving Holley's reseller destocking activity.  In response, Tomlinson blamed macroeconomic conditions – not ruined reseller relationships – and assured investors that Holley had policies in place to limit reseller destocking, stating:

> *We have historically seen this when there is bad economic news*.  I would have to say that we have shaped our policies around this over the years to minimize the impact and to minimize – well, to minimize the impact on the business, to minimize their inventory.  And I mean, when I look back to prior periods, I mean, think those strategies, those policies are working well.  And I think, while the impact was still significant to us in the quarter, *it was much lower than we've seen historically*.

**ANSWER**: Defendants admit that the Company held an earnings call on August 11, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

189.    In response to another question about reseller destocking, Tomlinson indicated Holley had "visibility to destocking in [Holley's] top resellers" that represented "more than half of [Holley's]

114

overall sales[,]" describing it as a "pretty meaningful look at destocking." To that end, Tomlinson stated Holley saw the most destocking with Holley's "e-tailers and warehouse distributors [.]" Bardos added such resellers "carry the widest breadth of [Holley's] inventory" and that it "makes the most sense that they're the ones that would have the highest level of destocking."

**ANSWER**: Defendants admit that the Company held an earnings call on August 11, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

190. Later in the call, Defendants were asked to explain the reseller destocking and whether it was "indiscriminate cutting" or "more selective[.]" In response, Tomlinson labeled resellers' actions as "fear-based" and "emotional[,]" while also assuring investors that demand remained high, stating: stating:

> *So we look at it as fear-based or maybe an emotional reaction to the bad economic news*. And the last time we saw this was in 2020, right after all the COVID lockdowns occurred. And what we saw on our DTC side, DTC charged right on through with high rates of growth, and resellers pulled back dramatically. And the conditions were such at that time that they had to come right back in within a month or 2 and start raising their orders.
>
> So I mean, I'm not suggesting that, that's going to happen this time. The economic conditions, I think, are much different. *But we do think that there is far more demand there than is visible in our numbers*, *hence my comment that we believe the demand for our products is solid*. And we've got some categories that are up, some categories that are down. We wanted to kind of talk about both sides of that to be fair and balanced.
>
> But another thing I would point – *I mean*, *we talked about DTC up 7%*. So far this year, our consumer events are well into the double-digit up category or range. *And so we do think demand for our products remains solid*.

**ANSWER**: Defendants admit that the Company held an earnings call on August 11, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph. Except

as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

191. The statements referenced in ¶¶175-190 above were materially false and misleading, and omitted material information which made Defendants' statements misleading because:

(a) at all relevant times, Holley excluded resellers from pricing promotions which were offered in the DTC channel and failed to adhere to MAP on the vast majority of its SKUs during the Class Period (*see* §VII, below);

(b) Defendants failed to disclose that as a result of the Company's extensive focus on its DTC channel and failure to adhere to MAP, the Company's critically important relationships with its resellers and distributors, whose business made up the vast majority of the Company's revenue, were suffering significant damage;

(c) Holley used discounting and other similar efforts to grow its DTC channel, which undermined the pricing discipline Holley historically had with its resellers and distributors, and further damaged the Company's relationships with its resellers and distributors by undercutting them;

(d) As a result of Holley's strained relationships with its resellers and distributors, those resellers and distributors were decreasing their purchases of Holley products, returning products already purchased at significant levels that were far above historical norms, increasing their purchases of competitors' products, and promoting Holley's competitors' products;

(e) Holley's growing DTC channel could not offset the negative financial impact of Holley's increasingly strained relationships with its resellers and distributors and, as a result, rather than keeping its foot on the gas, Holley was actually slamming the brakes on its critical reseller/distributor relationships;

(f) Holley was riding a wave of COVID-related stimulus money that temporarily boosted its sales and performance, and despite this unsustainable, temporary boost, Defendants

116

misled investors to believe the growth was sustainable and the result of persistent demand, and supportive of positive financial guidance;

(g)     Holley had failed to successfully integrate and capture synergies from its numerous acquisitions, which left the Company with inefficient operations, excess costs, and inventory management problems; and

(h)     As a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times, as were Defendants' material omissions of fact which made Defendants' statements misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

### B.     Third Quarter 2022 Financial Results

192.     On November 14, 2022, the Company once again announced disappointing performance when it announced its financial results for the 3Q22. The Company reported a 3.1% decline in net sales, a 25.8% decrease in gross profit, and a more than 50% decline in adjusted EBITDA compared to the 3Q21. The Company also once again cut its forecasts for 2022, lowering net sales to a range of $695 million to $710 million, down from already lowered guidance of $700 million to $725 million, and dropping adjusted earnings to a range of $118 million to $124 million, well below the 2022 numbers of $135 million to $145 million provided on July 28, 2022 and reaffirmed on August 11, 2022. The November 14, 2022 earnings release included the following statement by Tomlinson:

> While we are encouraged by the sequential improvement we saw late in the quarter, earnings fell short of expectations     ***Underlying demand remained solid***, ***direct to consumer sales were up 11%***, and enthusiast engagement accelerated at our Holley-owned events. ***Channel inventories continued their decline in July and August***, ***before partially recovering on the back of stronger shipments to resellers in September***....
>
> ***Warranty costs were higher as resellers caught up on a backlog of warranty returns***, ***and higher inbound freight and other overhead costs from earlier in the***

117

> *year are continuing to impact our results as they work their way through inventory*. Pricing actions taken mid-year partially offset these cost headwinds....
> In this challenging environment, *we're pleased with the solid demand we've seen for our products* at a time when consumers are stressed by inflationary pressures. *We believe we are now positioned to convert more of this demand to sales*....

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company announced its 3Q22 financial results in a Form 8-K on November 14, 2022. With regard to the second sentence in this paragraph, Defendants admit that the Company reported for 3Q22 a 3.1% decrease in net sales, a 25.8% decrease in gross profit, and aver that the Company's adjusted EBITDA was $16.4 million compared to $35.5 million in 3Q21. With regard to the third sentence in this paragraph, Defendants admit that the Company revised its full year 2022 outlook for net sales to a range of $695-$710 million and for adjusted EBITDA to a range of $118-$124 million. With regard to the fourth sentence in this paragraph, Defendants admit that the Company issued a press release on November 14, 2022, which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

193.    Continuing with his prepared statements, Tomlinson again highlighted "solid demand" and the Company's readiness to convert that demand to more sales, stating:

> In this challenging environment, we're pleased with the solid demand we've seen for our products at a time when consumers are stressed by inflationary pressures. *We believe we are now positioned to convert more of this demand to sales*, as supply chain conditions improve, and as we continue to execute operationally. *While there is still more work to do on lowering our cost structure and reducing our inventory levels*, *we are aggressively pursuing numerous improvement opportunities and continue to make solid progress integrating acquired businesses to drive further synergies*. We remain confident in the underlying profitability and cash flow generation potential of our business, and *we firmly believe that Holley's position as an industry leader with ample runway for long-term profitable growth is unchanged*.

**ANSWER**: Defendants admit that the Company issued a press release on November 14, 2022, which is publicly available and contains the language quoted in this paragraph. Except as expressly

admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

194.    Also on November 14, 2022, the Company filed its 3Q22 10-Q with the SEC, which reiterated the financial results in the 3Q22 earnings release and included a SOX certification signed by Tomlinson attesting that the 3Q22 10-Q did not contain any untrue statements or omissions of material facts.  Providing an overview of the Company's business, the 3Q22 10-Q stated, in relevant part:

> ***In addition***, ***we have historically used strategic acquisitions to*** (i) expand our brand portfolio, (ii) enter new product categories and consumer segments, (iii) ***increase direct-to-consumer*** ("***DTC***") ***scale and connection***, (iv) expand share in current product categories and (v) ***realize value-enhancing revenue and cost synergies***.  While we believe our business is positioned for continued organic growth, we intend to continue evaluating opportunities for strategic acquisitions that would complement our current business and expand our addressable target market.

**<u>ANSWER</u>**: Defendants admit that the Company filed a Form 10-Q on November 14, 2022, which is publicly available and contains the language quoted in this paragraph and a SOX certification signed by Tomlinson.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

195.    On the same day, November 14, 2022, the Company also hosted an earnings call to discuss its 3Q22 results, with Tomlinson, Nimmagadda, and non-defendant Trussell, Vice President of Finance and Interim CFO, speaking on behalf of the Company.  During his opening remarks on the call, Tomlinson stated that "earnings fell short of expectations" as "sales for the quarter were down year-over-year" despite improved shipping rates.  Discussing increased warranty costs, Tomlinson stated:

> ***Warranty costs were higher as resellers caught up on a backlog of warranty returns*** and higher inbound freight and other overhead costs are continuing to work their way through inventory.  Pricing actions taken midyear partially offset these cost headwinds.

119

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company held an earnings call on November 14, 2022, the transcript of which is publicly available, and that Tomlinson, Nimmagadda, and Trussell participated in the call. With regard to the second and third sentences in this paragraph, Defendants admit that the transcript of the November 14, 2022 earnings call, which is publicly available, contains the language quoted in these sentences. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

196.    Despite the poor results, Tomlinson lauded the Company's "solid demand" in the "core" DTC channel, and cited "innovation" and "new brand integration" as drivers of DTC:

> *We're pleased with the solid demand we've seen for our products* at a time when consumers are stressed by inflationary pressures. *Our direct-to-consumer sales were up 11%* and we saw enthusiast engagement continue to accelerate at our Holley owned events.
>
> As highlighted on Slide 2, *DTC sales were up year-over-year despite supply chain challenges that left us out of stock on many of our popular products. DTC sales provide us with visibility into consumer behavior and insight into underlying consumer demand because DTC sales are not influenced by reseller purchasing decisions. Our DTC strategy is core to what we do, and the growth in our DTC channel continues to be driven by innovation,* strong performance marketing, content and social media engagement, event expansions *and new brand integrations. Growing DTC sales remains a priority for our team.*

**ANSWER**: Defendants admit that the Company held an earnings call on November 14, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

197.    Tomlinson also spoke highly of the Company's "progress" with its M&A synergies:

> *Our team is aggressively pursuing strategies to drive higher productivity and lower our cost structure and we're continuing to make progress integrating acquired businesses in order to drive further synergies.*

**ANSWER**: Defendants admit that the Company held an earnings call on November 14, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

198. In his prepared remarks, Nimmagadda spoke highly of Holley "progressing on integrations" and "maximiz[ing] value creation" from acquisition synergies, but also noted that Holley did not complete an acquisition in the quarter. Specifically, Nimmagadda stated:

> Though we did not complete an acquisition during the third quarter, *we are progressing on integrations*.
>
> *As we have said on prior calls*, *driving synergies from our past acquisitions enables Holley to continue to maximize value creation within the year*. As we realize these savings on an annualized basis, we will enhance our balance sheet strength and further improve our liquidity position in support of long-term growth. As a reminder, over the past 12 months, we have completed 5 acquisitions that were highly strategic and expanded our wide range of products. *During the quarter*, *we further integrated several of our acquired companies onto our internal ERP system*, *reducing overall costs and increasing operational efficiencies*. Just to provide an example, we closed on RaceQuip in late June and I'm proud to report the team's success in completing our integration in early September. To that end, RaceQuip's safety products are now seamlessly offered to resellers alongside our existing performance and safety offering and for the first time, sold direct-to-consumer through holley.com in our existing digital platform.

**ANSWER**: Defendants admit that the Company held an earnings call on November 14, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

199. Discussing the Company's financial performance, and despite Defendants' many assurances that demand remained strong, Interim CFO Trussell disclosed that sales from acquisitions *increased* in the quarter, contributing $7.7 million, or 4.8%, of year-over-year growth. Organic sales, meanwhile, fell by $12.6 million, or 7.9%, year-over-year, "offsetting the impact from the

121

acquisitions." On top of that, Defendants disclosed that Holley raised prices, meaning that sales volume deteriorated even more and was offset by increased prices. Regarding the Company's reduction in gross profit, Bardos revealed that of the "960 basis point decrease[,]" "290 basis points" of the reduction "came from higher expenses associated with warranty costs."

**ANSWER**: With regard to the second sentence in this paragraph, Defendants admit that the Company held an earnings call on November 14, 2022, the transcript of which is publicly available and contains the language quoted in this sentence. With regard to the third sentence in this paragraph, Defendants aver that the phrase "sales volume deteriorated even more" is vague and ambiguous and deny the allegations on that basis. With regard to the fourth sentence in this paragraph, Defendants deny that Bardos participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

200.    During the question and answer portion of the call, Defendants were asked to explain the sudden spike in warranty costs. In response, Tomlinson falsely reiterated that the increase was due to a "backlog," stating:

> ***So we believe there was a backlog of warranty claims or warranty returns that we're sitting at our resellers***. And a lot of those came in, in the quarter. We have provided for an increase in warranty throughout the remainder of the year to ensure that that was our effort to make provision for any additional warranty that would come in.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that this paragraph purports to summarize statements made during the earnings call without specifying who made the alleged statements or when and how they were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the second sentence in this paragraph, Defendants admit that the Company held an earnings call on November 14, 2022, the transcript of which is publicly available and contains the language quoted

in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

201.    When asked about reseller destocking and related issues, including whether resellers were "rebuilding up inventory" versus increased "point-of-sale trends," Tomlinson said the Company was seeing "*increases*" in resellers' out-the-door sales:

> So the visibility that we have is around our products and we, because of our inability to ship the sell-through, the out-the-door sales have been below what they could have otherwise been if we were shipping.  As we've seen shipping -- our shipping rates improved, *we have seen the sell-through*, *and we have seen resellers now start to report increases*, *year-over-year increases in their out-the-door sales*.

**ANSWER**: Defendants admit that the Company held an earnings call on November 14, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

202.    Because of the wide range of disclosures made by Defendants regarding the Company's 3Q22 performance and outlook, mixed with Defendants' additional false statements that misrepresented and omitted key facts, as discussed below, the price of Holley stock remained artificially inflated.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

203.    On December 12, 2022, the Company announced that the Board approved the appointment of Weaver as Holley's CFO, effective immediately, and that Weaver would succeed Trussell, who served as Holley's Interim CFO since September 30, 2022.

**ANSWER**: Defendants admit the allegations in this paragraph.

204.    The statements referenced in ¶¶192-203 above were materially false and misleading, and omitted material information which made Defendants' statements misleading because:

(a)     at all relevant times, Holley excluded resellers from pricing promotions which were offered in the DTC channel and failed to adhere to MAP on the vast majority of its SKUs during the Class Period (*see* §VII, below);

(b)     Defendants failed to disclose that as a result of the Company's extensive focus on its DTC channel and failure to adhere to MAP, the Company's critically important relationships with its resellers and distributors, whose business made up the vast majority of the Company's revenue, were suffering significant damage;

(c)     Holley used discounting and other similar efforts to grow its DTC channel, which undermined the pricing discipline Holley historically had with its resellers and distributors, and further damaged the Company's relationships with its resellers and distributors by undercutting them;

(d)     As a result of Holley's strained relationships with its resellers and distributors, those resellers and distributors were decreasing their purchases of Holley products, returning products already purchased at significant levels that were far above historical norms, increasing their purchases of competitors' products, and promoting Holley's competitors' products;

(e)     Holley's growing DTC channel could not offset the negative financial impact of Holley's increasingly strained relationships with its resellers and distributors and, as a result, rather than keeping its foot on the gas, Holley was actually slamming the brakes on its critical reseller/distributor relationships;

(f)     Holley was riding a wave of COVID-related stimulus money that temporarily boosted its sales and performance, and despite this unsustainable, temporary boost, Defendants misled investors to believe the growth was sustainable and the result of persistent demand, and supportive of positive financial guidance;

124

(g)     Holley had failed to successfully integrate and capture synergies from its numerous acquisitions, which left the Company with inefficient operations, excess costs, and inventory management problems; and

(h)     As a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times, as were Defendants' material omissions of fact which made Defendants' statements misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

### C.     Tomlinson Abruptly Exits the Company and Holley Reports Its Preliminary Fourth Quarter and Full Year 2022 Financial Results

205.     On February 6, 2023, Holley made several announcements. The Company revealed that CEO Tomlinson was retiring, effective immediately, and also resigning from the Company's Board, and that the Board appointed Director Gloeckler as Interim President and CEO while the Company conducted a "comprehensive search process to identify a permanent CEO." Holley also announced that Graham Clempson, an "observer" to the Board, had been appointed to the Board effective immediately, to fill Tomlinson's vacancy, and would become the Board's Chair. The Company stated its search to replace Tomlinson would be conducted with the help of Heidrick & Struggles, a company "retained by the Board in September 2022 for a comprehensive review of succession planning."

**ANSWER**: With regard to the first and second sentences in this paragraph, Defendants admit that the Company issued a press release on February 6, 2023, which is publicly available, announcing that Tomlinson would retire as President and Chief Executive Officer and resign from the Board. With regard to the second sentence in this paragraph, Defendants admit that the February 6, 2023 press release, which is publicly available, stated that the Board appointed "current Director, Gloeckler, as Interim President and CEO while it conducts a comprehensive search process to

125

identify a permanent CEO."  With regard to the third sentence in this paragraph, Defendants admit that the February 6, 2023 press release, which is publicly available, stated that "Graham Clempson, an observer on the Board since the Company's business combination with Empower Ltd. in July 2021, was appointed to serve as a member of the Board, effective immediately."  With regard to the fourth sentence in this paragraph, Defendants admit that the February 6, 2023 press release, which is publicly available, stated that the CEO "search will be conducted with the assistance of Heidrick & Struggles, who was retained by the Board in September 2022 for a comprehensive review of succession planning."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

206.   The Company also announced its preliminary 4Q22 and FY22 financial results, revealing 4Q22 sales that fell short as well as adjusted EBITDA that Holley CFO Weaver called "'disappointing.'"  Specifically, the Company reported the following preliminary 4Q22 and FY22 "Highlights":

**4Q22 Highlights vs. 4Q21**

- Preliminary Net Sales of $153-$155 million compared to $180 million in the fourth quarter 2021

- Preliminary Gross Profit of $46-$48 million compared to $75 million in the fourth quarter of 2021

- Preliminary Net Loss of $19-$17 million compared to a Net Loss of $18 million in the fourth quarter of 2021

- Preliminary Adjusted EBITDA of $13 to $15 million, compared to $36 million in the fourth quarter of 2021

**FY22 Highlights vs. FY21**

- Preliminary Net Sales of $687-$689 million, compared to $693 million in 2021

- Preliminary Gross Profit of $253-$255 million, compared to $287 million in 2021

126

- Preliminary Net Income of $70-$72 million, compared to a Net Loss of $27 million in 2021

- Preliminary Adjusted EBITDA range of $113 to $115 million, compared to $169 million in 2021

(Footnote omitted.)

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that the Company announced its preliminary 4Q22 and FY22 financial results in a Form 8-K on February 6, 2023. With regard to the remaining sentences in this paragraph, Defendants admit that the February 6, 2023 Form 8-K, which is publicly available, contains the figures and language quoted in these sentences. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

207. The Company's preliminary 4Q22 earnings announcement included the following statement by Interim CEO Gloeckler, revealing to investors that Holley needed significant changes in order to return to "'profitable growth,'" stating:

> We are making the necessary changes to return Holley to profitable growth, including adding a highly experienced Interim Chief Operating Officer in December 2022, Brian Appelgate, who is leading our cost reduction initiatives.... The entire Holley team is committed to delivering on the Holley Strategic Vison – to inspire and enable enthusiasts in their automotive adventures while bringing innovation, discovery, and fun to motor life.

**ANSWER**: Defendants admit that the Company issued a press release on February 6, 2023, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

208. The preliminary 4Q22 earnings announcement also included the following statement by CFO Weaver that its 4Q22 and FY22 results had missed expectations and that demand had dropped to "***pre-covid levels***" during the second half of 2022, stating:

127

> Holley's results for the fourth quarter and full year 2022 were below our expectations. . . . Ongoing supply chain challenges and ***normalization of consumer demand to pre-covid levels reduced sales in the second half of 2022***. Adjusted EBITDA results were disappointing, as continued deleveraging of fixed cost, inflation, and manufacturing challenges from the unpredictable supply chain significantly impacted our profitability. While we reduced our past-due orders by over 25% in the fourth quarter, the improvement came in product categories outside of electronics, which has been a key growth area for the Company in recent years.

**ANSWER**: Defendants admit that the Company issued a press release on February 6, 2023, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

209. Weaver further elaborated that Holley's much-needed changes included the achievement of synergies from past M&A activity as well as the implementation of cost-cutting measures, stating:

> ***As Holley executed its acquisition growth strategy in recent years***, ***the Company underwent a significant transformation***. In the last three years, we've closed 16 acquisitions, integrated 13 ERP systems and consolidated more than 160,000 square feet across 10 locations. ***To fully maximize the value of these transactions and position the Company for the next wave of growth***, ***our focus in 2023 will be accelerating deal synergy capture and improving free cash flow across the Company through a combination of realigning teams to key strategic focus areas***, ***streamlining operations***, ***and working with vendors to bring cost back in line***. ***Furthermore***, ***targeted cost and inventory management efforts aim to improve profitability*** and support debt reduction, while a recently implemented interest rate collar should help to minimize the effects of rising interest rates on the Company. We are actively engaged in discussions with our lenders to ensure maximum flexibility as we execute these plans.
>
> We intend to provide our initial 2023 financial guidance on our upcoming fourth quarter 2022 earnings call in early March, and ***we will include more detail around these efforts and their expected impact during the call***.

**ANSWER**: Defendants admit that the Company issued a press release on February 6, 2023, which is publicly available and contains the language quoted in this paragraph. Except as expressly

admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

210. On this news, the price of Holley stock fell **31%**, or $1.06 per share, to close at $2.36 per share on February 7, 2023, on unusually high trading volume. The following day, February 8, 2023, the price of Holley stock fell an additional 9.75%, or $0.23 per share, to close at $2.13 per share.

**ANSWER**: Defendants aver that the price and trading volume of Holley stock is publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

211. Analysts reacted negatively to this news, with Telsey Advisory Group lowering its price target from $5 per share to $3 per share based on, *inter alia*, an "***unclear path for the company's leadership team with the recent departure of the CEO***." Similarly, the Benchmark Company lowered its price target from $8 per share to $6 per share upon Holley's "announc[ing] ***disappointing preliminary 4Q results along with a CEO transition after the close yesterday***," and Imperial Capital, LLC wrote that "[*w*]*e do not view the CEO transition favorably* as current CEO, Tom Tomlinson, has been the President and CEO during the last 12 years and has spent nearly 20 years overall at Holley."

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding analysts' beliefs or feelings and deny the allegations in this paragraph on that basis. Defendants further aver that the analyst reports referenced and quoted in this paragraph are publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

212. On February 6, 2023, Truist Securities stated that the "announcement continues a string of disappointing quarters[,]" reported a $5 price target which was "***at the low end of HLLY's peer group trading range***[,]" expressed surprise that demand remained weak considering Defendants' statements

about "*improving retailer/distributor stocking levels*[,]" and noted that Holley's M&A strategy "*may have compounded matters and further clouded internal visibility*:" stating:

> It was also news, to us, that consumer demand softened during the quarter, particularly given HLLY's Nov. commentary that sell through had actually strengthened throughout the Fall as it made headway in improving retailer/distributor stocking levels. Finally, it appears that operational complexities, following *16 acquisitions over the past 36 months & the integration of 13 distinct ERP systems*, *may have compounded matters and further clouded internal visibility*.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding beliefs or feelings and deny the allegations in this paragraph on that basis. Defendants further aver that the analyst reports referenced and quoted in this paragraph are publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## VII.    POST-CLASS PERIOD REVELATIONS

213.    The fallout continued after the Class Period. On March 9, 2023, the Company hosted an earnings call to discuss its 4Q22 and FY22 results. With Tomlinson and Bardos gone, Interim CEO Gloeckler, CFO Weaver, and Executive Chairman of the Board Matthew Rubel ("Rubel") participated in the call. In her opening remarks, Gloeckler stated that "sector demand" was "experiencing a normalization to pre-COVID levels" and that organic growth over the "long run" would be around 6% to 7%. Thus, the rapid growth Holley experienced during 2020 and 2021 was, in reality, a temporary COVID-stimulus fueled boost and was, in fact, not sustainable. Gloeckler added in her opening remarks that "*2022 was a challenging year for Holley*[,]" that the Company did not meet its targets in 2022, and that the prior year "*surfaced many areas of improvement* for our broader organization."

**ANSWER**: Defendants admit that the Company held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Gloeckler, Weaver, and Rubel participated in the call. Except as expressly admitted, Defendants

130

deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

214.    In his opening remarks, CFO Weaver pointed out that sales in the 4Q22 were down, in part, because of "weaker customer orders" in the face of a "normalization of demand trends back to pre-COVID growth rates" and added that "[t]o the extent [Holley's] comparable sales growth rate exceeded" roughly 6% to 7% "between 2020 and 2022, demand was likely positively impacted by consumer spending habits from stimulus related to COVID shutdowns."  Weaker added that Holley was expecting "demand normalization" to be a "headwind in the near term" and that "in the medium to long term" Holley would "organically... perform in line with the market" at the 6% to 7% rate, "with upside potential from innovation and mergers and acquisitions."

**ANSWER**: Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

215.    For 2023, however, Weaver stated the Company projected a sales *decline* from 2022 sales of $687 million to $689 million to a 2023 range of $625 million to $675 million, with approximately half of the decline attributable to demand reverting to pre-COVID levels. Additionally, Weaver stated there would be no near-term upside from M&A, stating that Holley would "*pause on M&A activity in 2023 and focus M&A efforts on finalizing successful integrations and synergy capture*."

**ANSWER**: Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

216.    As the call continued, Gloeckler spoke regarding Holley's struggles with realizing synergies from its M&A activity, stating that with regard to "a lot" of the acquisitions "over the past several years[,]" the Company was "***still working through those to find and realize synergies***."

**ANSWER**: Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available, and in which Gloeckler is quoted as stating:

> You mentioned mergers and acquisitions, and yes, we have had a lot of them over the past several years. And we're still working through those to find and realize synergies. Most of them are on our ERP systems. Most of them are in our distribution centers, and most of them have centralized back-office things like payroll. But there are other unique things to each business that we are focused on listening to the folks that are running those brands and businesses and making sure that we're optimizing them, both from a marketing standpoint and a manufacturing.

Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

217.    Later in the call, an analyst questioned how Holley's DTC business was able to grow while demand normalized and the reseller channels contracted, asking: "Are we just supposed to or expected to read that the normalization demand is really around the reorder, the ordering patterns from distributors and retailers, because it seems as if the end consumer is still strong, still buying[?]" In response Weaver stated the Company was still "dig[ging] into and understand[ing] the situation, stating:

> But the harder thing for us to kind of dig into and understand is really how much of that is incremental versus really channel shifting from either an online reseller or just another channel that customers may have been getting their products from. What I can say is one of the things that's helped us, and I know that we spoke to this in our Q3 call, was just around channel destocking. So as you can imagine, when it comes to inventory availability, ***in a lot of cases as our resellers might have become a bit more bearish*** and recognizing all the trends that we saw when it came to consumer shift from goods to services in the back half of the year, we still had product available.
>
> And so as ***they allow their inventories to decline***, we – it's likely that we picked up some of that benefit as we had products available for them to purchase. So there is that sort of nuance there, and we firmly believe D2C, long term is a great additional

sort of channel for us. But the incrementality piece of it is really the portion that we're having to dig into.

**ANSWER**: Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in the first sentence and the block quotation in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

218. Discussing the Company's results in 2022, Executive Chairman Rubel stated there "was still a ton of [COVID] stimulus that was put into the first quarter of last year" and that as a result, the 1Q22 results were "distorted." Continuing, Rubel stated that demand "mitigated" and that it would not be until 2024 that Holley would "have anniversaried all the noise" to be "back in a normal state."

**ANSWER**: Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available, and in which Rubel is quoted as stating:

> I think one of the things that we have to go backward to go forward here is that there was still a ton of stimulus that was put into the first quarter of last year. And so the first quarter of last year, both for the industry and for us was distorted. And so I think that's one of the things, Jesse has done a good job, Jesse and Michelle have done a good job trying to contextualize here. And so you'll -- then you went through some channel adjustments of inventory and some other things that happened after that demand mitigated. And so I think an evening of the demand is what we are kind of trying to get back to on historical levels. So you should start to see, by the time you get to second half, some of that curve moving more to the norm, and then by the time you hit 2024, you should have anniversaried all the noise and be back in a normal state. That's our perspective.

Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

219. In fact, in a slide presentation accompanying the Company's 4Q22 earnings call, Holley included a slide quantifying the demand boost it received from the COVID-era stimulus, which showed the degree to which Holley's legacy business outpaced the historical industry growth rate of approximately 6.5%, as shown below:

133



**ANSWER**: Defendants admit that Holley held an earnings call on March 9, 2023 and provided investors with an accompanying slide deck, which is publicly available, and which contains the slide depicted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

220. On May 17, 2023, the Company filed with the SEC a Form 8-K announcing the appointment of Stevenson as the Company's new President and CEO commencing on June 6, 2023. Leaving no doubt as to the reasons for Stevenson's hiring, the Company referenced his "turnaround" experience multiple times while describing his background. Prior to joining Holley, Stevenson was President and CEO at Blue Bird Corporation, where, according to Holley, he "led a comprehensive operational and financial turnaround of an iconic, nearly 100-year-old American company." The

May 17, 2023 8-K also described Stevenson's "nearly 25 years of experience transforming organizations and leading growth and turnarounds of large industrial and consumer companies in both the private and public sectors." After joining Holley, Stevenson provided investors with context regarding Holley's pricing-related practices that resulted in the deterioration of reseller relationships.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley filed a Form 8-K on May 17, 2023, which disclosed that Holley had appointed Stevenson as President and Chief Executive Officer of the Company commencing on June 6, 2023. With regard to the second, third, and fourth sentences in this paragraph, Defendants admit that the May 17, 2023 Form 8-K contains the language quoted in these sentences. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

221.    On February 28, 2024, the Company hosted an earnings call to discuss its financial results for the fourth quarter 2023. During his prepared remarks, Stevenson elaborated on the turnaround, describing Holley's "new approach" with respect to resellers, specifically admitting that Holley had previously excluded resellers from certain promotional efforts, stating:

> In addition, we have made improvements to our sales promotion. ***Previously, our distribution partners were not included in our promotional efforts. This resulted in them not promoting our products as desired during these time periods and in some cases even promoting our competitors' products to preserve their margins.*** We have addressed this issue in our new approach.

**ANSWER**: Defendants admit that Holley held an earnings call on February 28, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Stevenson participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

222.    Analysts noted the importance of this development, with Telsey Advisory Group including this "Enhanced Promotional Strategy" among the "Key Earnings Call Highlights[,]" and

135

Canaccord Genuity ("Canaccord") including the "improvements to its sales promotion" within Holley's "keys to unlock growth[.]"

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations regarding what analysts believed to be important and deny the allegations on that basis. Defendants further aver that the analyst reports referenced and quoted in this paragraph are publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

223. On May 8, 2024, the Company hosted an earnings call to discuss its financial results for the first quarter 2024. During the question-and-answer portion of the call, Stevenson was asked about Holley's "promotional plans" and what the Company had "seen from the distributors." In response, Stevenson elaborated on the "real miss" of previously excluding distributors during the Class Period, stating:

> Yeah, regarding our promotional strategy, our goal is to lift all channels with the great products in our portfolio and then that those are introducing and our distribution partners are a key piece of that. And previously I think we covered on the last earnings call, ***when Holley ran a promotion***, ***we didn't include our distribution partners and we felt that was a real miss as an important part of our go-to-market strategy***. So now going forward, we support them and during this promotional time period and work together and we're continuing to optimize that as we work on future promotions and continue to get more with our partners.

**ANSWER**: Defendants admit that Holley held an earnings call on May 8, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Stevenson participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

224. Analysts again noted the importance of Holley's expansion of its promotions to resellers, with Telsey Advisory Group including this "Enhanced Promotional Strategy" among the "Key Earnings Call Highlights[,]" and William Blair describing Holley's management's beliefs that the

136

"efforts to improve retail partnerships" through "a joint promotional offering every quarter where increased volumes, particularly on elevated demand for higher-margin SKUs, should offset any gross margin compression."

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations regarding what analysts believed to be important and deny the allegations on that basis. Defendants further aver that the analyst reports referenced and quoted in this paragraph are publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

225. On August 7, 2024, the Company hosted an earnings call to discuss its financial results for the second quarter 2024. During the question-and-answer portion of the call, Stevenson was asked about Holley's efforts to "continue to repair and kind of nurture those [distributor] relationships[,]" to which Stevenson responded:

> The things we're implementing with our distribution partners in terms of promotional planning, launch planning and just closer collaboration *were things that never existed before*. So we're really optimistic about our ability to win share in our distributors by really professionalizing our approach and being better partners.

**ANSWER**: Defendants admit that Holley held an earnings call on August 7, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Stevenson participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

226. Analysts discussed the importance of Holley's efforts to improve relationships with distributors, with Canaccord identifying as a "bright spot[]" Holley's "professionalization initiatives such as building relationships with distribution partners to tackle promotional planning and launch planning [that] has 'never existed before[,]'" J.P Morgan noted among its "Key takeaways" Holley's "increased cooperation with distribution partners around seasonal promotions," and Telsey

137

included among its "Key Earnings Call Highlights" Holley's efforts to "work[] with partners to ensure promotions are consistent across the DTC and reseller channels."

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations regarding what analysts believed to be important and deny the allegations on that basis. Defendants further aver that the analyst reports referenced and quoted in this paragraph are publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

227. On November 8, 2024, the Company hosted an earnings call to discuss its financial results for 3Q24. During his prepared remarks, Stevenson made several statements that, when viewed in context, indicate that Defendants' Class Period statements regarding Holley's "strong pricing discipline" across its channels with "strict conformance" to MAP were false and misleading, and that Holley's lack of adherence to MAP weakened trust with its distribution partners. Specifically, Stevenson stated that as of the end of 3Q24, *i.e.*, as of September 30, 2024, Holley failed to enforce MAP on the vast majority of its overall SKUs. Specifically, Stevenson stated:

> Additionally, *MAP enforcement is now in place for over 20,000 SKUs*, *which is 12 times more than it was just a short time ago*. *This is key to earning trust with distributors* and keeping everyone on a level playing field.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants admit that Holley held an earnings call on November 8, 2024, the transcript of which is publicly available, and that Stevenson participated in the call. With regard to the fourth sentence in this paragraph, Defendants admit that the November 8, 2024 earnings call, the transcript of which is publicly available, contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

138

228.    During the question-and-answer portion of the November 8, 2024 earnings call, Stevenson was asked about the Company's "number of actions" to "refine and optimize pricing and put in place a MAP policy" or "expand[] the MAP policy" and what that all "equate[d] to[.]" In response, Stevenson indicated Holley spent the last year working to implement pricing discipline and that, previously, Holley failed to monitor and enforce MAP on the vast majority of its products, stating:

> *Pricing is a discipline we've been working on putting into this organization for over the last year. And one of the things relative to MAP policy alignment was the number of SKUs we were monitoring and enforcing was very low*, compared to what we're doing now. As I commented in my prepared remarks, *it's up 12x compared to what we were doing before*.

**ANSWER**: Defendants admit that Holley held an earnings call on November 8, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

229.    Stevenson also stated that one of the "great benefits" of Holley's year-long effort to implement pricing discipline and follow MAP was that it "builds confidence in your distribution partners to invest in your brands because they know you're going to hold everybody on a level playing field *and people won't be undercutting them in the market*."  When asked to quantify the financial impact of the "pricing benefit[,]" Stevenson did not respond with hard numbers, but instead stated that enforcing pricing discipline and MAP was "just more a thing of building trust and aligning the market."

**ANSWER**: Defendants admit that Holley held an earnings call on November 8, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

230.    Analysts responded positively, with Canaccord discussing Holley management's belief in its "efforts to *repair distribution partner relationships*" in order to "gain [market] share[,]" J.P.

Morgan noting efforts to "rebuild[] standing with distribution partners" by "now enforcing MAP pricing on 20K SKUs (up 12x)," and Telsey Advisory Group again including Holley's efforts to "ensure promotions are consistent across the DTC and reseller channels" within its "Key Earnings Call Highlights."

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations regarding how analysts responded and deny the allegations on that basis. Defendants further aver that the analyst reports referenced and quoted in this paragraph are publicly available. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

231. Stevenson's post-Class Period statements corroborate the accounts of FEs set forth herein, which described the deterioration of Holley's reseller and distributer relationships as a result of Holley failing to use pricing discipline or adhere to its MAP agreements. *See* §IV, above.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

232. Stevenson acknowledged that pricing discipline and SKU monitoring and enforcement had been almost non-existent. Indeed, Stevenson's acknowledgement that Holley had only just recently implemented MAP enforcement on over 20,000 SKUs, which was *12 times more* than a short time ago, means that, until this effort, Holley failed to enforce MAP on the vast majority of its total SKUs. This is made clear by simple math: 20,000 SKUs divided by 12 is approximately 1,666 SKUs. Even if Holley enforced MAP for 25,000 SKUs, that number divided by 12 is 2,083. And, Holley had 80,000 SKUs in June 2023 when Stevenson joined the Company[9] (down from 100,000 prior to the end

---

[9] At the June 5, 2024 William Blair Growth Stock Conference, Stevenson stated that when he "first came onboard" in June 2023, the Company "had 80,000 SKUs."

of 2022).[10]  This means that as of June 2023, Holley enforced MAP on approximately 2% of its total SKUs (1,666 divided by 80,000) on the low end and 2.6% (2,083 divided by 80,000) on the high end. Stated another way, Holley *lacked* MAP enforcement for between 97% and 98% of its SKUs as of June 2023.  Likewise, using this math, Holley enforced MAP on approximately 1.7% of its total SKUs (1,666 divided by 100,000) on the low end and 2% (2,083 divided by 100,000) on the high end at the end of 2022.

**ANSWER**: Defendants deny the allegations in this paragraph and footnotes, including Plaintiff's characterization of the events at issue and any legal conclusions.

233.    Thus, despite Defendants' Class Period statements regarding "strict conformance" to MAP, in reality and based on the context of Stevenson's statements and reasonable inferences drawn therefrom, Holley had little to no pricing discipline or MAP enforcement on the vast majority of its products during the Class Period.  As Stevenson said on November 8, 2024, "[p]ricing is a discipline we've been working on putting into this organization for over the last year" and "the number of SKUs we were monitoring and enforcing *was very low* compared to what we're doing now."

**ANSWER**: With regard to the second sentence in this paragraph, Defendants admit that Holley held an earnings call on November 8, 2024, the transcript of which is publicly available and contains the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

---

[10] During the 4Q22 earnings call, interim CEO Gloeckler stated that Holley had "rationalized" (*i.e.*, eliminated) "more than 20,000 SKUs" during 4Q22.  Taken together with Stevenson's "80,000 SKUs" statement, that means Holley conservatively had at least 100,000 SKUs prior to the end of 4Q22.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

234.   At all relevant times, the Individual Defendants acted with scienter in making materially false and misleading statements during the Class Period, as well as making material omissions of fact which made Defendants' statements misleading during the Class Period. Each of the Individual Defendants had knowledge that the statements made were false and misleading when made, or acted with reckless disregard for the truth or falsity of those statements when made, as demonstrated by the allegations above. The additional facts alleged below further support a strong inference of scienter.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

### A.   The Individual Defendants Controlled the Company's Messaging to the Investing Public

235.   During the Class Period, the Individual Defendants were the Company's high- ranking officers and directors.  Tomlinson served as President, CEO, and member of Holley's Board since it went public in July 2021, and previously served as President and CEO of Holley Intermediate since December 2009, and CFO since March 2003.  Moreover, the 2021 10-K identified Tomlinson as the "Company's chief operating decision maker."  Bardos served as the CFO since Holley went public in July 2021.  Nimmagadda also served as the Executive Vice President of Corporate Development & New Ventures since Holley went public in July 2021.  The three Individual Defendants were the only "named executive officers" listed in the Definitive Proxy Statement filed with the SEC on March 31, 2022 pursuant to Section 14(a) of the Exchange Act, which was signed by Tomlinson.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrase "the Company's high-ranking officers and directors" is vague and ambiguous and deny the allegations on that basis.  With regard to the second sentence in this paragraph, Defendants admit that Tomlinson served as CEO for Holley's then-operating company from December 2009 until July 2021, and that

142

he became Holley's President, CEO, and Board member in July 2021.  Defendants further admit that Tomlinson served as the operating company's CFO from March 2003 until December 2009.  With regard to the third sentence in this paragraph, Defendants admit that the Company filed a Form 10-K on March 15, 2022 for the year ended December 31, 2021, which is publicly available and contains the language quoted in this sentence.  With regard to the fourth sentence in this paragraph, Defendants admit that Bardos served as Holley's CFO from May 2021 until August 2022.  With regard to the fifth sentence in this paragraph, Defendants admit that Nimmagadda began serving as the Executive Vice President of Corporate Development & New Ventures in June 2021.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

236.    In their roles, the Individual Defendants were heavily involved with the Company's operations and finances, and had day-to-day responsibilities concerning critical matters affecting the Company.  As such, they were intimately aware of Holley's existing financial condition and outlook.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrases "heavily involved," "the Company's operations and finances," "day-to-day responsibilities," and "critical matters" are vague and ambiguous and deny the allegations on that basis.  With regard to the second sentence in this paragraph, Defendants aver that the phrases "intimately aware" and "Holley's existing financial condition and outlook" are vague and ambiguous and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

237.    Moreover, the Individual Defendants controlled and actively participated in Holley's messaging to the investing public concerning demand for the Company's products, Holley's relationships with resellers, pricing, DTC sales, and Holley's integration efforts.  This is supported by Defendants' repeated statements and emphasis on such matters in SEC filings and press releases, and

143

during Holley's earnings calls, where Tomlinson, Bardos, and Nimmagadda provided detailed opening statements and responses to specific questions from securities analysts. *See* §§IV-VI, above.  By choosing to speak about such matters, Defendants not only had a duty to speak truthfully and not mislead, but also to be adequately informed about the topics they discussed.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrases "controlled," "actively participated," and "Holley's messaging to the investing public" are vague and ambiguous and deny the allegations on that basis.  With regard to the second sentence in this paragraph, Defendants admit that the Individual Defendants provided statements during earnings calls.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

238.    Tomlinson and Bardos also undertook the affirmative obligation to obtain knowledge in order to ensure the Company's quarterly and annual SEC filings were truthful by executing SOX Certifications of the Company's SEC Forms 10-Q and Forms 10-K, as described above in ¶¶139, 157, 166, 183, and 194, which further supports their knowledge or conscious disregard of the materially false and misleading statements as well as material omissions which made Defendants' statements misleading contained therein.

**ANSWER**: Defendants admit that Tomlinson and Bardos signed SOX Certifications in the Company's quarterly and annual SEC filings.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

**B.    The Individual Defendants Closely Tracked Key Areas of the Company's Business**

239.    As Defendants admitted during the Class Period, accelerating growth through increased DTC sales and M&A activity were "key strategies" or at the "core" of Holley's growth strategy.  In

addition, because the Company generated at least 80% of its sales through distributors and resellers, and Holley's relationships with its resellers were critical to its operations and outlook, the facts alleged and statements made by Defendants support a strong inference that Defendants had scienter regarding these core portions of Holley's business.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that this paragraph purports to summarize statements made by Defendants without specifying who made the alleged statements or when and how they were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

240. Throughout the Class Period, Holley reiterated in its SEC filings that above "strategies" were either at the "core" of or the "key" to Holley's growth and operations, specifically telling investors:

- Proxy Statement/Prospectus: ***Over the past three years***, ***our direct-to- consumer*** (***"DTC"***) ***and digital capabilities have been core drivers of our positive sales growt***h. For the year ended December 31, 2020, we generated approximately $84 million in sales through our DTC channel, which continues to be our fastest growing sales channel.

- July 2021 Prospectus: ***Over the past three years***, ***our DTC and digital capabilities have been core drivers of our positive sales growth***. For the year ended December 31, 2020, we generated through our DTC channel approximately $84 million in gross sales on a pro forma basis after giving effect to our acquisitions of Simpson, Drake and Detroit Speed as if each had occurred on January 1, 2020, which continues to be our fastest growing sales channel.

- October 18, 2021 Lender Presentation: ***DTC strategy is core to what we do***.

- February 2022 Prospectus: ***Over the past three years***, ***our DTC and digital capabilities have been core drivers of our positive sales growth***. For the year ended December 31, 2020, we generated through our DTC channel approximately $84 million in gross sales on a pro forma basis after giving effect to our acquisitions of Simpson, Drake and Detroit Speed as if each had occurred on January 1, 2020, which continues to be our fastest growing sales channel.

145

**ANSWER**: With regard to the first sentence and bullet in this paragraph, Defendants admit that Empower Ltd. filed a Form S-4 Registration Statement on April 8, 2021, which is publicly available and contains the language quoted in this paragraph.  With regard to the second bullet in this paragraph, Defendants admit that the Company filed a Form S-1 Registration Statement on July 21, 2021, which is publicly available and contains the language quoted in this paragraph.  With regard to the third bullet in this paragraph, Defendants admit that the Company filed with the SEC a lender presentation on October 18, 2021, which is publicly available and contains the language quoted in this paragraph.  With regard to the fourth bullet in this paragraph, Defendants admit that the Company filed a prospectus on February 23, 2022, which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

241.    Defendants also reiterated the Company's key strategies on earnings calls with the investing public during the Class Period.  For example:

- Nimmagadda, 1Q 2022 Earnings Call, May 12, 2022: *As we have discussed on previous calls*, *M&A remains a pivotal piece of our growth strategy*.

- Nimmagadda, 2Q 2022 Earnings Call, August 11, 2022: *As Tom* [*Tomlinson*] *mentioned in prior calls*, *we believe acquisitions are a key strategic pillar to drive growth at Holley*.

- Tomlinson, 3Q 2022 Earnings Call, November 14, 2022: *Our DTC strategy is core to what we do*, *and the growth in our DTC channel continues to be driven by innovation*, *strong performance marketing*, *content and social media engagement*, *event expansions and new brand integrations*. Growing DTC sales remains a priority for our team.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrase "key strategies" is vague and ambiguous and deny the allegations on that basis.  With regard to the first bullet in this paragraph, Defendants admit that the Company held an earnings call on May 12, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph, and

146

that Nimmagadda participated in the call.  With regard to the second bullet in this paragraph, Defendants admit that the Company held an earnings call on August 11, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Nimmagadda participated in the call.  With regard to the third bullet in this paragraph, Defendants admit that the Company held an earnings call on November 14, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph, and Tomlinson participated in the call.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

242.    Likewise, on earnings calls, the Individual Defendants spoke knowledgably about integration of recent acquisitions and the Company's strong relationships with resellers:

- Tomlinson, 2Q 2021 Earnings Call, August 11, 2021 (in response to a question about recent "acquisitions" including "AEM"): *We are working diligently to integrate those businesses*.

- Tomlinson, 3Q 2021 Earnings Call, November 10, 2021 (in response to a question about whether the "cybersecurity incident" had "any effects in terms of your relationships with your resellers"): *No*, *not at all*.  *I was just going to say no effects with resellers*.  *They're very supportive*.  *Our brands are must-carry brands*.  *And they were – for the period of time we were down*, *again*, *they were very supportive and very anxious to get us back up and shipping to them*.

- Tomlinson, 4Q 2021 Earnings Call, March 3, 2022 (in response to a question about "new acquisitions"): "When you – in the context of integration, *we made progress during the second half of the year*, still a lot of work to do there.  *You mentioned AEM*.  *We are excited to be working more closely with that group*.  *We've got those teams on the innovation side folded in together*... *So*, *very excited to be making progress with that*.

- Nimmagadda, 1Q 2022 Earnings Call, May 12, 2022: *As it relates to recent acquisitions*, *we are well on track to integrate these businesses*, *realize cost savings synergies and drive growth*.  *We are also actively exploring opportunities to further accelerate the execution of our integration efforts in order to maximize value creation in the year*.

- Tomlinson, 1Q 2022 Earnings Call, May 12, 2022 (in response to a question about integration, including for AEM): *We have made progressive moves at*

147

*AEM… We should – we would also expect to have AEM finished in the third quarter.*

- Tomlinson, 1Q 2022 Earnings Call, May 12, 2022 (in response to a question about if the Defendants had "seen any changes between your DTC channels [upgrading] or pullback from your retail partners"): *I mean, I will say that direct-to-consumer has continued to be very strong, and we do have the ability for some of our resellers also to look at their out-the-door sales. And so through – for the quarter, which is the visibility we have, direct- to-consumer remains strong.* And one of the things that we have seen historically is that our resellers, particularly the ones that carry inventory, do have the ability to pull back and reduce their inventory when they become concerned about the economy. *And so we did see a little bit of that in the quarter.*

- Tomlinson, 2Q 2022 Earnings Call, August 11, 2022: Shifting gears to distribution. *It is very clear that there was meaningful reseller destock – destocking in the quarter. Our top resellers reduced their purchases well below their out-the-door sales of our products.* Given our policies and supply chain constraints that have existed over the last few years, *we believe reseller inventory levels are currently low, and their ability to continue to reduce their inventory is limited.*

- Tomlinson, 2Q 2022 Earnings Call, August 11, 2022 (in response to a question about DTC growth and reseller destocking): *And we only have visibility to destocking in our top resellers. Now that does represent more than – including our DTC, that represents more than half of our overall sales. So it is a pretty meaningful look at destocking.*

  - Tomlinson, 3Q 2022 Earnings Call, November 14, 2022 (responding to a question about reseller destocking): When you – so we don't have perfect visibility to channel inventories, *but we're able to track the increases and decreases in channel inventories with our largest resellers.*

**ANSWER**: With regard to the first bullet in this paragraph, Defendants admit that the Company held an earnings call on August 11, 2021, the transcript of which is publicly available, and in which Tomlinson is quoted as stating:

We are working diligently to integrate those businesses. Obviously we haven't completed those efforts at this time. There is a lot that goes into it. But I would expect early in 22 to begin to see the effects of really pushing forward with the direct to consumer strategy at those acquired businesses.

With regard to the second bullet in this paragraph, Defendants admit that the Company held an earnings call on November 10, 2021, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Tomlinson participated in the call. With regard to the third bullet in this paragraph, Defendants admit that the Company held an earnings call on March 3, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Tomlinson participated in the call. With regard to the fourth bullet in this paragraph, Defendants admit that the Company held an earnings call on May 12, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Nimmagadda participated in the call. With regard to the fifth bullet in this paragraph, Defendants admit that on the May 12, 2022 earnings call, the transcript of which is publicly available, Tomlinson is quoted as stating:

> We have made progressive moves at AEM. Our primary focus right now is wrapping up the Simpson integration, which is the largest acquisition that we've done relatively recently, although it's worth saying that we didn't start integrating that for a year -- until a year after the acquisition date because of an earnout. I think that's -- I think we pretty thoroughly discussed that. And so that actually is the priority. We plan to have that done in the second quarter. We should -- we would also expect to have AEM finished in the third quarter.

With regard to the sixth bullet in this paragraph, Defendants admit that the May 12, 2022 earnings call, the transcript of which is publicly available, contains the language quoted in this paragraph. With regard to the seventh and eighth bullets in this paragraph, Defendants admit that the Company held an earnings call on August 11, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Tomlinson participated in the call. With regard to the ninth bullet in this paragraph, Defendants admit that the Company held an earnings call on November 14, 2022, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Tomlinson participated in the call. Except as expressly admitted,

149

Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

243. The accounts of several former Holley employees confirm that the Individual Defendants were hands-on executives who actively monitored, had full access to, and were made aware of the Company's performance throughout the Class Period, which further supports that the Individual Defendants knew or were reckless in not knowing the true, negative state of the Company, even while painting a flowery view for the investing public.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "several former Holley employees" and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

244. Holley used a companywide software program called Sightline which was vital to the Company's central, day-to-day operational matters. Sightline was Holley's main software which kept track of sales, returns, purchases, shipments, inventories, customer feedback, and other day-to-day activities. All of the Individual Defendants had access to this data contained within Sightline. According to FE2, Tomlinson's subordinates personally provided him with Sightline reports on a monthly basis. According to FE5, expedite and de-expedite reports were generated on daily and weekly bases, and allowed anyone looking at them to see sale activities, as well as whether orders were processed, cancelled, or shipped.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrase "vital to the Company's central, day-to-day operational matters" is vague and ambiguous and deny the allegations on that basis. With regard to the second sentence in this paragraph, Defendants aver that the phrase "main software" is vague and ambiguous and deny the allegations on that basis. With regard to the third sentence in this paragraph, Defendants aver that the phrases "access" and "this

150

data" are vague and ambiguous and deny the allegations on that basis. With regard to the fourth sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "FE2" and deny the allegations in this paragraph on that basis. With regard to the fifth sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "FE5" and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

245. Nimmagadda was also particularly dug in on the Company's M&A and integration efforts. According to FE4, Nimmagadda would interact with FE4 in order to discuss process improvements on the factory floor and how to make day-to-day processes more efficient and effective, including for resources – such as manufacturing equipment – acquired through acquisitions. Further, according to FE3 and as discussed above, there was a meeting held at AEM's California facilities with AEM's employees a few days after the March 3, 2022 earnings call during which Nimmagadda discussed "recent M&A activity" and Tomlinson spoke about the AEM acquisition, telling investors that "[w]e've got those teams on the innovation side folded in together" and that the Defendants were "very excited to be making progress with that." According to FE3, the meeting's purpose was to announce a mass layoff of AEM employees, and in attendance were Nimmagadda and a member of Holley's human resources.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that the phrases "particularly dug in" and "Company's M&A and integration efforts" are vague and ambiguous and deny the allegations on that basis. With regard to the second sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "FE4" and deny the allegations in this paragraph on that basis. With

regard to the third and fourth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "FE3" and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

246. Further, according to FE2, Tomlinson "micromanaged" much of Holley's operations. To this end, according to FE2, Tomlinson had to approve every single new project from the Company's engineers. According to FE2, as a result of the micromanaging and because of the aforementioned layoffs, instead of developing its own products, Holley would just acquire other companies and product lines.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "FE2" and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## C.    Belated Disclosures Support a Strong Inference of Defendants' Scienter

247. After the Class Period ended, Tomlinson's and Bardos' replacements admitted that Holley was struggling with M&A integrations throughout the Class Period. On March 9, 2023, the Company hosted an earnings call to discuss its 4Q22 and FY22 results. Gloeckler, in her role as Interim CEO, Interim President, and Director, admitted in her opening remarks that "sector demand" was "experiencing a normalization to pre-COVID levels" and that long-term organic growth would be around 6% to 7%. Therefore, Holley's rapid growth experienced during 2020 and 2021 was attributable to temporary COVID-stimulus related relief, rather than sustainable business practices. In her opening remarks, Gloeckler added that "*2022 was a challenging year for Holley*[,]" that the

Company did not meet its targets in 2022, and that the prior year "***surfaced many areas of improvement*** for our broader organization."

**ANSWER**: With regard to the second, third, and fifth sentences in this paragraph, Defendants admit that the Company held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in these sentences, and that Gloeckler participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

248. In his opening remarks, CFO Weaver similarly singled out "weaker customer orders" in the face of a "normalization of demand trends back to pre-COVID growth rates" as the reason for why 4Q22 sales were down, clarifying that "[t]o the extent [Holley's] comparable sales growth rate exceeded" roughly 6% to 7% "between 2020 and 2022, demand was likely positively impacted by consumer spending habits from stimulus related to COVID shutdowns." Weaver disclosed Holley's expectation that "demand normalization" would be a "headwind in the near term" and that "in the medium to long term" Holley would "organically... perform in line with the market" at the 6% to 7% rate, "with upside potential from innovation and mergers and acquisitions."

**ANSWER**: Defendants admit that the Company held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Weaver participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

249. Discussing the Company's results in 2022, Executive Chairman Rubel revealed that 1Q22 results were "distorted" as the result of "a ton of [COVID] stimulus that was put into the first quarter of last year," and that it would not be until 2024 that Holley would "have anniversaried all the noise" to be "back in a normal state."

153

**ANSWER**: Defendants admit that Holley held an earnings call on March 9, 2023, the transcript of which is publicly available, and in which Rubel is quoted as stating:

> I think one of the things that we have to go backward to go forward here is that there was still a ton of stimulus that was put into the first quarter of last year.  And so the first quarter of last year, both for the industry and for us was distorted. And so I think that's one of the thing Jesse has done a good job, Jesse and Michelle have done a good job trying to contextualize here. And so you'll -- then you went through some channel adjustments of inventory and some other things that happened, after that demand mitigated. And so I think an evening of the demand is what we are kind of trying to get back to on historical levels. So you should start to see, by the time you get to second half, some of that curve moving more to the norm. And then by the time you hit 2024, you should have anniversaried all the noise and be back in a normal state. That's our perspective.

Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

250.    For 2023, however, Weaver stated the Company projected a sales ***decline*** from 2022 sales of $687 million to $689 million to a 2023 range of $625 million to $675 million, with approximately half of the decline attributable to demand reverting to pre-COVID levels.  Weaver also elaborated on the M&A integration and synergy capture issues disclosed on February 6, 2023, further explaining that Holley would "***pause on M&A activity in 2023 and focus M&A efforts on finalizing successful integrations and synergy capture***."  Leaving no doubt that the integration struggles had been significantly impacting the Company's financials, Weaver stated that the "pause" was implemented in order "***to restore Holley's profitability***, ***improve***[] ***free cash flow***, ***optimize working capital and de***[-]***lever the balance sheet***."

**ANSWER**: With regard to the first sentence in this paragraph, Defendants aver that this sentence purports to summarize statements made during an earnings call without specifying how the statement was made.  Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the second sentence in this paragraph, Defendants admit that the Company held an earnings call on March 9, 2023, the transcript

of which is publicly available and contains the language quoted in this sentence, and that Weaver

participated in the call.  With regard to the third sentence in this paragraph, Defendants admit that on

the March 9, 2023 earnings call, the transcript of which is publicly available, Weaver is quoted as

stating:

> Since I joined Holley late last year, the key objectives for our team have been to restore
> Holley's profitability, improved free cash flow, optimize working capital and de[-]lever the
> balance sheet. These will continue to be the main objectives for our team this year while we
> pause on M&A activity in 2023 and focus M&A efforts on finalizing successful integrations
> and synergy capture.

Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including

Plaintiff's characterization of the events at issue and any legal conclusions.

251.    Gloeckler further confirmed Holley's struggles with realizing synergies from its M&A

activity, stating that with regard to "a lot" of the acquisitions "over the past several years[,]" the

Company was "***still working through those to find and realize synergies***."

**ANSWER**: Defendants admit that the Company held an earnings call on March 9, 2023, the

transcript of which is publicly available, and in which Gloeckler is quoted as stating:

> You mentioned mergers and acquisitions, and yes, we have had a lot of them over the past
> several years. And we're still working through those to find and realize synergies. Most of
> them are on our ERP systems. Most of them are in our distribution centers, and most of them
> have centralized back-office things like payroll. But there are other unique things to each
> business that we are focused on listening to the folks that are running those brands and
> businesses and making sure that we're optimizing them, both from a marketing standpoint
> and a manufacturing.

Except as expressly admitted, Defendants deny the allegations in this paragraph, including Plaintiff's

characterization of the events at issue and any legal conclusions.

252.    Weaver also reflected on "***bearish***" attitudes of the company's resellers in response to a

question about normalization of demand and the ordering patterns from distributors and retailers:

> What I can say is one of the things that's helped us, and I know that we spoke to
> this in our Q3 call, was just around channel destocking.  So as you can imagine,
> when it comes to inventory availability, ***in a lot of cases as our resellers might***
> ***have become a bit more bearish*** and recognizing all the trends that we saw when it

came to consumer shift from goods to services in the back half of the year, we still had product available.

And so as *they allow their inventories to decline*, we – it's likely that we picked up some of that benefit as we had products available for them to purchase....

**ANSWER**: Defendants admit that the Company held an earnings call on March 9, 2023, the transcript of which is publicly available and contains the language quoted in this paragraph, and that Weaver participated in the call. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

253. The allegations set forth in ¶¶221, 223, 225, 227-229, and 232-233, *supra*, further support a strong inference of scienter. Viewed collectively and in context, these belated disclosures by Holley's current CEO Stevenson make clear that Holley had little to no pricing discipline or MAP enforcement on the vast majority of its products during the Class Period, and that Holley excluded its distribution partners from promotions, which harmed Holley's business, further establishing Defendants' scienter.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## IX.    LOSS CAUSATION

254. As detailed herein, during the Class Period, Defendants issued a series of false and misleading statements and omitted material information which made Defendants' statements misleading. Among other things, Defendants misrepresented and concealed the truth about the deterioration of Holley's relationships with critical resellers and distributors, Holley's purported pricing discipline, the negative impact caused by Holley's increased DTC focus, the temporary, unsustainable boost in demand Holley was riding due to COVID-related stimulus, and Holley's failure to integrate the glut of companies it recently acquired. As a result of Defendants' material

156

misrepresentations, as well as material omissions which made Defendants' statements false and misleading, the price of Holley securities was artificially inflated throughout the Class Period until the truth was revealed through partial disclosures on July 28, 2022, November 14, 2022, and February 6, 2023.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

255.    The alleged false and misleading statements, as well as material omissions which made Defendants' statements misleading, individually and collectively had the intended effect of preventing the market from learning the truth and keeping the price of Holley's stock artificially inflated. To that end, Holley stock traded at artificially inflated prices, resulting in a Class Period high of $12.67 on July 28, 2022. As the truth began to leak out through three partial disclosures, the price of Holley stock declined dramatically, inflicting significant losses on Lead Plaintiff and the Class. But for Defendants' materially false and misleading statements, as well as material omissions which made Defendants' statements misleading, Lead Plaintiff and members of the Class would not have purchased Holley securities at artificially inflated prices, or at all.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

256.    The truth began to emerge after the market closed on July 28, 2022, when the Company announced its 2Q22 preliminary results, shocking investors by revealing disappointing financial results for 2Q22 and forecasting earnings that missed analysts' estimates. Among other things, Defendants attributed the negative financial results and outlook to "resellers that reduced their purchases below their out-the-door sales levels, indicating that some sell-down of reseller inventory also occurred in the quarter." In response, the price of Holley stock dropped 37%, or $4.68 per share, from a close of $12.67 per share on July 28, 2022, to a close of $7.99 per share on July 29, 2022, on unusually high

trading volume. On the next trading day, August 1, 2022, the price of Holley stock fell an additional 16.5%, or $1.32 per share, to close at $6.67 per share. The total stock price decline over this two-day period was more than 47%.

**ANSWER**: With regard to the second sentence in this paragraph, Defendants admit that the Defendants announced preliminary 2Q22 financial results in a Form 8-K on July 28, 2022, which is publicly available and contains the language quoted in this sentence. With regard to the third and fourth sentences in this paragraph, Defendants aver that the price and trading volume of Holley stock is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

257.    The truth continued to leak out after the market closed on November 14, 2022, when the Company announced disappointing financial results for 3Q22 and once again cut its forecast for FY22. This time, Defendants revealed that resellers returned a shockingly high amount of products, which Defendants attributed to "resellers [catching] up on a backlog of warranty returns [.]" Over the next two days as the market digested the disclosure and weighed the slight beat on sales, purportedly steady and strong customer demand, and the expected improvements to the supply chain environment, the stock ultimately fell *20%*, dropping by $0.59 per share from its November 14, 2022 closing price of $2.99 per share to its November 16, 2022 closing price of $2.40 per share, a record low for the Company.

**ANSWER**: With regard to the second sentence in this paragraph, Defendants admit that Holley announced preliminary 3Q22 financial results in a Form 8-K on November 14, 2022, which is publicly available and contains the language quoted in this sentence. With regard to the third sentence in this paragraph, Defendants aver that the price of Holley stock is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

258. The full truth was revealed after the market closed on February 6, 2023, when Holley announced Tomlinson's abrupt retirement as CEO and President, and his resignation from the Board. Holley also disclosed preliminary 4Q22 and FY22 financial results, revealing 4Q22 sales that fell short of market estimates as well as adjusted EBITDA that new Holley CFO Weaver called "'disappointing.'" Holley attributed reductions in sales in the second half of 2022 to reduced consumer demand, as well as to Holley's struggles with integrating acquired companies and realizing "deal synergy capture." On this news, the price of Holley stock, which had closed at $3.42 on February 6, 2023, fell 31%, or $1.06 per share, to close at $2.36 per share on February 7, 2023, on unusually high trading volume. The following day, February 8, 2023, the price of Holley stock fell an additional 9.75%, or $0.23 per share, to close at $2.13 per share, down approximately 85% from the Class Period peak of $14.52 per share on March 16, 2022. The total stock price decline over this two-day period was nearly 38%.

**ANSWER**: With regard to the second sentence in this paragraph, Defendants admit that Holley announced preliminary 4Q22 and FY22 financial results in a Form 8-K on February 6, 2023, which is publicly available, and contains the language quoted in this sentence. With regard to the third sentence in this paragraph, Defendants admit that the Company issued a press release on February 6, 2023, which is publicly available, and in which Weaver is quoted as stating:

> To fully maximize the value of these transactions and position the Company for the next wave of growth, our focus in 2023 will be accelerating deal synergy capture and improving free cash flow across the Company through a combination of realigning teams to key strategic focus areas, streamlining operations, and working with vendors to bring cost back in line.

With regard to the fourth, fifth, and sixth sentences in this paragraph, Defendants aver that the price and trading volume of Holley stock is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

259.    The declines in the prices of Holley securities alleged herein were the direct result of the nature and extent of Defendants' fraudulent material misrepresentations as well as material



omissions (which made Defendants' statements misleading) being revealed to the investors and the market. The timing and magnitude of the price declines in Holley securities negate any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is supported by the following performance graph, which demonstrates a clear divergence in the price of Holley securities from the US small-cap Russell 2000 ("RTY") and the S&P 500 ("SPX") – Holley was added to the former on June 27, 2022, and analysts used both indexes as comparison points for Holley – as the truth began to emerge on July 28, 2022:

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

260.    Notably, Holley stock fell 37% between July 28, 2022 and July 29, 2022, while RTY increased by nearly 1% and SPX increased by nearly 1.5%.  When Holley stock fell an additional 16.5% on August 1, 2022, RTY fell by less than.02%, while SPX fell by about.03%.

**ANSWER**: Defendants aver that the price of Holley stock is publicly available.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

261.    When Holley stock fell by 20% between November 14, 2022 and November 16, 2022, RTY decreased by.05% and SPX increased by.001% during the same period.

**ANSWER**: Defendants aver that the price of Holley stock is publicly available.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

262.    When Holley stock fell by 31% between February 6, 2023 and February 7, 2023, RTY increased by nearly 1%, while SPX increased by 1.3%.  When Holley fell an additional 9.75% on February 8, 2023, RTY fell by 1.5%, while SPX fell by 1.1%.

**ANSWER**: Defendants aver that the price of Holley stock is publicly available.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

263.    Accordingly, the economic losses, *i.e.*, damages, suffered by Lead Plaintiff on the above dates were the direct and proximate result of Defendants' material misrepresentations, as well as material omissions which made Defendants' statements misleading, that artificially inflated Holley's stock price and the subsequent significant decline in the value of Holley's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

161

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions

264.    As a result of their purchases of Holley securities at artificially inflated prices during the Class Period and the subsequent declines in the value of those shares when the truth was revealed to the market through the disclosure events described above and the artificial inflation was removed, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

265.    At all relevant times, the market for Holley securities was an efficient market for the following reasons, among others:

(a)    Holley securities met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Holley filed periodic public reports with the SEC;

(c)    Holley regularly communicated with public investors via established market communication mechanisms, including the regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Holley was followed by several securities analysts employed by major brokerage firms, including JP Morgan, Jefferies, and BofA Securities, Inc. (f/k/a  Bank of America Merrill Lynch), who wrote reports that were distributed to the sales force and certain customers of

162

their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

**ANSWER**: Defendants aver that the phrases "efficient market," "met the requirements for listing," "highly efficient and automated market," "established market communication mechanisms," "major brokerage firms," and "sales force and certain customers" are vague and ambiguous and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

266.    As a result of the foregoing, the market for Holley securities promptly digested current information regarding Holley from all publicly available sources and reflected such information in the price of the securities.  Under these circumstances, all purchasers of Holley securities during the Class Period suffered similar injury through their purchase of Holley securities at artificially inflated prices and a presumption of reliance applies.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

267.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or material omissions which made Defendants' statements misleading.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

163

Given the importance of the Class Period material misstatements and material omissions which made Defendants' statements misleading set forth above, that requirement is satisfied here.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## XI.    NO SAFE HARBOR

268.    The "Safe Harbor" warnings accompanying Holley's reportedly forward-looking statements issued during the Class Period were ineffective to shield any of the false or misleading statements alleged herein.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with generally accepted accounting principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

269.    Many of the statements alleged were not "forward-looking" when made, or omitted material information which made Defendants' statements misleading, and, therefore, are not protected by the safe harbor.  Alternatively, to the extent any statements were forward-looking, the safe harbor still does not apply because they were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

270.    Defendants are also liable for any false and misleading forward-looking statement pleaded because, at the time each statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Holley who

164

knew that the statement was false.  In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the statements would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

271.    To the extent Defendants provided risk warnings in their Class Period statements, they were mere boilerplate warnings.  As a result, the generic warnings were not narrowly tailored to the actual risks associated with investing in Holley stock and did not fairly and adequately warn actual and potential investors of the appropriate risks.  Indeed, the risk warnings provided by Defendants in their Class Period statements included boilerplate statements,[11] such as:

- Failure to compete effectively or to develop and market new products and a reduction in demand for the Company's products *could* reduce the Company's business, financial condition and results of operation;

- The Company may acquire or invest in other companies, which it *may* not be able to integrate successfully, and which *could* divert the Company management's attention, result in dilution to the Company's stockholders, and otherwise disrupt the Company's operations and harm the Company's business, sales, financial condition and results of operations;

- The Company's failure to maintain relationships with retail partners or increase sales through its DTC channel *could* harm its business; and

- The Company depends on retail partners to display and present its products to customers, and the Company's failure to maintain and further develop the Company's relationships with retail partners *could* harm the Company's business.

---

[11] *See* July 21, 2021 Form 8-K (incorporating Proxy Statement/Prospectus); July 2021 Prospectus; 2Q21 10-Q; 3Q21 10-Q; 2021 10-K; 1Q22 10-Q; 2Q22 10-Q; 3Q22 10-Q.

**ANSWER**: With regard to the third sentence in this paragraph, Defendants admit that they provided the quoted risk warnings and deny that the warnings were "boilerplate."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph and footnote, including Plaintiff's characterization of the events at issue and any legal conclusions.

272.    These or other materially similar risk disclosures disseminated throughout the Class Period did not serve to adequately inform the market of the true risks and actual operational experience of the Company.  Indeed, that these stated warnings were inadequate and provided no new, meaningful information is evident from Defendants' failure to meaningfully modify the Company's risk factor language as well as the market's reaction to the revelation of Defendants' untrue and/or misleading statements.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## XII.    CLASS ACTION ALLEGATIONS

273.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Holley securities during the Class Period and were damaged thereby as alleged herein (the "Class").  Excluded from the Class are Defendants and their immediate families, the officers, directors, and affiliates of Defendants, at all relevant times, and their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

**ANSWER**: Defendants admit that Plaintiff purports to bring a class action pursuant to Federal Rules of Civil procedure 23(a) and 23(b)(3) on behalf of all persons or entities who purchased or otherwise acquired publicly traded Holley securities between July 21, 2021 and February 6, 2023.  Defendants further admit that the proposed class excludes Defendants, members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust,

corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

274.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Holley securities trade on the NYSE and according to the Company's 3Q22 10-Q, Holley had more than 118 million shares of common stock outstanding as of November 10, 2022.  These shares were owned by hundreds, if not thousands, of persons.

**ANSWER**: Defendants lack information sufficient to form a belief as to the truth of the allegations in this paragraph and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

275.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether Defendants violated the Exchange Act;

(b)    whether statements made by Defendants to    the    investing    public misrepresented material facts about Holley;

(c)    whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

167

(e)     whether the prices of Holley securities were artificially inflated; and

(f)     the extent of damages sustained by Class members and the appropriate measure of damages.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

276.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

277.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

**ANSWER**: Defendants lack information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's ability to fairly and adequately protect the interests of the class, Plaintiff's retention of counsel, and Plaintiff's lack of a conflict of interest with the class and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

278.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

**COUNT I**
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

168

279.    Plaintiff incorporates ¶¶1-278 by reference.

**ANSWER**: Defendants incorporate their answers to Paragraphs 1-278.

280.    During the Class Period, Holley and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

281.    Holley and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Holley securities during the Class Period.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

282.    In addition to the duties of full disclosure imposed on Holley and the Individual Defendants as a result of their affirmative false and misleading statements to the public, they had a duty to promptly disseminate truthful information with respect to Holley's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, so

169

that the market price of the Company's securities would be based on truthful, complete, and accurate information.  SEC Regulations S-X, 17 C.F.R. §210.1-01, *et seq*., and S-K, 17 C.F.R. §229.10, *et seq*.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

283.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Holley securities during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Holley securities and experienced losses when the artificial inflation was released from Holley securities as a result of the partial revelations and price declines detailed herein.  Plaintiff and the Class would not have purchased Holley securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

284.     By virtue of the foregoing, Holley and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

**COUNT II**
**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

285.     Plaintiff incorporates ¶¶1-278 by reference.

**ANSWER**: Defendants incorporate their answers to Paragraphs 1-278.

170

286.    The Individual Defendants acted as controlling persons of Holley within the meaning of Section 20(a) of the Exchange Act.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

287.    By virtue of their high-level positions, participation in and/or awareness of Holley's operations, and/or intimate knowledge of Holley's disclosures, policies, and financial performance, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Holley, including the content and dissemination of the various statements that Plaintiff contends is false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

288.    As set forth above, Holley violated Section 10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions which made Defendants' statements materially misleading as alleged in this complaint.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for Holley's Section 10(b) violations.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was released from the Company's common stock.

171

**ANSWER**: Defendants deny the allegations in this paragraph, including Plaintiff's characterization of the events at issue and any legal conclusions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees, expert fees, and other costs and disbursements; and

D.      Awarding such equitable, injunctive, or other relief as deemed appropriate by the Court.

**ANSWER**: To the extent any response is required to Plaintiff's prayer for relief, Defendants deny each and every allegation contained herein.

## JURY DEMAND

Plaintiff demands a trial by jury.

**ANSWER**: Defendants demand a trial by jury on all triable issues.  Defendants reserve the right to amend their Answer as necessary once the precise nature of the relevant circumstances or events is determined through discovery.

## AFFIRMATIVE DEFENSES

Without admitting or acknowledging that Defendants bear any burden of proof as to any of them, Defendants assert the following affirmative defenses:

172

## First Affirmative Defense

Plaintiff and members of the putative class would have acquired Holley stock even if, when acquired, they had known of the allegedly untrue statements of material fact, omissions of material fact, or misleading statements or other wrongful conduct upon which Defendants' purported liability rests.

## Second Affirmative Defense

Certain matters alleged to be the subject of misrepresentations and omissions were publicly disclosed or were in the public domain, and as such were available to Plaintiff, members of the putative class, and/or the securities markets.

## Third Affirmative Defense

Plaintiff's claims are not actionable to the extent that the alleged untrue statements of material fact, omissions of material fact, misleading statements, and/or other challenged statements made by Defendants fall within the Safe Harbor provisions of the Reform Act, as codified at 15 U.S.C. § 77z-2(c).

## Fourth Affirmative Defense

Under principles of contribution and indemnity, persons or entities other than Defendants are wholly or partially responsible for the purported damages, if any, Plaintiff and putative class members have sustained.

## Fifth Affirmative Defense

Any damages sustained by Plaintiff or any member of the putative class must be rendered and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than Defendants under the principles of equitable allocation, recoupment, set-off, and comparative fault.

173

## Sixth Affirmative Defense

Plaintiff and members of the putative class have failed to mitigate any damages they may have suffered.

## Seventh Affirmative Defense

Any recovery for damages allegedly incurred by Plaintiff and members of the putative class, if any, is limited to the percentage of responsibility of Defendants in proportion to the total fault of all persons, whether or not named as parties to this action, who caused or contributed to Plaintiff's alleged damages, if any, pursuant to the proportionate liability provisions of the Private Securities Litigation Reform Act of 1995, as codified at 15 U.S.C. § 78u-4(f)(3)(A). The acts and practices of persons or entities not associated with Defendants and ongoing economic events constitute independent intervening and superseding causes of the alleged harm, if any, suffered by Plaintiff or members of the putative class, relieving Defendants of any liability.

## Eighth Affirmative Defense

Any damages attributed to a purported loss in value of Holley securities is a result of Plaintiff's failure to take reasonable steps to reduce their damages when they first learned or should have learned of any alleged misstatement or omission.

## Ninth Affirmative Defense

Defendants exercised reasonable care and acted in good faith, including good faith conformity with applicable Securities and Exchange Commission rules, regulations, and orders, and also did not directly or indirectly induce the act or acts constituting the alleged violations or causes of action. Defendants are therefore not subject to liability under the federal securities laws.

## Tenth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff and/or other members of the putative class had actual or constructive knowledge of the risks involved and thus assumed the risk that the value of Holley stock would decline if such risks materialized.

## Eleventh Affirmative Defense

Each and every one of Defendants alleged to be a control person under Section 20(a) of the Securities Exchange Act of 1934 acted in good faith and did not directly or indirectly induce any acts constituting the alleged violations and causes of action.

## Twelfth Affirmative Defense

Plaintiff's claims against Defendants are barred, in whole or in part, because the purported misstatements or omission alleged in the Complaint did not affect the market price of Holley securities owned by Plaintiff or other members of the putative class.

\*    \*    \*

Defendants have insufficient knowledge or information upon which to form a belief as to whether there may be additional affirmative defenses available to them. Defendants expressly reserve the right to plead additional affirmative and other defenses that may become available or apparent during this litigation and/or required by any amendments to the Supplemented Amended Complaint.

WHEREFORE, Defendants pray that this Court enter judgment as follows:

1.    That judgment be entered in favor of Defendants;

2.    That Plaintiff and the purported plaintiff class take nothing from Defendants by their Supplemented Amended Complaint, and that the same be dismissed with prejudice;

175

3.        For costs, attorneys' fees, expert witness fees, and court hearing fees incurred herein; and

4.        For such other and further relief as this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Pursuant to Fed. R. Civ. P. 38(b), Defendants hereby demand a jury trial on all issues so triable in this action.

Dated: November 12, 2025

*s/ Sean M. Berkowitz*

Sean M. Berkowitz (*pro hac vice*)
Eric R. Swibel (*pro hac vice*)
Nicholas J. Siciliano (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Street, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Facsimile: 312.993.9767
Email: sean.berkowitz@lw.com
        eric.swibel@lw.com
        nicholas.siciliano@lw.com

Michele D. Johnson (*pro hac vice*)
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: 714.540.1235
Facsimile: 714.755.8290
Email: michele.johnson@lw.com

Michael P. Abate
Kaplan Johnson Abate & Bird LLP
710 W. Main St., 4th Floor
Louisville, KY 40202
Telephone: 502-540-8280
Email: mabate@kaplanjohnsonlaw.com

*Attorneys for Defendants Holley Inc., Tom Tomlinson, Dominic Bardos & Vinod Nimmagadda*